# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **MEDTECH PRODUCTS INC.,**<br>**90 North Broadway**<br>**Irvington, New York 10533**<br><br>   **Plaintiff,**<br><br>   **v.**<br><br>**DENTEK ORAL CARE, INC.,**<br>**307 Excellence Way**<br>**Maryville, Tennessee 37801**<br><br><br>**KELLY M. KAPLAN,**<br>**4 Woodmont Road**<br>**Upper Montclair, NJ 07043**<br><br><br>**RAY DUANE,**<br>**7741 Broadwing Drive**<br>**North Las Vegas, NV 89084-2432**<br><br><br>**C.D.S. ASSOCIATES, INC.,**<br>**3236 East Chandler Blvd.**<br>**Suite # 1041**<br>**Phoenix, AZ 85048**<br><br>   **Defendants.** | **07 CV 3302 (KMK) (LMS)**<br><br>**JURY DEMAND**<br><br>**SECOND AMENDED COMPLAINT**<br>**FOR INJUNCTIVE RELIEF AND**<br>**MONEY DAMAGES** |

For its Second Amended Complaint for Injunctive Relief and Money Damages against Defendants DENTEK ORAL CARE, INC. ("DenTek"), KELLY M. KAPLAN ("Kaplan"), RAY DUANE ("Duane"), and C.D.S. ASSOCIATES, INC. ("CDS") (collectively, the "Defendants"), Plaintiff MEDTECH PRODUCTS INC. ("Medtech") states and alleges as follows:

## INTRODUCTION

1.     Medtech markets, distributes, and sells an over-the-counter ("OTC") bruxism device or dental protector designed to protect the teeth and jaw from the detrimental effects of teeth grinding under Medtech's trademarks THE DOCTOR'S® NIGHTGUARD™.  Medtech markets, distributes, and sells dental protectors throughout the United States and in the New York area.

2.     The product at issue is Medtech's patented dental protector designed to protect the teeth and jaw from the detrimental effects of bruxism (teeth grinding), a product which is sold under the trademarks THE DOCTOR'S® NIGHTGUARD™, and that nationally generates more than ten million dollars in annual sales for Medtech.

3.     Medtech's THE DOCTOR'S® NIGHTGUARD™ brand dental protector is covered by valid patents issued by the U.S. Patent and Trademark Office.  THE DOCTOR'S® NIGHTGUARD™ is a high-quality product that has both distinct advantages to the consumer and a distinctive feel.  THE DOCTOR'S® NIGHTGUARD™ product therefore offers superior protection and comfort—characteristics that consumers of dental protectors have come to expect from Medtech's product.

4.     Medtech initially brought this action on April 24, 2007, alleging that DenTek had launched a coordinated campaign of unfair competition to deceptively lure consumers into purchasing DenTek's dental protector product in the mistaken belief that it is, or comes from, Medtech, the maker of the market-leading and well-advertised THE DOCTOR'S® NIGHTGUARD™ dental protectors.

5.     At the time the Complaint was filed, Medtech knew that (a) DenTek misappropriated the NIGHTGUARD™ trademark and trade dress; (b) DenTek misappropriated

the NIGHTGUARD™ patented invention; and (c) DenTek had copied Medtech's "At-Home Fitting Instructions" for the NIGHTGUARD™ dental protector.

6.      As of April 24, 2007, DenTek's dental protector product had been on the market since approximately mid-March 2007. The Complaint alleged an action for willful infringement of a duly and legally issued patent; unfair competition in violation of the Lanham Act by use of false designation of origin in interstate commerce and violation of common law trademark rights; violation of New York's Consumer Protection Act; and copyright infringement.

7.      Defendants Duane and Kaplan were the Vice President of Sales and Vice President of Marketing, respectfully, of Dental Concepts LLC ("Dental Concepts"), Medtech's predecessor in interest. Duane and Kaplan also both worked after the acquisition of Dental Concepts as consultants to Medtech.

8.      Duane, immediately thereafter, and Kaplan, soon thereafter, then assisted DenTek in bringing its infringing product to the market in seven months by divulging Medtech's confidential and proprietary information and material to DenTek. In or around late-May 2007, Medtech discovered that Kaplan was working for DenTek and immediately filed a Motion to Amend its Complaint to allege that the similarities of the THE DOCTOR'S® NIGHTGUARD™ dental protector and the DenTek dental protector products resulted from the misuse of Medtech's confidential and proprietary information given to DenTek. In late-June 2007, Medtech discovered that Duane was also associated with DenTek.

9.      As executives for Dental Concepts/Medtech, Duane and Kaplan had substantial access to confidential and proprietary information and material relating to THE DOCTOR'S® NIGHTGUARD™ product. Duane's and Kaplan's actions in divulging such information to DenTek violate their valid contracts with Medtech.

10.    DenTek's OTC bruxism device is made using the patented technology embodied in THE DOCTOR'S® NIGHTGUARD™ dental protector; it relies on a manufacturer identified and used by Dental Concepts; Dental Concepts' dental and other consultants assisted DenTek in bringing the product to market; Dental Concepts' legal and regulatory advisors were identified, approached and, in some cases, retained to assist DenTek in bringing the competitive product to market; DenTek is using Medtech's trademark to market the product; and DenTek is relying on Medtech's copyrighted material.

11.    All of DenTek's efforts to develop and market the DenTek OTC bruxism device are attributable to Duane's and Kaplan's previous association with Dental Concepts. Moreover, DenTek's one-size-fits-all product's marketplace entry was made possible by Duane's and Kaplan's knowledge of Medtech's proprietary strategy to maintain its three-size platform. DenTek used Medtech's inside information to take advantage of a market opportunity.

12.    The confidential and proprietary information of Duane and Kaplan, learned as a result of their association with Dental Concepts, permitted the DenTek product to truncate the normal product development timeline. By utilizing Medtech's confidential and proprietary information, DenTek was able to establish itself with a major retailer to ensure a quick competitive entry into the marketplace that would pay handsome long-term dividends.

## PARTIES, JURISDICTION & VENUE

13.    Medtech is a corporation organized and existing under the laws of Delaware, with its principal place of business at 90 North Broadway, Irvington, New York 10533.

14.    DenTek is a corporation organized and existing under the laws of Tennessee, with its principal place of business at 307 Excellence Way, Maryville, Tennessee 37801.

15.    Kaplan is an individual residing at 4 Woodmont Road, Upper Montclair, New Jersey 07043.

16.    Duane is an individual residing at 7741 Broadwing Drive, North Las Vegas, NV 89084-2432.

17.    CDS is a corporation organized and existing under the laws of the State of New Jersey, with a principal place of business at 3236 East Chandler Blvd., Suite # 1041, Phoenix, AZ 85048.

18.    This Complaint arises under 15 U.S.C. §§ 1116-18 and 1125(a); 17 U.S.C. § 101 et seq.; 35 U.S.C. § 271; and the laws of the State of New York.

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b), and 15 U.S.C. § 1121.    This Court also has subject matter jurisdiction over this claim under 28 U.S.C. § 1332(a)(1).    There is complete diversity of citizenship between the parties: Medtech is a Delaware corporation with a principal place of business in New York; DenTek is a Tennessee corporation with a principal place of business in Tennessee; Kaplan is an individual residing in New Jersey; Duane is an individual residing in Nevada; and CDS is a New Jersey corporation with a principal place of business in Nevada.    The damages alleged exceed the jurisdictional amount exclusive of costs and interest.    Moreover, this Court has supplemental and pendent jurisdiction under 28 U.S.C. § 1367 because the state and federal claims are derived from a common nucleus of operative facts and considerations of judicial economy dictate that the state and federal issues be consolidated for a single trial.

20.    DenTek, Kaplan, Duane and CDS are subject to personal jurisdiction in this Court.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Venue is also proper pursuant to 28 U.S.C. § 1391(c) because DenTek is subject to personal jurisdiction in this District under New York law.

## FACTS COMMON TO ALL COUNTS

22.    Medtech and its predecessor in interest, Dental Concepts LLC ("Dental Concepts"), pioneered sales of OTC dental protectors and have been selling THE DOCTOR'S® NIGHTGUARD™ brand dental protector for more than ten years.  Until recently, Medtech was the only lawful source of any such product in the over-the-counter market.

23.    Dental Concepts began using the NIGHTGUARD™ mark in association with the marketing, distribution, and sale of dental protectors on or about January 1997.  As such, Medtech (as the successor in interest to Dental Concepts) created the entire category of OTC dental bruxism protectors, revolutionizing at-home consumer care for bruxism or nighttime tooth grinding.

## I.    BACKGROUND OF DENTAL CONCEPTS LLC: BUILDING DENTAL CONCEPTS FOR SALE TO A STRATEGIC ACQUIRER.

24.    Mr. Michael Lesser ("Mr. Lesser"), along with Hamilton Investment Partners, LLC ("Hamilton"), a private investment firm that makes equity and subordinated debt investments in partnership with management teams, acquired Dental Concepts from Dr. Gene Wagner and Peter Strauss in 1999.  Mr. Lesser became the president and Chief Executive Officer ("CEO") of Dental Concepts.

25.    In 1999 Dental Concepts had a mix of oral care products designed and marketed to offer consumers at-home and affordable self care to maintain oral health.  The stable of products included ORAPIK® Interdental Pick, the largest product in terms of gross sales.  It also

included THE DOCTOR'S BRUSHPICKS®, THE DOCTOR'S® Traveler Plaque and Tartar Remover, THE DOCTOR'S® Tooth-Stain Remover/Polisher, and THE DOCTOR'S® NIGHTGUARD™.

26.    In 1998 and early 1999, the NIGHTGUARD™ brand dental protector only accounted for approximately 14% of the gross annual sales of Dental Concepts.    The NIGHTGUARD™ brand dental protector had a distribution consisting of less than a thousand CVS stores, less than a thousand Walgreen stores, and Giant stores, headquartered in Landover, Maryland.    Gross sales of the NIGHTGUARD™ brand dental protector for 1998 were $226,483 and for 1999 were $686,000.

A.    **MR. LESSER RECRUITS DUANE AND KAPLAN TO BE MEMBERS OF THE CORE MANAGEMENT TEAM OF DENTAL CONCEPTS.**

27.    In July 1999, Mr. Lesser began building his core management team.    One of Mr. Lesser's first steps as CEO was to solicit Duane to serve as Vice President of Sales of Dental Concepts.    Duane was an executive sales consultant who was a long-time friend of Mr. Lesser. More importantly, Duane was a "difference" maker that Mr. Lesser considered to be a critical hire for the management to grow Dental Concepts going forward.

28.    In the same way, Mr. Lesser recruited Kelly Kaplan, who was then working for a pharmaceutical company.    Mr. Lesser considered Kaplan to be an ideal hire.    She eventually became Vice President of Marketing.

29.    Neither Duane nor Kaplan had any business experience with bruxism devices prior to their employment with Dental Concepts.

30.    From the beginning, Mr. Lesser and the other members of the management team at Dental Concepts had a clearly defined strategic goal to which they focused their energies: rapidly build the value of the company and sell it to a strategic acquirer within three to five

years. Mr. Lesser clearly and consistently communicated this strategic goal to Duane and Kaplan, as well as the other members of senior management, throughout the time they were associated with, or employed by, Dental Concepts.

**B.    CDS AND RAY DUANE'S CONSULTING AGREEMENT, INCLUDING THE COVENANT NOT TO COMPETE AND NON-SOLICITATION AGREEMENT.**

31.    CDS's and Duane's Consulting Agreement was dated September 30, 1999. A copy of Duane's Consulting Agreement is attached hereto as **Exhibit A** (under seal).

32.    The Consulting Agreement provides that CDS's "services" shall be provided "through Duane, the President of [CDS]." (**Ex. A** at p. 1.) These "services" were to "direct and supervise the sales of [Dental Concepts'] products, subject to and under supervision of [Dental Concepts'] President and its Board of Managers." (*Id.* ¶ 2(a).) Duane was required "to devote his entire business time, energy and skill to such activities on behalf of [Dental Concepts]." (*Id.* at p. 1, ¶ 2(b).)

33.    To protect Dental Concepts' trade secrets and confidential information, and because Duane agreed that those interests were deserving of protection, Duane agreed that for a period of twenty-four (24) months after termination of his employment he would be bound by a non-compete agreement and non-solicitation agreement. (**Ex. A** at pp. 5-6, ¶ 7) (hereinafter the "Covenant Not to Compete and Non-Solicitation Agreement").

34.    The text of the Consulting Agreement's Covenant Not to Compete and Non-Solicitation Agreement provides:

> (b)    The Consultant [CDS] and Duane agree that, commencing as of the date hereof and during the period of the Consultant's engagement by the Company (whether under this Agreement or otherwise) and *for a period of twenty-four (24) months from and after the date of termination of such engagement*, if such engagement is terminated by the Consultant or is terminated by the Company for Just Cause, *neither the Consultant nor Duane shall*, without the prior written approval of the Board of Managers of the Company, *directly or indirectly*,

through any other person or entity, whether for itself or himself or as agent on behalf of any other person or entity, and whether as employee, consultant, principal, lender, partner, officer, director, stockholder or otherwise:

(i)    solicit, raid, entice or induce, or cause, any person who presently is, or any time during the Consultant's engagement by the Company shall be or shall have been, an employee of the Company or any of its Affiliates at any time during the twelve (12) months preceding such solicitation, raid, enticement, inducement or causation, to become employed or retained by any other person or entity; or

(ii)    initiate communications with, solicit, entice, or induce any client, customer or account who presently is, or at any time during the period of the Consultant's engagement by the Company shall be or shall have been, a client, customer, supplier or account of the Company or Dental Concepts, Inc. (the "Predecessor") at any time during the twenty-four (24) months preceding such communication, solicitation, enticement or inducement, to terminate or reduce any contractual, business or other relationship with the Company;

(iii) sell any product or provide any service which is competitive with any of the businesses, products or services of the Predecessor and/or the Company engaged in or marketed during the period of the Consultant's engagement with the Company or during the 24-month period prior thereto (the "Activities'), or promote, market, sell, become or acquire an interest in, or associate in a business relationship with, or aid or assist, any other person or other entity whatsoever who is engaged in any line of business competitive with any of the Activities;

(iv) become an employee, consultant, agent, principal, lender, partner, officer, director, stockholder of, or otherwise provide services to or on behalf of, any other person or entity who is engaged in any line of business competitive with any of the Activities engaged in during the period of the Consultant's engagement with the Company or during the 24-month period prior thereto, or

(v)    promote, market, assist or participate in the development, sale, marketing or licensing of any product or service competitive with any of those marketed by the Predecessor and/or the Company during the period of the Consultant's engagement with the Company or the 24-month period prior thereto; (**Ex. A** at pp. 5-6, ¶ 7(b) (emphasis added).)

35.    The Consulting Agreement clearly shows that CDS and Duane were aware of the Dental Concepts strategy to sell to a strategic buyer in three to five years. The Consulting Agreement provided a transaction incentive for a profitable sale that was tied to the selling price. Specifically, if the selling price of Dental Concepts to the strategic acquirer was between $15,000,000 and $24,999,999, Duane would receive $500,000; between $25,000,000 and

$29,999,999, Duane would receive $750,000; between $30,000,000 and $34,999,999, Duane would receive $1,000,000.

36.    Therefore, CDS and Duane had a direct economic incentive to sell Dental Concepts to a strategic buyer at the highest transaction price possible.

### C.    KAPLAN'S EMPLOYMENT AGREEMENT.

37.    Kaplan's Employment Agreement was effective as of September 13, 1999.  A copy of Kaplan's Employment Agreement is attached hereto as **Exhibit B** (under seal).

38.    Kaplan's Employment Agreement also clearly shows that Kaplan was aware of the Dental Concepts strategy to sell to a strategic buyer in three to five years.  The Employment Agreement provided that if Dental Concepts sold during her employment for between $15,000,000 and $24,999,999, Kaplan would receive $200,000; between $25,000,000 and $34,999,999, she would receive $300,000.  (**Ex. B** at Schedule B.)

39.    Therefore, Kaplan also had a direct economic incentive to sell Dental Concepts to a strategic buyer at the highest transaction price.

### D.    THE PROPRIETARY INFORMATION AND INVENTIONS AGREEMENTS WITH CDS, DUANE AND KAPLAN.

40.    As Executive Vice Presidents, Duane and Kaplan had substantial access to confidential and proprietary information regarding the NIGHTGUARD™ dental protector device, as well as the other products of Dental Concepts.

41.    This confidential and proprietary information was closely guarded and kept secret by Dental Concepts and related to, among other things, the design, manufacturing, marketing and sale of the NIGHTGUARD™ dental protector device.  Both Kaplan and Duane were involved extensively in every aspect of the NIGHTGUARD™ business including brand development and

marketing, and the formulation of strategic sales and market goals and initiatives. Throughout their employment, they were also intimately familiar with Dental Concepts' consultants, brokers, designers, suppliers, product formulation and production sources, and marketing strategies.

42.     In recognition of this fact, both Duane and Kaplan signed a Proprietary Information and Inventions Agreement and agreed that all such confidential information would be the property of Dental Concepts. This duty covered all confidential and proprietary information, whether already existing or "new contributions of value to the Company" made by them while they were associated with Dental Concepts. A copy of Duane's Proprietary Information and Inventions Agreement is attached hereto as **Exhibit C** (under seal). A copy of Kaplan's Proprietary Information and Inventions Agreement is attached hereto as **Exhibit D** (under seal).

43.     Confidentiality covenants are common in this industry and both Duane and Kaplan knew their meaning and import. Not surprisingly, DenTek itself requires its employees and consultants to execute confidentiality covenants because of the highly competitive nature of the industry and the danger of having trade secrets peddled to a competitor. On information and belief both Kaplan and Duane have executed confidentiality agreements prior to or concurrent with their engagements with DenTek.

44.     Both Duane's and Kaplan's Proprietary Information and Inventions Agreement stated:

> The Company possesses and will continue to possess information that has been acquired, created, discovered or developed, or has otherwise become known to the Company (including, without limitation, information acquired, created, discovered, developed or made knowm by or to [CDS, Duane or Kaplan] during the period of [CDS's, Duane's, or Kaplan's employment or] engagement by the Company), and/or in which property or other rights have been assigned or otherwise conveyed to the Company, which information has commercial value in the business in which the Company is engaged and none of which is in the public

domain except through the breach by [CDS, Duane or Kaplan] or anyone else of a confidentiality duty to the Company. All of the aforementioned information is hereinafter called "**Proprietary Information**." By way of illustration, but not limitation, Proprietary Information includes "**Developments**" (as herein defined), data, know-how, techniques, marketing plans and opportunities, cost and pricing data, strategies, forecasts and customer lists. "**Developments**" includes inventions, product designs, developments, improvements, discoveries, trade secrets, technologies, processes, research, methods, formulae, uses of any of the foregoing, computer software and programs (including source code and related documentation), test and/or experimental data and results, specifications, laboratory notebooks, drawings and technical information and materials. (**Exs. C and D** at p. 1, ¶ C (emphasis added).)

45.    The Proprietary Information and Inventions Agreement also makes clear that it covers all information gathered during CDS's, Duane's and Kaplan's employment or association with Dental Concepts:

All Proprietary Information shall be the sole property of the Company and its assigns, and the Company and its assigns shall be the sole owner of all patents, copyrights, trade secrets, trademarks, trade names and other rights in connection therewith. [CDS, Duane and Kaplan] hereby assign to the Company any and all rights which any of Obligors may have or acquire in any and all Proprietary Information. At all times, both during Consultant's engagement by the Company and after its termination, [CDS, Duane and Kaplan] will keep in confidence and trust all Proprietary Information, and will not use or disclose any Proprietary Information without the written consent of the Company, except as may be necessary in the ordinary course of performing Consultant's duties as a consultant to the Company. SINCE IT IS SOMETIMES DIFFICULT TO SEPARATE PROPRIETARY INFORMATION FROM THAT WHICH IS NOT, OBLIGORS WILL REGARD ALL INFORMATION GAINED OR DEVELOPED AS A RESULT OF ANY ASSOCIATION WITH THE COMPANY AS PROPRIETARY INFORMATION. (**Exs. C and D** at p. 2, ¶ D.1.)

46.    Further, CDS, Duane and Kaplan all "represent[ed] and warrant[ed]" that their "obligations under [the Proprietary Information and Inventions Agreement] and otherwise as an employee [or Consultant of] the Company and my performance under this Agreement or otherwise, do not and will not breach any agreement or obligation in favor of any person or entity whether to keep in confidence proprietary information acquired by me prior to

employment by the Company or any non-competition or similar agreement or otherwise. I have not entered into, and I agree that I shall not enter into, any agreement either written or oral in conflict herewith." (**Exs. C and D** at p. 3, ¶ 6.)

### E.  DENTAL CONCEPTS INCREASES SALES AND DISTRIBUTION OF THE DOCTOR'S® NIGHTGUARD™ THROUGH NATIONAL RADIO ADVERTISING.

47.     In January 1997, and for several years thereafter, the NIGHTGUARD™ dental protector was the only significant such product on the OTC market. Its quality and efficacy generated significant product recognition, and the NIGHTGUARD™ mark became firmly associated in the minds of the consuming public with the high-quality dental protector product marketed and sold by Medtech.

48.     In December 1999, Dental Concepts began to run its first national radio advertisement for THE DOCTOR'S® NIGHTGUARD™. At the three retailers who were stocking the product (CVS, Walgreens, and Giant stores in the Washington D.C. area), immediate results were demonstrated: distribution and sales of the NIGHTGUARD™ brand dental protector significantly increased.

49.     In the following years, advertising on national radio continued to generate consumer recognition of the NIGHTGUARD™ brand dental protector. Radio advertisements were featured on ABC, Westwood One, Premiere, Dial Global and Media America Radio Networks. These distinctive advertisements featured the sound of teeth grinding together and used the THE DOCTOR'S® NIGHTGUARD™ mark consistently.

50.     The radio advertisements saw substantial results. In 2000, gross sales of the NIGHTGUARD™ brand dental protector were around $2.3 million (up 248% from 1999). In 2001, after spending over $1 million on advertising, largely on national radio advertisements, sales increased over 100%. This trend continued with advertising expenditures in 2002 to 2004

totaling over $4.75 million and sales growing in that same time period by 13%. In 2005 and 2006, THE DOCTOR'S® NIGHTGUARD™ was "on air" for over 40 weeks in each year.

51.     Dental Concepts spent substantial amounts of time and money developing its contacts in the industry. For instance, Item New Product Development ("Item"), a design firm in Rhode Island, was identified and contacted to provide certain information about designing a dental accessory for Dental Concepts, and as such was identified as a quality design firm for dental accessories.

### F.     DENTAL CONCEPTS IMPROVES ITS EXISTING DENTAL PROTECTOR DESIGN AND OBTAINS THE '051 PATENT.

52.     Richard Riordan started working at Dental Concepts as the Vice President of Operations in October 2001. At that time, the NIGHTGUARD™ brand dental protector was manufactured by Stelray Plastic Products, Inc. ("Stelray"), an injection molder located in Connecticut.

53.     In 2001, the NIGHTGUARD™ brand dental protector was sold as a two-part device that utilized a separate base to hold the moldable material in place while the dental imprint was formed. The separate base was used during the self-fitting process of the consumer. Mr. Lesser was looking to improve the NIGHTGUARD™ brand dental protector.

54.     Dental Concepts discussed ways of improving the NIGHTGUARD™ brand dental protector with Stelray, and certain research and development was conducted with Stelray. After some research and development with Stelray, Dental Concepts retained Frank Lesniak, a chemist who was associated with Hayloft Enterprises, Inc., to design an improved dental protector. Mr. Riordan, as the head of operations for Dental Concepts, was to be the liaison between Lesser and Kaplan on the one hand, and Frank Lesniak, on the other. Dental Concepts

would dictate the criteria, performance and appearance of the product to Mr. Lesniak, who was responsible for the technical design of the product.

55.    Dental Concepts also sought out the assistance of several doctors from Tufts Dental School to assist Dental Concepts from a medical and dental perspective. These doctors, Dr. Noshir Mehta ("Dr. Mehta"), Dr. Gerard Kugel ("Dr. Kugel"), and Dr. Ayman Aboushala ("Dr. Aboushala"), were involved with looking at the prototypes, making design and fit suggestions, and generally collaborating with Dental Concepts as the "technical experts." (Collectively Dr. Mehta, Dr. Kugel and Dr. Aboushala are referred to as the "Tufts Doctors.")

56.    The development process with Mr. Lesniak took about a year, with several directional changes. The formulation for the new dental protector was developed and Mr. Lesniak turned over all patent rights to Dental Concepts. Because of the directional changes, this device was marketed first to dentists for a chair-side fitting under the Dental Concepts' BRUXGUARD™ brand.

57.    Dental Concepts engaged the law firm of Natter & Natter, a New York firm, to advise it regarding the intellectual property of Dental Concepts, including to act as trademark counsel and patent counsel responsible for filing and monitoring the patents of Dental Concepts.

58.    Medtech's new dental protector and technology was covered by U.S. Patent No. 6,830,051, issued by the U.S. Patent and Trademark Office on December 14, 2004 (the "'051 Patent"). A true and correct copy of the '051 Patent is attached hereto as **Exhibit E**.    The '051 Patent is valid and is subsisting in full force and effect, and Medtech is the current assignee of all rights under the '051 Patent.    Medtech has complied with all appropriate requirements to maintain the validity and effect of the '051 Patent.

59.    The United States Patent and Trademark Office has recognized the industry-leading developments in dental protector products by Medtech, as indicated by the following United States patents:

Hidalgo, et al, U.S. Pat. No. D504,744 (issued May 3, 2005), "Bruxism Guard"

Wagner, U.S. Pat. No. D382,965 (issued Aug. 26, 1997), "Mouthguard"

Wagner, U.S. Pat. No. 5,566,684 (issued Oct. 22, 1996), "Custom Fit Mouthguard"

60.    The grant via the United States Patent and Trademark Office of the '051 Patent is *prima facie* evidence of the validity of such patent.  The patent grants Medtech the right to exclude others from making, using, selling or offering to sell the patented invention in commerce in the United States.

61.    DenTek, Duane, and Kaplan are estopped by common law and assignor estoppel from denying the validity of the '051 Patent.

62.    The '051 Patent is constructive notice to DenTek and to all others of Medtech's ownership of the patented invention.  Moreover, Medtech's NIGHTGUARD™ dental protector products have long been and are currently marked with the applicable U.S. Patent Numbers.

63.    Dental Concepts spent substantial time and money in efforts to obtain FDA approval to sell its bruxism devices in the over-the-counter market.  In that regard, Dental Concepts first engaged the law firm of Hyman, Phelps & McNamara, P.C. ("Hyman Phelps") and, subsequently, Hogan & Hartson with respect to FDA regulatory issues.  Hogan & Hartson prepared Dental Concepts' OTC 510(k) submission, but only after researching and submitting under other theories, notably a petition under section 513(g) of the Act.  Thus, the FDA approval process was long, involved, and expensive.  Moreover, in connection with that approval process, certain confidential submissions were made to the FDA regarding various aspects of the product.

64.     In her executive position with Dental Concepts, Kaplan was the primary liaison between Dental Concepts and its intellectual property counsel (Natter & Natter) and regulatory counsel (Hyman Phelps, and Hogan & Hartson) and, as such, was privy to highly sensitive and confidential legal advice from Dental Concepts' trusted intellectual property and regulatory counsel.

### G.     DENTAL CONCEPTS IS SOLD TO PRESTIGE FOR $31 MILLION.

65.     Throughout their time at Dental Concepts, both Duane and Kaplan knew that the ultimate goal was to sell the Company to a potential acquirer and, in or around late-2004, that process began.  At the initiation of Hamilton Partners, Dental Concepts started looking for bidders for the Company.

66.     Duane and Kaplan were heavily involved in pitching Dental Concepts to potential acquirers.  Both participated in management meetings with potential acquirers and both were responsible for explaining certain aspects of the company.  As Duane and Kaplan both had transaction incentives built into the Consulting Agreement and Employment Agreement, both had an incentive for Dental Concepts to be sold at the highest possible price to any strategic acquirer.

67.     Eventually, Dental Concepts entered into discussions with Prestige Brands Holdings, Inc. ("Prestige") (which would eventually integrate Dental Concepts into Medtech).

68.     As a result of these acquisition discussions, Prestige was provided with information regarding Dental Concepts to evaluate the company in terms of a potential transaction. In order to receive this confidential company information to evaluate the financial, market, and other strategic positioning of Dental Concepts, Prestige was required to execute a

Confidentiality Agreement on June 9, 2005. A copy of the Prestige Confidentiality Agreement is attached as **Exhibit F** (under seal).

69.     The Prestige Confidentiality Agreement contained the following provision restricting any further use and disclosure of confidential information obtained as part of the transaction:

> As a condition of being furnished such [Company] information, [Prestige] hereby agree[s] to treat any information concerning the Company (whether oral or written and whether prepared by or on behalf of the Company) which is furnished to [Prestige] or [its] Representatives (as defined below) by or on behalf of the Company (herein collectively called referred to as the "Evaluation Material") in accordance with the provisions of this letter, and to take and refrain from taking certain other actions herein set forth. The term "Evaluation Material" shall also include notes, analyses, compilations or other documents or material prepared by [Prestige] or [its] Representatives which contain, reflect or are based on information furnished to [Prestige] or [its] Representatives pursuant hereto. (**Ex. F** at p. 1.)

70.     From June through November 2005, both Duane and Kaplan participated in "management presentations" presenting and pitching a Dental Concepts acquisition to Prestige. The management presentations indicated that Dental Concepts was in a strong market position, and that any competitive entry into the dental protector market was subject to "Significant barriers" because of the design and utility patents, including the '051 Patent.

71.     Prestige ultimately acquired Dental Concepts in November 2005 for a transaction price of around $31 million. Certain post-closing purchase price adjustments (largely due to issues with the balance sheet) were made to the escrowed funds for the transaction that negatively affected Duane's transaction incentive bonus in the amount of $250,000.

**H.    DUANE AND KAPLAN REAFFIRM THEIR CONFIDENTIALITY OBLIGATIONS AND EXECUTE A GENERAL RELEASE OF DENTAL CONCEPTS.**

72.    As part of that acquisition, both Duane and Kaplan executed a General Release with Dental Concepts under which they received the transaction incentive dictated by the Consulting Agreement and Employment Agreement, as well as other benefits. A true and correct copy of Duane's General Release is attached hereto as **Exhibit G** (under seal). A true and correct copy of Kaplan's General Release is attached hereto as **Exhibit H** (under seal). (Collectively, Exhibits G and H are referred to as the "General Releases.")

73.    The General Releases specified that they were executed "[i]n connection with the acquisition of [Dental Concepts] by [Prestige]" and that Duane and Kaplan would each receive a severance and contractual payout. "In exchange for the [that payout], [Duane and Kaplan intend to] fully and unconditionally release any and all claims" against Dental Concepts." (**Exs. G and H** at p. 1.)

74.    Duane was paid $750,000 (which was four times his annual salary) at the time that he executed the General Release and agreed to the Confidentiality Clause. (**Ex. G** at p. 1, ¶ 1.)

75.    Kaplan was paid $300,000 (which was two times her annual salary) at the time that she executed the General Release and agreed to the Confidentiality Clause. (**Ex. H** at p. 1, ¶ 1.)

76.    Dental Concepts made clear, again, in the General Releases that it valued its confidential and proprietary information. The General Releases are further evidence of the efforts that Dental Concepts made to keep that information confidential.

77.     As part of the Duane General Release with Dental Concepts, Duane agreed to keep secret the confidential and proprietary information he learned while at Dental Concepts. The Duane General Release contained the following "Confidential Information" clause:

Confidential Information. Employee [Duane] agrees that it will not use, divulge, sell or deliver to or for any other person, firm or corporation other than the Company [Dental Concepts] and its respective subsidiaries, affiliates, successors and assigns any confidential information and material (statistical or otherwise) relating to the Company's business, including, but not limited to, confidential information and material concerning manufacturing, distribution, marketing, sales, advertising, customers, employees, suppliers, licensors, financial information, methods and processes incident to the business, and any other secret or confidential information. On or before the Effective Date, Employee will surrender to the Company all lists, books and records of or in connection with the Company's business and all other property belonging to the Company. (**Ex. G** at p. 3, ¶ 7.)

78.     CDS was not a party to the Release.

79.     As part of the Kaplan General Release with Dental Concepts, Kaplan likewise agreed to keep secret the confidential and proprietary information she learned while at Dental Concepts.     The Kaplan General Release contained the following "Confidential Information" clause, with Kaplan being the "Employee" and Dental Concepts the "Company":

Confidential Information. Employee agrees that it will not use, divulge, sell or deliver to or for any other person, firm or corporation other than the Company and its respective subsidiaries, affiliates, successors and assigns any confidential information and material (statistical or otherwise) relating to the Company's business, including, but not limited to, confidential information and material concerning manufacturing, distribution, marketing, sales, advertising, customers, employees, suppliers, licensors, financial information, methods and processes incident to the business, and any other secret or confidential information. On or before the Effective Date, Employee will surrender to the Company all lists, books and records of or in connection with the Company's business and all other property belonging to the Company. (**Ex. H** at p. 3, ¶ 7.)

80.     As the successor in interest to Dental Concepts, Medtech can enforce the terms of the General Releases.     As the General Release was executed "[i]n connection with the

acquisition" of Dental Concepts by Prestige, the possibility of actions by Medtech to enforce the terms of the General Releases were clearly contemplated by Duane and Kaplan at the time the General Release was executed.

81.     The General Releases also provide that "the prevailing party" in any litigation to enforce the agreement "shall be entitled to recover from the opposite party all reasonable attorneys' fees and costs incurred in connection with such action." (**Exs. G and H** at p. 3, ¶ 6.)

## II.     MEDTECH HAS CONTINUED TO MARKET THE NIGHTGUARD™ BRAND DENTAL PROTECTOR SINCE ACQUIRING DENTAL CONCEPTS.

82.     From November 2005 to the present, Medtech has continued where Dental Concepts left off and has spent a considerable amount of time, money, and labor in marketing and promoting dental protector products under the NIGHTGUARD™ mark through extensive radio and television advertising campaigns. (Hereinafter, Dental Concepts and Medtech are collectively referred to as "Medtech.")

83.     Medtech made a shift to marketing the bruxism device previously sold professionally as BRUXGUARD®, which utilizes the technology of the '051 patent, as a new and improved NIGHTGUARD™ brand OTC bruxism device. This shift was accompanied by a packaging redesign and substantial marketing efforts, which included national television advertising. These business plans were confidential but were known to Kaplan and Duane in their transitional roles.

84.     On December 22, 2005, Hogan & Hartson submitted a premarket notification under Section 510(k) of the Federal Food, Drug, and Cosmetic Act on behalf of Medtech. Hogan & Hartson noted in the cover letter correspondence:

> Dental Concepts considers its intent to market [THE DOCTOR'S® NIGHTGUARD™] as confidential commercial information. The company has not disclosed its intent to market this device to anyone except its employees, others with a financial interest in the company, its advertising and law firms, and

its consultants. The company, therefore requests that FDA not disclose the existence of this application until such time as final action on the submission is taken.

In addition, some of the material in this application may be trade secret or confidential commercial or financial information within the meaning of 21 C.F.R. § 20.61, and therefore, not disclosable under the Freedom of Information Act even after the existence of this application becomes public.

85.    Medtech obtained FDA approval on March 3, 2006 to sell the NIGHTGUARD™ dental protector OTC. Prior to that date, sales were made OTC with the knowledge of the FDA, but without formal approval.

86.    Medtech originated the market by becoming the first to obtain formal FDA approval for an OTC dental protective device for bruxism or night time tooth grinding on March 3, 2006. A true and correct copy of the summary basis of approval is attached as **Exhibit I**. All previous bruxism devices had been limited to 'prescription only' sales by the FDA approval process.

## A.    CDS, DUANE AND KAPLAN CONTINUE THEIR CONSULTING AND EMPLOYMENT AT PRESTIGE THROUGH FEBRUARY 2006.

87.    CDS and Duane continued consulting for Medtech through and including February 2006. Duane stayed on board until Dental Concepts was completely transitioned into Medtech.

88.    CDS and Duane declined continued employment in a sales position that was offered by Prestige.

89.    Kaplan continued her employment with Medtech/Dental Concepts through and including February 2006. Kaplan assisted with the integration of Dental Concepts into the Prestige systems and, as such, was privy to the continued strategic thinking of Medtech. For instance, in December 2005, Kaplan was included in high-level discussions within Medtech

regarding the future considerations and strategy of Medtech for THE DOCTOR'S®
NIGHTGUARD™.

90.     In the context of her continued work with Medtech, she specifically provided
verbal assurances to Prestige that she would keep information she learned during that time period
in the strictest of confidences.

91.     Kaplan declined a position that was offered by Prestige.  When Kaplan left in
February 2006, she had indicated that she was going to work for StaiNo, LLC of Long Eddy,
New York.  StaiNo manufactures certain oral care products unrelated to Bruxism devices.

92.     Under the Consulting Agreement, the provisions of the Covenant Not to Compete
and Non-Solicitation Agreement (Section 7), as well as the Proprietary Information and
Inventions Agreement, survive "the termination or expiration of this [Consulting] Agreement
and/or the Term, irrespective of the reason therefore, including without limitation ***under
circumstances in which the Consultant or Duane continues thereafter to be engaged by the
Company*.*" **Ex. A** at p. 6, ¶ 7(c) (emphasis added).

93.     The Consulting Agreement's Covenant Not to Compete and Non-Solicitation
Agreement survived the acquisition and were applicable to any consulting work of Duane and
CDS after the acquisition.  *See* **Ex. A** ¶ 7(c).

**B.     MEDTECH CONTINUES TO INVEST MILLIONS OF DOLLARS ENHANCING THE
        PROMINENCE OF THE NIGHTGUARD™ MARK.**

94.     At all times, Medtech's THE DOCTOR'S® NIGHTGUARD™ packaging has
consistently and prominently featured the NIGHTGUARD™ mark on the front of the packaging,
as pictured below (hereinafter referred to as Medtech's NIGHTGUARD™ "Trade Dress"):



95.    Since Fall 2006, Medtech's packaging has prominently displayed the NIGHTGUARD™ on the front cover, with "NIGHT" in bold letters and "GUARD" set off in a contrasting font.  The package lists on its side panel certain warnings and instructions.  The package also prominently states on the back, in contrasting red and purple, the following featured phrase:

*Designed by a dentist*
*for protection and comfort.*
*Custom fit by you*
*for convenience.*

The package layout of Medtech's NIGHTGUARD™ dental protector is readily recognizable to consumers for dental protector devices. A true and correct copy of the packaging for Medtech's NIGHTGUARD™ dental protector is attached hereto as **Exhibit J**.

## C.    THE SUCCESS OF THE NIGHTGUARD™ MARK

96.    As a direct result of its marketing and promotional activities, Medtech has created a distinctive designation to the public of Medtech as the source of a high-quality dental protector and related products under the NIGHTGUARD™ mark and Trade Dress. (Two different drug chains initially attempted to trade on this recognition by adopting similar purple, red and white Trade Dress. Both chains have ceased that practice in response to enforcement actions by Medtech.)

97.    Through its extensive advertising campaign and sales of high-quality dental protectors to the public under the NIGHTGUARD™ brand name, Medtech has successfully established the NIGHTGUARD™ mark as a widely-recognized symbol of high-quality dental protectors, and has accumulated incalculable goodwill associated with Medtech's NIGHTGUARD™ mark and Trade Dress.

98.    Medtech sells the NIGHTGUARD™ dental protector with an "At-Home Fitting Instructions" insert that describes the dental protector product and how the customer should use the product. A true and correct copy of the "At-Home Fitting Instructions" insert is attached as **Exhibit K** hereto.

99.    Since use of the NIGHTGUARD™ mark began, Medtech has used the NIGHTGUARD™ mark to market its dental protector through advertisements, on nationally syndicated radio networks and shows, and on cable television. The advertisements display the NIGHTGUARD™ mark.

100.    In the past three years alone, Medtech has spent approximately $9,000,000 in advertising and promotion to build the NIGHTGUARD™ brand name. Those efforts include a

recent cable television advertising campaign. As a result of that advertising campaign, growth in sales increased dramatically.

101.    The NIGHTGUARD™ dental protector product has enjoyed a consistently high level of commercial success. Over the past six years, Medtech has sold more than $43,000,000 of its NIGHTGUARD™ dental protector products. Notwithstanding the recent addition of numerous competitors in this category, the NIGHTGUARD™ dental protector product remains the recognized category leader.

102.    By virtue of this success, the NIGHTGUARD™ trademark has become associated exclusively with Medtech. Medtech presently owns a pending federal trademark application for its NIGHTGUARD™ mark (NIGHTGUARD, Ser. No. 77/056,556, United States Patent and Trademark Office).

103.    Medtech owns a federal copyright registration for its packaging and "At-Home Fitting Instructions" insert (**Exhibit K**), as reflected in U.S. Reg. No. TX 6-536-309, issued by the U.S. Register of Copyrights on April 23, 2007 (the "Copyright Registration"). A true and correct copy of the Copyright Registration is attached hereto as **Exhibit L**. The Copyright Registration is valid and is subsisting in full force and effect.

104.    Medtech's Copyright Registration is *prima facie* evidence of the validity of such registration, of Medtech's ownership of the copyright, and of Medtech's exclusive right to use the copyrighted material. Moreover, Medtech's packaging and "At-Home Fitting Instructions" carry a copyright notice that is actual notice to DenTek and to all others of Medtech's ownership of the copyrighted material.

**D.    MEDTECH CONTINUED TO MEET AND CONFER ABOUT ITS STRATEGY AND PRODUCTS WITH THE TUFTS DOCTORS THROUGH 2006.**

105.    Medtech continued throughout 2006 to meet and confer with the Tufts Doctors regarding its strategy to market the NIGHTGUARD™ brand dental protectors.

106.    In June 2006, Medtech met with the Tufts Doctors to share their strategic plan for THE DOCTOR'S® brand in a confidential meeting.  The Tufts Doctors were also informed of certain meetings with key accounts while a formal engagement agreement was in the process of being finalized.

107.    These negotiations with the Tufts Doctors were to finalize a formal arrangement memorializing the informal consulting arrangement that had existed for years with Dental Concepts.  The negotiations continued from around late-June 2006 through November 2006.

**III.    DENTEK, WITH THE ASSISTANCE OF DUANE AND KAPLAN, USED MEDTECH'S CONFIDENTIAL INFORMATION TO DEVELOP ITS COMPETING DENTAL PROTECTOR.**

108.    DenTek is currently marketing and selling a dental protector in interstate commerce for bruxism or nighttime tooth grinding in the over-the-counter market which improperly utilizes Medtech's NIGHTGUARD™ mark.  DenTek began selling its product in or around March 2007.

**A.    DENTEK RECRUITED RAY DUANE IN OR BEFORE JULY 2006 TO CREATE A COMPETING DENTAL PROTECTOR FOR DENTEK.**

109.    Only after the longstanding success of the NIGHTGUARD™ devices in the marketplace did DenTek begin to adopt Medtech's NIGHTGUARD™ trademark, patented invention, and copyrighted material in a deliberate and transparent attempt to wrongfully profit from Medtech's investments in the intellectual property protecting its NIGHTGUARD™ dental protector.

110.   In contrast to the years of hard work and advertising expenses expended by Medtech, DenTek was able to quickly bring a dental protector to market, and capture a large percentage of the market share in a mere matter of months by using Medtech's confidential and proprietary information, as well as its trademark, copyrighted material, and patented product.

111.   In July 2006, only four months after Duane's engagement with Medtech had ended, DenTek contacted Duane and asked if he would be interested in participating in a new project with DenTek.  DenTek is engaged in distributing a line of dental accessories that are competitive with Dental Concepts.

112.   Under the Consulting Agreement's Covenant Not to Compete and Non-Solicitation Agreement, CDS and Duane agreed that "*for a period of twenty-four (24) months from and after the date of termination of such engagement* [March 1, 2006 through February 29, 2008] . . . *neither the Consultant nor Duane shall . . . directly or indirectly . . .* become an employee, consultant . . . or otherwise provide services to or on behalf of, any other person or entity who is engaged in any line of business competitive with any of the Activities engaged in during the period of the Consultant's engagement with the Company or during the 24-month period prior thereto." (**Ex. A** at pp. 4-5, ¶ 7(b) (emphasis added).)

113.   Despite the fact that both CDS and Duane were bound by the terms of the Consulting Agreement's Covenant Not to Compete and Non-Solicitation Agreement, when asked whether he was subject to any non-competition covenants with Dental Concepts or Medtech, Duane responded that he was not.  DenTek did not ask to see any employment agreements with Dental Concepts.

114.   Sometime after the initial phone conversation, most likely in July 2006, Duane agreed to meet with David Fox (President of DenTek) in Philadelphia, Pennsylvania to discuss

the nature of the assignment.  Allegedly at that meeting, Fox told Duane that the project was bringing an OTC bruxism device to the market that would compete with THE DOCTOR'S® NIGHTGUARD™.

115.    Under the Consulting Agreement's Covenant Not to Compete and Non-Solicitation Agreement, CDS and Duane agreed that "*for a period of twenty-four (24) months from and after the date of termination of such engagement* [March 1, 2006 through February 29, 2008] . . . *neither the Consultant nor Duane shall . . . directly or indirectly . .* promote, market, assist or *participate in the development, sale, marketing or licensing of any product* or service competitive with any of those marketed by the Predecessor and/or the Company during the period of the Consultant's engagement with the Company or the 24-month period prior thereto." (**Ex. A** at pp. 4-5, ¶ 7(b) (emphasis added).)

116.    Despite the fact that he was prohibited from doing so, Duane allegedly failed to inform Fox that he could not work on the project, given that he was bound by the terms of a non-competition covenant.  Instead, Duane agreed to act as a consultant to DenTek.

**B.    DUANE SOLICITS FURTHER CONFIDENTIAL AND PROPRIETARY INFORMATION FROM EXISTING PRESTIGE EMPLOYEES.**

117.    On August 21, 2006, Riordan submitted his resignation to Medtech and informed Medtech that he had taken a position with a company that did not compete with Medtech in the oral care market.

118.    By August 24, 2006, Duane already knew that Riordan had resigned from Medtech as Duane and Riordan had a close and personal friendship.  After meeting with DenTek and formulating DenTek's strategy, Duane contacted Richard Riordan, who was still working for Medtech and privy to confidential and proprietary information, and requested specific information relating to Medtech's strategy for its Bruxguard® products and other information to

assist in his efforts with developing DenTek's competitive dental protector. In exchange, Duane offered Riordan access to DenTek's Chief Executive Officer, John Jansheski.

119.    Duane's inquiries to Riordan were intended to gather Medtech's inside confidential and proprietary information and were designed to solicit confidential and proprietary information regarding Medtech's future strategy and product line development.

### C.    CDS AND DUANE FINALIZE A CONSULTING AGREEMENT WITH DENTEK.

120.    On or about August 25, 2006, DenTek and Duane finalized the terms of their arrangement and signed an agreement pursuant to which Duane agreed to assist DenTek with the development of an OTC bruxism device to compete with THE DOCTOR'S® NIGHTGUARD™. A copy of the CDS/DenTek Agreement is attached as **Exhibit M** (under seal).

121.    Around the same time as DenTek and Duane finalized their August 25, 2006 agreement to create a new bruxism device, Duane set out the goals for the consulting agreement. A copy of the Objectives Sheet is attached as **Exhibit N** (under seal).

122.    At the time that the engagement was agreed upon, DenTek was privy to information that the world's largest retailer was interested in a one-size fits all alternative to the existing small, medium and large configuration.

123.    Duane and/or Kaplan misappropriated Medtech's confidential and proprietary strategic information, namely its decision to maintain the three-size platform despite retailer pressure for a one-sku product (a one-size-fits-all device). Duane and Kaplan possessed Medtech's strategic information because of their association with Medtech and because of Duane's efforts in misappropriating this competitive information from Riordan.

124.    Therefore, Duane, Kaplan and DenTek knew that a window of opportunity existed to enter into the market with a one-size-fits-all device and gain shelf space in the largest retailer with minimal or no risk.  The danger of expending valuable development expenses and, thereby, being beaten to the market by Medtech was nonexistent given Medtech's strategic decision—known only to insiders—to maintain and emphasize the three-size product platform.

125.    DenTek and Duane intentionally kept their association and development of the dental protector a secret from the trade generally, and from Medtech specifically.

126.    Medtech did not know of Duane's association with DenTek until late-June 2007, after this lawsuit had been filed; his pervasive involvement in creating the DenTek dental protector was not known until August 3, 2007, when he was deposed in the pending case against DenTek.

D.    **DENTEK AND DUANE SYSTEMATICALLY CALL ON DENTAL CONCEPTS' SUPPLIERS, CONSULTANTS AND FORMER EMPLOYEES TO DEVELOP THEIR COMPETING PRODUCT.**

127.    DenTek had no prior experience in the dental protector market.

128.    By virtue of Duane and Kaplan's inside information, DenTek was able to virtually eliminate the development time normally associated with entering into a new line of products.

129.    All evaluation and vetting processes were truncated based on Duane and Kaplan's inside information about suppliers, designers, consultants, and legal advisors—all to the specific disadvantage of Medtech.  Such information was critical, because of a limited window of opportunity with the largest retailer that made time of the essence.

130.    After their engagement, and in accordance with their plan, DenTek, Duane, and Kaplan systematically called upon and recruited various persons and companies known to Duane

and Kaplan only because they had the confidential and proprietary information that they had

from their time at Dental Concepts, and because of Duane's clandestine activities. In this regard:

> a.     Shortly after he began working for DenTek, Duane called Item, who was known to him because of his association with Dental Concepts;

> b.     Duane contacted Stelray and Proman Products, who were identified to Duane by Riordan, to interview them as potential molders and to help him develop a dental protector for DenTek.

> c.     Duane or DenTek, at Duane's direction, contacted Natter & Natter, Hyman, Phelps, and Hogan & Hartson and asked those firms—that were in possession of confidential and proprietary information from Dental Concepts—to represent DenTek in connection with the Product to compete with THE DOCTORS® NIGHTGUARD™.

> d.     In or around late-August or early-September, Kaplan and Duane personally called and solicited the Tufts Doctors to work for DenTek and provide information and feedback on the one-size-fits-all dental protector that DenTek was developing.

> e.     Duane recruited Kaplan, the former Vice President of Marketing at Dental Concepts, to work for DenTek in developing its one-size-fits-all dental protector product.

131.    The Consulting Agreement's Covenant Not to Compete and Non-Solicitation

Agreement prohibited CDS and Duane from "initiat[ing] communications with, solicit[ing],

entic[ing], or induc[ing] any. . . account who presently is, or at any time during the period of the

Consultant's engagement by the Company shall be or shall have been, a client, customer,

**supplier or account** of the Company or Dental Concepts, Inc. (the "Predecessor") at any time

during the twenty-four (24) months preceding such communication, solicitation, enticement or

inducement, to terminate or reduce any contractual, business or other relationship with the

Company." (**Ex. A** at pp. 4-5, ¶ 7(b) (emphasis added).)

132.    Duane personally (or someone at DenTek on Duane's behalf) called and solicited

Riordan to be "an operations guy to put into DenTek's New York office" sometime shortly after

Riordan left Medtech. This offer of employment was a follow-up to the implied *quid pro quo* for

Riordan's sharing confidential and proprietary information with Duane prior to Riordan's resignation.

133.    In or around mid-October, Duane personally (as well as someone at DenTek on Duane's behalf) called and solicited Kaplan to work as a "project leader" on the development of DenTek's dental protector. Duane personally was responsible for recruiting Kaplan to DenTek: (a) Duane suggested Kaplan to DenTek; (b) Duane informed DenTek of the ways to best induce Kaplan to work for DenTek; and (c) Duane called Kaplan and personally recommended DenTek to her.

134.    Duane also agreed to modify his August 25, 2006 Agreement with DenTek specifically in order to make room for Kaplan. A true and correct copy of the Addendum is attached hereto as **Exhibit O** (under seal).

135.    Although ostensibly unrelated, Duane subsequently entered into a second "consulting agreement" under which, upon information and belief, he continues to be compensated.

136.    The Consulting Agreement's Covenant Not to Compete and Non-Solicitation Agreement prohibited CDS and Duane from "solicit[ing], raid[ing], entic[ing] or induc[ing], or caus[ing], any person who presently is, or any time during the Consultant's engagement by the Company shall be or shall have been, an employee of the Company or any of its Affiliates at any time during the twelve (12) months preceding such solicitation, raid, enticement, inducement or causation, to become employed or retained by any other person or entity." (**Ex. A** at pp. 4-5, ¶ 7(b) (emphasis added).)

### E.    DENTEK, DUANE AND KAPLAN PROCURE A RELATIONSHIP WITH ITEM AND STELRAY.

137.    Item was hired to design the dental protector for DenTek.

138.    Stelray was hired to work as a manufacturer for DenTek.

139.    Upon information and belief, Duane and Kaplan also engaged AGI/Klearfold, the packager used by Dental Concepts for another dental protector device.

## F.    DENTEK, DUANE AND KAPLAN USED MEDTECH'S CONFIDENTIAL INFORMATION TO PROCURE A RELATIONSHIP WITH THE TUFTS DOCTORS.

140.    The fact that the Tufts Doctors were working with Dental Concepts and Medtech was confidential information.  As a result of Duane and Kaplan's efforts, DenTek knew of this confidential relationship, including the terms of the relationship and the status of negotiations, and used this in competition with Medtech to compete for a consulting contract with the Tufts Doctors.

141.    In early-September 2006, Kaplan and Duane made contact with Dr. Mehta and Dr. Aboushala.  While Medtech was not informed that the Tufts Doctors were negotiating with DenTek, DenTek was informed that the Tufts Doctors were negotiating with Medtech very early in the process.

142.    On September 5, 2006, Kaplan e-mailed Dr. Mehta and asked critical strategic questions regarding Medtech:

> Dear Nosh:
>
> How are you?  Hope you and your family are well.  It has been about 6 months and I wanted to check in, say hi and be sure that you and your family are well.
>
> I am doing fine.  All is well with my family and business.  I hope all is well at Tufts.  Are you doing anything really fun (like it was when we were working together)?  Are you doing any work with Prestige?  The Doctor's NightGuard or BruxGuard?  . . . .
>
> I would love you hear back from you when you have a moment.

(**Exhibit P** (under seal).)

143.    On September 7, 2006, Dr. Mehta e-mailed "Yes we are in discussion with Prestige . . . for the Bruxguard." Ms. Kaplan wrote in reply:

> Everything is well here. I know Ray [Duane] is reaching out to you and I would listen to what he has to say. I hope to get to Boston and will let you know when.

Then, after an additional exchange, she states: "I hope you have the opportunity to meet with Ray and discuss his potential opportunity." (**Exhibit Q** (under seal).)

144.    Duane subsequently used this initial contact by Kaplan to reach out to the Tufts Doctors and, ultimately, recruit them to work for DenTek. On or around October 12, 2006, DenTek and Dr. Mehta from Tufts University executed a Confidentiality and Non-Disclosure Agreement. The Confidentiality Agreement stated:

> Disclosure of Information. DenTek may from time to time disclose and provide copies of certain Confidential Information to Dental Consultant [Dr. Mehta] so Dental Consultant may conduct the Purpose [design and development of packaging concepts].

> Confidential Nature.    Dental Consultant recognizes and acknowledges the confidential nature and competitive value of the Confidential Information and that damage could result to DenTek if any of the Confidential Information is disclosed to any third party. Each party acknowledges that the receiving party has not received and will not receive any right or claim with respect to any such Confidential Information.

> Use of Confidential Information. Dental Consultant shall use the Confidential Information solely for the purpose of conducting the Purpose, and such Confidential Information shall not be used in any way detrimental to DenTek. Dental Consultant shall safeguard the Confidential Information and not allow it to be viewed except by itself and its proper Representatives. . . .

145.    Upon information and belief, the other Tufts Doctors executed a similar Confidentiality Agreement with DenTek after meeting with DenTek in Boston where DenTek showed the Tufts Doctors a product that had already been designed.

146.    Despite the fact that the Tufts Doctors had been engaged by DenTek, they continued to negotiate with Medtech and received confidential information about Medtech's

strategy with the NIGHTGUARD™ brand dental protector and with certain of Medtech's customers. On October 14, 2006, for instance, Medtech discussed its ongoing strategy with the NIGHTGUARD™ brand dental protector and dealings with its customers.

147.   In November 2006, DenTek and the Tufts Doctors discussed a Letter of Agreement and Consulting Agreement which contained an exclusivity provision prohibiting any work for Medtech. That agreement also included a Confidentiality clause stating:

> Confidential Information. As a consultant to DenTek, Consultant has access to Confidential Information (as defined herein). Consultant agrees to maintain the confidentiality of all Confidential Information throughout the term of this Agreement and for a period of three (3) years after the termination of this Agreement. For purposes of this section, the term "Confidential Information" means data and information (in whatever form) relating to any aspect of the business of DenTek (or its subsidiaries and/or affiliates) which is or has been disclosed to Consultant or of which Consultant becomes aware. . . . All Confidential Information is and shall remain solely the property of DenTek or its subsidiaries and/or affiliates.

148.   The Tufts Doctors and DenTek never agreed on the terms of a final written contract because DenTek insisted upon including an exclusivity provision in the contract. However, the Tufts Doctors were engaged and remunerated by DenTek for performing various consulting services for the development of DenTek's product. This had the intentional effect of creating a conflict so that the Tufts Doctors could no longer work for Medtech.

149.   Even after the exchange of the agreement with DenTek, the Tufts Doctors continued to communicate with Medtech and inquire about the "final agreement" and "expedit[ing] the process." In fact, it was not until December 12, 2006 that Dr. Mehta communicated finally that he had "discuss[ed] with the other company that we would work with them on a OTC bruxism guard that verbally we had agreed to do this only with their company."

150.    DenTek never revealed to the Tufts Doctors the goals of DenTek's project.  If the goals reflected in Exhibit N had been conveyed to the Tufts Doctors, DenTek would have been unsuccessful in procuring any consulting relationship with the Tufts Doctors.

### G.    DENTEK, DUANE AND KAPLAN HIRED MEDTECH'S LEGAL COUNSEL.

151.    Hogan & Hartson was hired by DenTek to provide legal services to DenTek in obtaining FDA approval to sell the DenTek dental protector OTC.

152.    As it had for Medtech less than a year earlier, Hogan & Hartson prepared and filed on DenTek's behalf a premarket notification under Section 510(k) of the Federal Food, Drug, and Cosmetic Act for its dental protector.  Hogan & Hartson's filing for DenTek was made on November 17, 2006.

153.    Hogan & Hartson agreed to represent DenTek in the 510(k) premarket approval for a device that was, by DenTek's own admission, substantially the same—and competitive to—THE DOCTOR'S® NIGHTGUARD™ dental protector.  Hogan & Hartson undertook this representation without obtaining any conflicts waiver from Medtech.

154.    Moreover, at least one attorney for DenTek directly worked for Medtech in the preceding submission for THE DOCTOR'S® NIGHTGUARD™ dental protector by Dental Concepts (this was prescription to OTC switch) less than a year earlier.  There were no others lawfully in the marketplace.  This was not a situation where Hogan & Hartson was providing regulatory guidance within an already crowded competitive environment.

155.    In addition to the assistance given DenTek by Kaplan and Duane, and Medtech's legal counsel, DenTek relied on Dr. Mehta to discuss the DenTek dental protector with the FDA. Dr. Mehta was already established as an expert with the FDA on THE DOCTOR'S®

NIGHTGUARD™ dental protector and compared the two products to assist DenTek in obtaining approval for DenTek's device.

### H.    DENTEK AND DUANE SUCCEED IN SOLICITING KELLY KAPLAN TO TAKE OVER AS PROJECT MANAGER.

156.    No later than late-October or early-November, DenTek and Duane were successful in recruiting Kaplan. At that time, Kaplan took over the project and continued to work on bringing DenTek's competing product to the market.

157.    While Duane's initial consulting agreement terminated on its own provision, Duane has subsequently entered into a second consulting agreement with DenTek, which is ongoing and under which Duane is being compensated.

158.    After Duane, Kaplan continued to provide to DenTek certain of Medtech's confidential and proprietary information relating to THE DOCTOR'S® NIGHTGUARD™ product. This assistance violates the terms of the General Release, **Ex. B**, and explains the numerous and pervasive similarities between the DenTek dental protector and THE DOCTOR'S® NIGHTGUARD™ dental protector.

159.    Because of the assistance of Duane and Kaplan, DenTek has procured the same product designers and manufacturers, lawyers, and/or technical advisors as Medtech. Because of Duane's and Kaplan's position within Dental Concepts (now Medtech), both had confidential and proprietary knowledge about contacts among designers, manufacturers, technical experts, sales brokers, packaging firms and others.

160.    Kaplan relied upon confidential legal advice provided by Medtech's intellectual property and regulatory counsel in making various recommendations and determinations regarding DenTek's dental protector and marketing that dental protector.

161.    Kaplan also relied on the confidential and proprietary strategies of Medtech to maintain its three-size platform and provide DenTek with an unfair competitive advantage.

162.    In disclosing Medtech's confidential and proprietary information to DenTek, Duane and Kaplan personally benefited.

### I.    BY VIRTUE OF MEDTECH'S CONFIDENTIAL AND PROPRIETARY INFORMATION, DENTEK ELIMINATED THE ORDINARY DEVELOPMENT PROCESS.

163.    To Medtech's disadvantage, DenTek, Duane and Kaplan used Medtech's confidential and proprietary to virtually eliminate DenTek's development process and competitive entry into the dental protector market.

### IV.    DENTEK'S DENTAL PROTECTOR INFRINGES ON MEDTECH'S INTELLECTUAL PROPERTY.

164.    DenTek's competing product was brought to market in mid-March 2007. DenTek's dental protector violates Medtech's valid patent rights, Medtech's trademark and Medtech's copyrighted material.

### A.    DENTEK HAS MISAPPROPRIATED THE NIGHTGUARD™ PATENTED INVENTION.

165.    DenTek's product infringes on Medtech's valid patent rights relating to dental protectors.  As a result, DenTek has wrongfully and deliberately used Medtech's patented product formulation to make DenTek's product feel like the NIGHTGUARD™ dental protector and otherwise infringe Medtech's valid patent rights.

166.    DenTek received a Section 510(k) premarket authorization on January 23, 2007 from the FDA for marketing of the DenTek "NightGuard" product, based upon the DenTek product being "substantially equivalent" to Medtech's product.   Upon information and belief,

DenTek relied upon Medtech's confidential and proprietary information in making its submission to the FDA.

167.    In its filings with the FDA, DenTek itself, through its legal counsel Hogan & Hartson, made the following assertion:

> The DenTek NightGuard is substantially equivalent to The Doctor's NightGuard. The DenTek NightGuard has the same intended uses, indications and principles of operation, and similar technological characteristics as its predicate device. The minor technological differences between the DenTek NightGuard and its predicate device raises no new questions of safety or effectiveness. Thus, the DenTek NightGuard is substantially equivalent to The Doctor's NightGuard.

168.    Due to DenTek's sales of a dental protector that deliberately infringes on Medtech's valid patent rights discussed above, Medtech has been, and will continue to be, irreparably harmed by DenTek's actions as DenTek will be wrongfully selling to Medtech's customers dental protectors that are prohibited from manufacture and sale under Medtech's valid patent rights.

**B.    DENTEK HAS MISAPPROPRIATED THE NIGHTGUARD™ MARK AND TRADE DRESS.**

169.    In introducing its competing product, DenTek is also wrongfully benefiting from the commercial success of THE DOCTOR'S® NIGHTGUARD™. Medtech has committed millions of dollars to extensive radio and television advertising in order to support and expand the brand recognition for THE DOCTOR'S® NIGHTGUARD™.

170.    Furthermore, DenTek's product attempts to misappropriate the consumer trust placed in Medtech's NIGHTGUARD™ brand dental protector by copying the copyrighted material that is published in Medtech's "At-Home Fitting Instructions" and packaging.

171.    The DenTek package prominently displays the "NIGHTGUARD" mark on the front cover, with "NIGHT" in bold letters and "GUARD" set off in a contrasting fashion. The

DenTek package also prominently states the following phrase, which uses essentially the same terminology as Medtech's featured and copyrighted phrase:    "Designed by a Dentist <u>Fit by You</u>."    A true and correct copy of the packaging for DenTek's competing product is attached hereto as **Exhibit R** and is pictured below:



172.    DenTek's competing product is displayed adjacent to Medtech's THE DOCTOR'S® NIGHTGUARD™ dental protectors in retail stores throughout the country, including in the New York area.

173.    In addition to DenTek's confusing packaging, DenTek's advertising campaign prominently features Medtech's NIGHTGUARD™ mark and was designed to look and feel similar to THE DOCTOR'S® NIGHTGUARD™ advertising.    Advertisements for the DenTek dental protector across various advertising mediums consistently use Medtech's NIGHTGUARD™ mark and attempt to confuse the consumer about the origin of the product.

174.    A DenTek print advertisement began running on June 1, 2007 using a picture of a man and a shattered-looking background.    A true and correct copy of the DenTek print advertisement is attached hereto as **Exhibit S**.    The print advertisement displays the following text on the bottom, which includes six separate references to Medtech's NIGHTGUARD™ mark:



175.  Television advertising for the DenTek dental protector also prominently features the NIGHTGUARD™ mark.  The television advertisement started airing on May 14, 2007 and displays the www.DenTekNightGuard.com web address for a substantial portion of the advertisement's running.  The television advertisement also consistently refers to the product as "DenTek NightGuard."  Finally, the television advertisement includes another iteration of the Medtech featured phrase, stating that the DenTek dental protector "was **designed by dentists**, with a comfortable custom fit that cushions your teeth while you sleep." (emphasis added).

176.  Radio advertisements also feature Medtech's NIGHTGUARD™ mark, consistently referring to the product as the "DenTek NightGuard," and instructing the radio listener to visit the www.DenTekNightGuard.com web address for more information about the infringing product.

177.  Not only will retailers and consumers be confused into purchasing DenTek's dental protector product when they want Medtech's NIGHTGUARD™ dental protector, but

DenTek's product will also eviscerate the goodwill Medtech has spent the last ten years (and millions of dollars) cultivating for NIGHTGUARD™.

### C. DENTEK HAS MISAPPROPRIATED THE NIGHTGUARD™ COPYRIGHTED "AT-HOME FITTING INSTRUCTIONS" AND PACKAGING.

178. DenTek's competing product also includes "At-Home Fitting Instructions," a true and correct copy of which is attached hereto as **Exhibit T**.

179. The DenTek "At-Home Fitting Instructions" closely copies THE DOCTOR'S® NIGHTGUARD™ "At-Home Fitting Instructions." Substantial portions of Medtech's "At-Home Fitting Instructions" are also copied on the packaging of the DenTek dental protector product. Further, Medtech's copyrighted phrase, "Designed by a dentist for protection and comfort. Custom fit by you for convenience," is copied in pertinent part: "Designed by a dentist; fit by you." The following chart reproduces the text of the two instructions, with the text copied by DenTek indicated by bold and underlined font:

| THE DOCTOR'S® NIGHTGUARD™<br>AT-HOME FITTING INSTRUCTIONS<br>EXHIBIT K | DENTEK NIGHTGUARD<br>AT-HOME FITTING INSTRUCTIONS<br>EXHIBIT T |
|---|---|
| *Use* | *Use* |
| The Doctor's® **NightGuard™ is indicated for the protection against Bruxism or nighttime teeth grinding.** It **is intended to reduce damage to teeth and to prevent the noise associated with bruxing or teeth grinding.** | DenTek® **NightGuard is indicated for the protection against Bruxism or nighttime teeth grinding. By cushioning and keeping the teeth apart,** DenTek® NightGuard **is intended to reduce damage to teeth and to prevent the noise associated with bruxing or teeth grinding.** |
| The Doctor's® **NightGuard™ is similar to the dental protector recommended by many dentists for nighttime teeth grinding** with one advantage: you fit it yourself. **After fitting,** The Doctor's® **NightGuard™ conforms to your teeth so it** will be **comfortable.** And it will **stay** in place through the **night.** **By cushioning and keeping the teeth apart,** The Doctor's® NightGuard™ reduces the chances for tooth damage; and it stops the annoying grinding sound so your sleep partner will not be disturbed. | DenTek® **NightGuard is similar to the dental protector recommended by many dentists for nighttime teeth grinding. After fitting,** DenTek® **NightGuard conforms to your teeth so it** is **comfortable** to wear and **stays** in your mouth all **night.** |

| *Description* | *Description* |
|---|---|
| The Doctor's® **NightGuard™ is a moldable dental protector**, composed of a soft formable upper material and a hard base.  This patented, 2-layered device safely and effectively prevents the noise associated with grinding while cushioning the teeth.  When heated by water and then briefly cooled, the upper layer can be molded to fit comfortably around your upper teeth, forming a cushion.  The **hard base prevents bite-through** by consumers with moderate or severe **bruxing/grinding.  The life of your dental protector will vary based on the force of your teeth grinding.  The average dental protector should last six months or more.** | DenTek® **NightGuard is a moldable dental protector** specially designed with two materials:<br><br>• The blue, formable material, when heated, molds to your upper molars, front teeth, and most of the gum line for optimal retention.<br><br>• The **hard**er **base** material cushions your teeth and **prevents bite through** from **bruxing/grinding**.<br><br>**The life of your** custom fit **dental protector will vary based on the force of your teeth grinding.  The average dental protector should last** approximately **six months or more.** |
| *For Best Results* | *For Best Results* |
| **Read and follow instructions BEFORE and DURING custom fitting the dental protector.  The dental protector** can be fitted on the upper or lower teeth, but upper is preferred. | **Read and follow instructions BEFORE and DURING custom fitting the dental protector.  The dental protector** should be fitted to the upper teeth.<br><br>If you need additional assistance, visit our website, or call our customer service department between 8am and 5pm eastern standard time and we will guide you through the fitting process.<br><br>www.denteknightguard.com<br>1-800-4DENTEK |
| *What You Need to Begin* | *What You Need to Begin* |
| • **A cup** of cold **water**<br>• **A pot** to **boil water**<br>• **A kitchen** fork or **spoon**<br>• A mirror<br>• **A** clock with a **second hand to time** fitting steps in seconds. | • **A cup** of room temperature **water**<br>• **A pot** of **boiling water**<br>• **A** metal **kitchen spoon**<br>• **A timer** |
| *Test Fitting* | *Test Fitting* |
| As soon as you remove the dental protector from the package, and **before you begin boiling, conduct a "test fitting."**<br><br>1.    **Position** Doctor's® **NightGuard™ in your mouth** to determine if you have properly chosen the small, medium or large size.  You will know the sizing is correct if your teeth fit comfortably into the channel of the dental protector and if the arms of the U shape reach only to the end of your last molar.<br><br>2.    **If the arch (U-shape)** of the dental | *Before you begin boiling*, conduct a "test fitting."<br><br>1.    **Position** DenTek® **NightGuard in your mouth** and bite down.  **If the arch (U-shape) is too wide or too narrow**, squeeze or stretch it to align with **the arch of your mouth during the final fitting**.<br><br>2.    **If the length of the dental protector extends beyond your** last **molar** and feels uncomfortable, use scissors to cut it along the trim guides.  Start at the first line from the end |

protector **is too narrow or too wide** to fit **the arch of your mouth**, the dental protector can be altered **during the final fitting**.

3.      **If the length of the dental protector extends beyond your** back **molars** in the test fitting, the dental protector can be shortened by using a single-edge razor blade or a sharp knife.

and test fit it again.  If that still is not comfortable, cut it again at the second trim line, remembering that it's best if all teeth touch the dental protector.  Continue this until the dental protector feels comfortable and all teeth are cushioned.  The optimal fit is when all teeth are properly centered and resting on the dental protector.

### Final Fitting

**After completing the test fitting, you are now ready to custom fit** the dental protector.

**Fill a pot with approximately three inches of water.  Boil water until you see a rolling boil** and **bubbles**.  Let the water boil for one minute before inserting the dental protector into the water.

2.      **Submerge the dental protector into the** boiling **water for** 60 **seconds**.

3.      Using a fork or **spoon, remove the dental protector** from the boiling water and **submerge** it **into** the **cup of** cold **water for one second to remove the heat** from the dental protector.

4.      **Position the dental protector** comfortably **in**to **your mouth**.  You can widen or narrow the dental protector at this point in the process by up to ½ inch.

5.      **Once in place, firmly bite down** into the dental protector.

6.      **Press in along the gum line** using **equal amounts of pressure on both sides of the "U" shape from the front** of the dental protector **to the rear** molars.  Be sure to use your fingers to **mold the soft** impression **material up and around** the **teeth**.

7.      **Suck in to remove excess moisture** and create the suction that will allow the dental protector to stay comfortably in place on your upper teeth.

8.      Once you feel you have attained a comfortable fit, remove the dental protector and place into the cup of cold water for another 30 second to "set" the mold.

### Final Fitting

**After completing the test fitting, you are now ready to custom fit** DenTek® NightGuard.  Make sure you have a cup of room temperature water ready for cooling.

1.      **Fill a pot with approximately three inches of water.  Boil water until you see a rolling boil** with **bubbles**.  Remove the pot from the heating element and let rest for one minute.

2.      **Submerge the dental protector** face down **into** hot **water for** 25 **seconds**.

3.      **Remove dental protector** with a metal **spoon** and **submerge into cup of** room temperature **water for one second to reduce the heat** before fitting.

4.      **Position the dental protector in your mouth**, aligning it with your teeth, so that all of your teeth rest on the dental protector.  You may need to squeeze or stretch the arch of the dental protector to align with the arch of your mouth.

5.      **Once in place, bite down firmly** and **suck in to remove excess moisture.**  Using your fingers, **press in along the gum line** under your lip with **equal amounts of pressure on both sides of the "U" from the front to the rear** teeth, mol**ding** the soft blue **material up and around** your **teeth** and gum line.

If you did not get a good fit the first time, repeat the boiling process one more time starting at Step 1 above.  After the second try, the material loses retention and you will need to follow the instructions for a replacement dental protector.

| *Storage and Maintenance* | *Storage and Maintenance* |
|---|---|
| *Proper care of your dental protector will extend its life.* | Proper care of your DenTek® NightGuard will extend its life. |
| • After each use, simply rinse the dental protector in cool water or mouth wash. <br> • Store The Doctor's® NightGuard™ in the container provided when not in use. | • After each use, rinse the dental protector in cool water or mouthwash. Never use hot water on your dental proctor as it might lose its shape. <br> • Store in the hygienic storage container when not in use. |

| *Warnings* | *Warnings* |
|---|---|
| Do not use: <br> • If you are under 18 years of age. <br> • If you wear braces, dentures, or other dental products. <br> • If you can wiggle any of your teeth. <br> • If your dentist has told you that you have TMJ. <br> • If you have any tooth or jaw pain or pain with bruxing or tooth grinding. <br> • As an athletic mouth guard. Product does not absorb shock. <br> • For more than three months without consulting your dentist. <br> Ask a Dentist Before Use if You Have: <br> • Loose fillings, loose caps or cavities with no fillings. <br> • Clicking of your jaw. <br> • Jaw pain, teeth pain, face pain, or have a hard time chewing. <br> • Two or more missing teeth. <br> • Mouth sores. <br> • Gum disease or bleeding gums. <br> • Serious breathing, respiratory or other health problems. <br> When Using This Product: <br> • See your dentist every six months. <br> Stop Use and Ask a Dentist if: <br> • Your same symptoms last even after several weeks of use. <br> • The product easily falls out of your mouth. <br> • The product causes you to gag or feels uncomfortable. <br> • You have bleeding gums, soreness, or other reaction inside your mouth. <br> • You notice new symptoms (jaw pain, teeth pain, ear pain, headache, neck stiffness, or joint clicking) because of the product. <br> • You have loose teeth or a change in your bite that lasts more than a few minutes | Do not use: <br> • If you are under 18 years of age. <br> • If you wear braces, dentures, or other dental appliances. <br> • If you can wiggle any of your teeth. <br> • If your dentist has told you that you have TMJ. <br> • If you have any tooth or jaw pain or pain with bruxing or tooth grinding. <br> • As an athletic mouth guard. *Product does not absorb shock.* <br> • For more than three months without consulting your dentist. <br> Ask a dentist before use if you have: <br> • Loose fillings, loose caps or cavities with no fillings. <br> • Clicking of your jaw. <br> • Jaw pain, teeth pain, face pain, or have a hard time chewing. <br> • Two or more missing teeth. <br> • Mouth sores. <br> • Gum disease or bleeding gums. <br> • Serious breathing, respiratory other health problems. <br> When using this product: <br> • See your dentist every six months. <br> Stop use and ask a dentist if: <br> • Your same symptoms last even after several weeks of use. <br> • The product easily falls out of your mouth. <br> • The product causes you to gag or feels uncomfortable. <br> • You have bleeding gums, soreness, or other reaction inside your mouth. <br> • You notice new symptoms (jaw pain, teeth pain, ear pain, headache, neck stiffness, or joint clicking) because of the product. <br> • You have loose teeth or a change in your bite that lasts more than a few minutes |

| after taking product out. | after taking the product out. |

## V.    DENTEK'S, DUANE'S, AND KAPLAN'S ACTIONS ARE HARMFUL TO MEDTECH.

180.    DenTek's actions of infringing upon Medtech's NIGHTGUARD™ trademark, copyrights, and patent rights are willful and deliberate, and have caused and will continue to cause damage and irreparable injury to Medtech.

181.    Duane's and Kaplan's actions in providing DenTek with Medtech's proprietary and confidential information have caused, and will continue to cause, damage and irreparable injury to Medtech.  DenTek's infringing product was quickly brought to market because of proprietary information unlawfully provided to DenTek by Duane and Kaplan.

182.    DenTek's use of Medtech's proprietary and confidential information did not merely provide it with short-term development cost savings.  Rather, DenTek's quick market entry allowed it to gain coveted shelf space with the largest retailer which is or becomes a long term asset of great value, to the detriment of Medtech.

183.    Medtech has already lost sales and revenues as confused customers bought DenTek's product when they intended to buy Medtech's product.  At each of the four Information Resources Inc. ("IRI") tracked key accounts, retail sales of THE DOCTOR'S® NIGHTGUARD™ have declined significantly (approximately 65%).

184.    At the largest retailer—where DenTek made its initial headway into the market based on the inside information provided by Duane and Kaplan—sales of the THE DOCTOR'S® NIGHTGUARD™ have declined severely (approximately 70%).

185.    DenTek's entry has not caused any growth in category volume.  Instead, a reallocation of existing volume from Medtech to DenTek has taken place.

186.    DenTek's conduct will continue to damage Medtech's ability to maintain its hard-won brand recognition and reputation for high-quality products in the over-the-counter dental protector category. Further damage and irreparable injury will result if DenTek is allowed to continue to violate Medtech's rights and deceive consumers.

187.    Medtech has spent considerable time, effort, and money in gaining valuable shelf space for its product in retail outlets. The loyalty of these retailers, and the continued availability of the shelf space, is seriously threatened by DenTek's conduct and the resulting consumer confusion. Once shelf space is lost it is essentially impossible to regain. DenTek's deliberate use of its confusingly designed and marketed products to capture Medtech's shelf space will cause irreparable injury to Medtech.

188.    More importantly, DenTek's conduct will damage Medtech's ability to maintain its brand recognition in the dental protector category due to DenTek's deliberately deceptive behavior. If DenTek floods the market with its infringing and confusing product, it will undermine Medtech's efforts to continue to grow its brand, maintain its reputation for high-quality products, and establish greater success.

189.    DenTek's conduct is all the more culpable when measured against the trademarks used by competitors in the dental protector category. A survey of the trademarks used by these competitors shows several non-infringing options available to companies that wish to enter this market, such as "SLEEP RIGHT SELECT™," "VERSACRYL™," "REST ASSURED™," and "STRESSGARD™."

190.    DenTek's deliberate acts constitute unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); patent infringement under 35 U.S.C. § 271; copyright infringement under 17 U.S.C. § 501; conduct in violation of the New York Act for Consumer Protection, NY Gen. Bus.

Section 349(h); and violations of related common-law rights including breach of contract, tortuous interference with contract, civil conspiracy and misappropriation of trade secrets.

191.    Medtech seeks temporary and permanent injunctive relief to halt DenTek's deliberate and wrongful conduct and an award of compensatory and punitive damages, as well as attorneys' fees and expenses, for DenTek's willful and wanton conduct.


### COUNT I
### PATENT INFRINGEMENT
### (AGAINST DENTEK)

192.    Medtech incorporates the allegations contained in Paragraphs 1-191 above as if fully set forth herein.

193.    Medtech is the owner by assignment of the '051 Patent.  DenTek manufactures, makes, has made, uses, assembles, sells and/or offers for sale an OTC bruxism device that infringes one or more claims in the '051 Patent, literally and/or under the doctrine of equivalents, and/or induces or contributes to the infringement of one or more claims in the '051 Patent by others, including but not limited to retailers and consumers who buy DenTek's product.

194.    DenTek's actions are a violation of 35 U.S.C. § 271.

195.    DenTek's infringing actions are willful and deliberate, and Medtech is entitled to treble damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 35 U.S.C. § 285, this being an exceptional case.

196.    DenTek's infringement has damaged Medtech in an amount to be determined at trial.

197.    DenTek's infringement has caused and, unless restrained by this Court, will continue to cause Medtech irreparable injury.    Medtech has no adequate remedy at law for DenTek's infringement.

**COUNT II**
**LANHAM ACT - UNFAIR COMPETITION/USE OF FALSE DESIGNATION IN**
**INTERSTATE COMMERCE**
**(AGAINST DENTEK)**

198.    Medtech incorporates the allegations contained in Paragraphs 1-197 above as if fully set out herein.

199.    Notwithstanding Medtech's well-known and prior-established rights to the NIGHTGUARD™ mark, DenTek has caused dental protector goods to enter into interstate commerce using the designation and representation "NIGHTGUARD" connected therewith.

200.    DenTek's use of the mark "NIGHTGUARD" is a false designation of origin which is likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection or association of Defendant with Plaintiff, and as to the origin, sponsorship, or approval of DenTek's dental protector by Medtech.

201.    DenTek's acts are in violation of 15 U.S.C. § 1125(a), in that DenTek has used in connection with goods and services a false designation of origin, a false or misleading description in order to cause mistake and to deceive as to the affiliation, connection, or association of DenTek's goods with Medtech, and as to the origin, sponsorship, and approval of DenTek's goods, services, and commercial activities by Medtech.

202.    As a result of DenTek's infringing conduct, Medtech has been injured, and likely will continue to be injured as to its goodwill and the value of its NIGHTGUARD™ mark.

203.    DenTek's infringing actions are willful and deliberate, and Medtech is entitled to attorneys' fees pursuant to 15 U.S.C. § 1117.

204.    DenTek's infringing conduct has damaged Medtech in an amount to be determined at trial, including lost sales, revenues, and profits.

205.    DenTek's infringing conduct has caused and, unless restrained by this Court, will continue to cause Medtech irreparable injury.  Medtech has no adequate remedy at law for DenTek's infringement.

**COUNT III**
**COPYRIGHT INFRINGEMENT**
**(AGAINST DENTEK)**

206.    Medtech incorporates the allegations contained in Paragraphs 1-205 above as if fully set out herein.

207.    DenTek has copied substantial portions of Medtech's copyrighted material, as identified in the Copyright Registration.

208.    DenTek's conduct infringes upon and violates the exclusive rights belonging to Medtech as owner of the work identified in the Copyright Registration, including, without limitation, Medtech's rights under 17 U.S.C. § 106.

209.    DenTek has willfully engaged in, and is willfully engaging in, the acts complained of with oppression, fraud, and malice, and in conscious disregard of the rights of Medtech.  DenTek's infringing actions are willful and deliberate, and Medtech is entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 505.

210.    DenTek's infringing conduct has damaged Medtech in an amount to be determined at trial.  DenTek also has realized and continues to realize profits and other benefits belonging to Medtech.  Accordingly, Medtech seeks an award of damages and costs pursuant to 17 U.S.C. §§ 504 and 505.

211.    DenTek's infringing conduct has caused and, unless restrained by this Court, will continue to cause Medtech irreparable injury.   Medtech has no adequate remedy at law for DenTek's infringement.

**COUNT IV**
**COMMON LAW - UNFAIR COMPETITION**
**(AGAINST DENTEK)**

212.    Medtech incorporates the allegations contained in Paragraphs 1-211 above as if fully set out herein.

213.    By misappropriating the commercial advantage gained by Medtech in the NIGHTGUARD™v trademark, the Copyright Registration, and the '051 Patent, DenTek has competed unfairly in violation of the common law of New York, as preserved by N.Y. Gen. Bus. Law § 360-O.

214.    DenTek has acted in bad faith.

215.    DenTek's infringing actions are willful and deliberate.

216.    DenTek's conduct has damaged Medtech in an amount to be determined at trial.

217.    DenTek's conduct has caused and, unless restrained by this Court, will continue to cause Medtech irreparable injury.   Medtech has no adequate remedy at law for DenTek's deliberate infringement.

**COUNT V**
**COMMON LAW - UNJUST ENRICHMENT**
**(AGAINST DENTEK)**

218.    Medtech incorporates the allegations contained in Paragraphs 1-217 above as if fully set out herein.

219.    DenTek has received substantial benefits and profited from its unlawful use of Medtech's NIGHTGUARD™ trademark, its copyrighted material, and its patented invention, but has not compensated Medtech for the benefits DenTek received.

220.    DenTek's receipt of the above benefits and profits constitutes unjust enrichment.

221.    DenTek's conduct has damaged Medtech in an amount to be determined at trial.

### COUNT VI
### VIOLATION OF SECTION 349(H) NEW YORK ACT FOR
### CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES
### (AGAINST DENTEK)

222.    Medtech incorporates the allegations contained in Paragraphs 1-221 above as if fully set out herein.

223.    DenTek's use of Medtech's NIGHTGUARD™ trademark, its copyrighted material, and its patented invention constitute efforts to pass off its products as products originating from Medtech.   DenTek's actions described herein are consumer-oriented and are misleading in a material way.

224.    DenTek's use of Medtech's NIGHTGUARD™ trademark, its copyrighted material, and its patented invention causes a likelihood of consumer confusion and misunderstanding as to the source, sponsorship, approval, or association with respect to DenTek's products referenced herein.

225.    DenTek's use of Medtech's NIGHTGUARD™ trademark, its copyrighted material, and its patented invention constitutes a deceptive trade practice in violation of N.Y. Gen. Bus. § 349(h).

226.    DenTek's actions are willful and deliberate.

227.    DenTek's conduct has damaged Medtech in an amount to be determined at trial.

228.    DenTek's conduct has caused and, unless restrained by this Court, will continue to cause Medtech irreparable injury.  Medtech has no adequate remedy at law for DenTek's infringement and deceptive practices.

## COUNT VII

## BREACH OF CONTRACT – CONSULTING AGREEMENT AND PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT (AGAINST DEFENDANTS CDS AND DUANE)

229.    Medtech incorporates the allegations contained in Paragraphs 1-228 above as if fully set out herein.

230.    CDS and Duane executed and agreed to be bound by Consulting Agreement and the Proprietary Information and Inventions Agreement. The Consulting Agreement included a valid and enforceable non-compete agreement.

231.    CDS and Duane have breached the Consulting Agreement by working for a company competitive to Dental Concepts; and soliciting, enticing and inducing suppliers and accounts of Medtech; soliciting, enticing and inducing employees of Medtech.

232.    CDS and Duane have further breached the Consulting Agreement and the Proprietary Information and Inventions Agreement by using confidential and proprietary information for personal benefit and providing such information to DenTek.

233.    Medtech fully performed and discharged all duties it had under the Consulting Agreement and the Proprietary Information and Inventions Agreement.

234.    As a result of CDS's and Duane's breaches of contract, Medtech has been damaged in an amount to be proven at trial.

235.    CDS and Duane agreed that any violation of the Consulting Agreement would cause Dental Concepts irreparable harm:

(d)    Each of the Consultant and Duane acknowledges that the services to be rendered by it and him are of a special, unique and extraordinary character and, in

connection with such services, it and he will have access to confidential information vital to the business of the Company and its Affiliates. By reason of the foregoing, the Consultant and Duane each consents and agrees that, if it or he violates or threatens to violate any of the provisions of this Section 7 or of Exhibit A [the Proprietary Information and Inventions Agreement] the Company and/or its Affiliates would sustain irreparable harm and, therefore, in addition to any other rights or remedies which the Company and/or its Affiliates may have under this Agreement or otherwise, the Company and its Affiliates shall be entitled (without the necessity of posting any bond or security) to an injunction from any court of competent jurisdiction restraining the Consultant and Duane from committing or continuing any such violation (or participating therein). (**Ex. A** at p. 5, ¶ 7(d).)

236.    Further, the Proprietary Information and Inventions Agreement provided:

By reason of the fact that irreparable harm would be sustained by [Dental Concepts] in the event that there is a breach by [CDS and/or Duane] of any of the terms, covenants and agreements set forth in this Agreement, in addition to any other rights that the Company may otherwise have, the Company shall be entitled to apply to and obtain specific performance and/or injunctive relief against [CDS and/or Duane] from any court of competent jurisdiction, without making a showing that monetary damages would be inadequate and without the requirement of posting any bond or other security whatsoever, in order to enforce or prevent any breach or threatened breach of any of the terms, covenants and agreements set forth in this Agreement, and [CDS and/or Duane] will not contest such application for specific performance and/or injunctive relief. (**Ex. C** at p. 4, ¶ 8.)

237.    As a result of CDS's and Duane's breaches of contract, Medtech has suffered and continues to suffer irreparable harm.

238.    Medtech prays that CDS and Duane be enjoined from further competitive conduct and that damages be awarded in an amount to be proven at trial.

**COUNT VIII**
**BREACH OF CONTRACT – PROPRIETARY INFORMATION**
**AND INVENTIONS AGREEMENT**
**(AGAINST KAPLAN)**

239.    Medtech incorporates the allegations contained in Paragraphs 1-238 above as if fully set out herein.

240.    Kaplan executed and agreed to be bound by the Proprietary Information and Inventions Agreement attached as **Exhibit D**.

241.    Kaplan breached the Proprietary Information and Inventions Agreement by providing confidential and proprietary information to DenTek.

242.    Medtech fully performed and discharged all duties it had under the Proprietary Information and Inventions Agreement.

243.    Further, the Kaplan Proprietary Information and Inventions Agreement provided:

By reason of the fact that irreparable harm would be sustained by [Dental Concepts] in the event that there is a breach by [Kaplan] of any of the terms, covenants and agreements set forth in this Agreement, in addition to any other rights that the Company may otherwise have, the Company shall be entitled to apply to and obtain specific performance and/or injunctive relief against [Kaplan] from any court of competent jurisdiction, without making a showing that monetary damages would be inadequate and without the requirement of posting any bond or other security whatsoever, in order to enforce or prevent any breach or threatened breach of any of the terms, covenants and agreements set forth in this Agreement, and [Kaplan] will not contest such application for specific performance and/or injunctive relief.  (**Ex. D** at p. 4, ¶ 8.)

244.    As a result of Kaplan's breaches of contract, Medtech has suffered and continues to suffer irreparable harm.

245.    Medtech prays that Kaplan be enjoined from further competitive conduct and that damages be awarded in an amount to be proven at trial.

### COUNT IX
### BREACH OF CONTRACT –GENERAL RELEASES
### (AGAINST DUANE AND KAPLAN)

246.    Medtech incorporates the allegations contained in Paragraphs 1-245 above as if fully set out herein.

247.    Duane and Kaplan had valid agreements, which are enforceable by Medtech, and which are attached hereto as the General Releases at **Exhibits G and H**.

248.    Under the General Releases, Duane and Kaplan were to maintain the secrecy of the confidential and proprietary information learned as a result of their positions as Executive Vice President of Sales and Executive Vice President of Marketing of Dental Concepts (predecessor in interest to Medtech).

249.    All duties and performance required by Dental Concepts/Medtech under the General Releases have been discharged and fully performed.

250.    Duane and Kaplan have breached the General Releases by providing DenTek with Medtech's confidential and proprietary information.

251.    Medtech has been damaged by Duane's and Kaplan's breaches as DenTek has had unauthorized access to and utilized Medtech's confidential and proprietary information in bringing DenTek's infringing product to the market.

252.    Duane's and Kaplan's conduct has caused and, unless restrained by this Court, will continue to cause Medtech irreparable injury. Medtech has no adequate remedy at law for Duane's and Kaplan's breach of contract.

253.    Duane's General Release provided:

Should there be a violation or attempted or threatened violation of this provision, the Company may apply for and obtain an injunction to restrain such violation or attempted or threatened violation, Employee conceding that the loss of such secret or confidential information cannot reasonably or adequately be compensated in damages in an action at law, and that the right to said injunction is necessary for the protection and preservation of the rights of the Company and of any transferee or assignee hereof to prevent irreparable damage to the Company. Such injunctive relief shall be in addition to such other rights and remedies as the Company, and any other permitted transferee or assignee hereof, may have against Employee arising from any breach hereof on his part. (**Ex. G**. at p. 3, ¶ 7.)

254.    Likewise, Kaplan's General Release provided that an injunction was necessary in light of any violation of the General Release:

Should there be a violation or attempted or threatened violation of this provision, the Company may apply for and obtain an injunction to restrain such violation or attempted or threatened violation, Employee conceding that the loss of such secret or confidential information cannot reasonably or adequately be compensated in damages in an action at law, and that the right to said injunction is necessary for the protection and preservation of the rights of the Company and of any transferee or assignee hereof to prevent irreparable damage to the Company. Such injunctive relief shall be in addition to such other rights and remedies as the Company, and any other permitted transferee or assignee hereof, may have against Employee arising from any breach hereof on his part. (**Ex. H** at p. 3, ¶ 7.)

255.    Pursuant to the General Releases, Medtech is "entitled to recover from the opposite party all reasonable attorney's fees and costs incurred in connection with" this action to enforce its rights under the agreement. (**Exs. G and H** at p. 3 ("Future Legal Action").)

**COUNT X**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(AGAINST DENTEK)**

256.    Medtech incorporates the allegations contained in Paragraphs 1-255 above as if fully set out herein.

257.    Duane and Kaplan had valid agreements, which are enforceable by Medtech, and which are attached hereto as the Consulting Agreement (**Ex. A**), the Proprietary Information and Inventions Agreements (**Exs. C and D**), and the General Releases (**Exs. G and H**), under which Duane and Kaplan were to maintain the secrecy of the confidential and proprietary information they had learned as executives of Dental Concepts.

258.    DenTek knew or should have known of the valid contracts between Duane and Dental Concepts/Medtech and Kaplan and Dental Concepts/Medtech.

259.    DenTek is a sophisticated entity well aware of the industry practice of securing confidentiality agreements, as evidenced by its own conduct with Duane, Kaplan and the Tufts Doctors.

260.    Upon information and belief, DenTek procured Duane's and Kaplan's breaches of the aforementioned contracts, as applicable.

261.    Medtech has been damaged by Duane's and Kaplan's breach as DenTek has brought its infringing product to the market with the assistance of unauthorized access to Medtech's confidential and proprietary information.

262.    Duane's, Kaplan's and DenTek's conduct has caused and, unless restrained by this Court, will continue to cause Medtech irreparable injury.  Medtech has no adequate remedy at law for Duane's and Kaplan's breaches of contract and DenTek's tortious interference with contractual relations.

**COUNT XI**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(AGAINST DUANE)**

263.    Medtech incorporates the allegations contained in Paragraphs 1-262 above as if fully set out herein.

264.    Kaplan had a valid agreement, which was enforceable by Medtech, and which is attached hereto as the General Release (**Ex. H**), under which Kaplan was to maintain the secrecy of the confidential and proprietary information she had learned as an executive of Dental Concepts.

265.    Duane knew or should have known of the valid contract between Kaplan and Dental Concepts/Medtech.

266.    Duane  procured Kaplan's breach of that contract.

267.    Medtech has been damaged by Kaplan's breach as DenTek has brought its infringing product to the market with the assistance of unauthorized access to Medtech's confidential and proprietary information.

268.    Duane's, Kaplan's and DenTek's conduct has caused and, unless restrained by this Court, will continue to cause Medtech irreparable injury. Medtech has no adequate remedy at law for Kaplan's breach of contract and DenTek's tortious interference with contractual relations.

## COUNT XII

### CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

269.    Medtech incorporates the allegations contained in Paragraphs 1-268 above as if fully set out herein.

270.    Upon information and belief, DenTek, Duane, CDS, and Kaplan conspired, agreed, and planned to use Medtech's confidential and proprietary information in violation of Duane's, CDS's and Kaplan's valid confidentiality agreements and New York law.

271.    Upon information and belief, Duane, CDS, and Kaplan revealed to DenTek confidential and proprietary information belonging to Medtech, in violation of their confidentiality agreements, and DenTek used that information in bringing its infringing product to the market.

272.    Medtech has been damaged as a result of Defendants' conspiracy.

273.    Medtech prays that Defendants be enjoined from further concerted activities intended and calculated to injure Medtech, and that damages be awarded in an amount to be proven at trial.

## COUNT XIII

### TRADE SECRET MISAPPROPRIATION
### (AGAINST ALL DEFENDANTS)

274.    Medtech incorporates the allegations contained in Paragraphs 1-273 above as if fully set out herein.

275.    Medtech and its predecessor in interest, Dental Concepts, has expended considerable time, effort, and money developing its trade secrets, including but not limited to manufacturing cost details, drawings, test data, and other information about the design and manufacturing process for its dental protectors.

276.    Medtech has undertaken efforts to ensure that its trade secrets are kept secret and not generally known to the public. Its efforts include, but are not limited to, (1) identifying materials as proprietary and confidential information belonging to Medtech; (2) maintaining computer files in a password-protected system; (3) requiring Medtech employees to sign an acknowledgement of a company policy regarding confidential information; (4) selectively including only those persons within the organization that need to be in the loop on specific information; and (5) requiring key Medtech employees, vendors, and consultants to sign confidentiality agreements.

277.    Because of their employment and trusted management positions at Medtech, Duane and Kaplan had access to Medtech's trade secrets, including but not limited to manufacturing cost details, drawings, test data, and other information about the design and manufacturing process for its dental protectors.

278.    Medtech shared this information with Duane and Kaplan, as its exclusive consultant and employee, subject to the confidentiality agreements that both had signed, and in which both agreed not to divulge or appropriate to their own use or to the use of others any secret

or confidential information or knowledge obtained by them or disclosed to them during their employment at Medtech.

279.    In addition to the confidentiality agreements executed at the beginning of their associations, Medtech obtained the General Releases from both Duane and Kaplan at the time of the acquisition of Dental Concepts and the end of their associations with Dental Concepts and Medtech.

280.    Despite these safeguards, without Medtech's consent, and in violation of the common law New York duty Duane and Kaplan owed to Medtech to maintain the secrecy of Medtech's trade secrets, Duane and Kaplan used Medtech's trade secrets in the performance of their duties at DenTek for their own benefit and disclosed Medtech's trade secrets to DenTek and its employees and officers.

281.    DenTek had a reason to know and, upon information and belief, did know at and/or after the time that Duane and Kaplan disclosed Medtech's trade secrets, and at and/or after the time DenTek made use of these trade secrets, that these trade secrets came from Medtech, and that Duane and Kaplan owed a duty to Medtech to maintain their secrecy.

282.    As a result of Defendants' violations, Medtech has suffered damages and continues to suffer damages as a result of Defendants' actions.

283.    As a result of Defendants' violations, Medtech has suffered and continues to suffer irreparable harm.

## COUNT XIV

### TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP/ECONOMIC ADVANTAGE (AGAINST ALL DEFENDANTS)

284.    Medtech incorporates the allegations contained in Paragraphs 1-283 above as if fully set out herein.

285.    Medtech had a business relationship or contemplated contract of economic benefit with the Tufts Doctors.    This business relationship and prospective continued business relationship was for the Tufts Doctors to provide valuable consulting advice about bruxism and the efficacies of various protective devices, such as THE DOCTOR'S® NIGHTGUARD™ brand dental protector.

286.    Even though Medtech had a consulting arrangement with the Tufts Doctors that was confidential, Duane, Kaplan and DenTek all specifically knew of the relationship and prospective relationship of Medtech with the Tufts Doctors.

287.    DenTek, Duane and Kaplan's actions resulted in the Tufts Doctors' ceasing to provide consulting services regarding design of bruxism devices to Medtech.  The denial of such effected services is acts as a continued injury Medtech.

288.    Duane, Kaplan and DenTek intentionally interfered with Medtech's relationship and prospective continued business relationship with the Tufts Doctors.  Defendants acted with intent to harm Medtech, used confidential and inside information, and did not inform the Tufts Doctors of the true goals and purposes of the relationship.

289.    Defendants injured Medtech's relationship with the Tufts Doctors.

## JURY DEMAND

Medtech demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Medtech respectfully requests that process issue and be served upon Defendants, and that the claims in this action be tried and an Order be entered that:

1.    Temporarily enjoins DenTek from unfairly competing with Medtech in any manner whatsoever or from infringing on Medtech's patent rights, trademark, or copyright, in particular, from manufacturing, distributing, selling, offering for sale, holding for sale or advertising any goods utilizing Medtech's patented technology, Medtech's NIGHTGUARD™ mark or any colorable variations thereof, and Medtech's copyright.

2.    Permanently enjoins DenTek from unfairly competing with Medtech in any manner whatsoever or from infringing on Medtech's patent rights, trademark, or copyright; in particular, from manufacturing, distributing, selling, offering for sale, holding for sale or advertising any goods utilizing Medtech's patented technology, Medtech's NIGHTGUARD™ mark or any colorable variations thereof, and using Medtech's copyrighted material.

3.    Requires DenTek to assign any rights to any pending patent applications for any bruxism device to Medtech, any such application necessarily having been derived from the confidential information wrongfully transferred to DenTek and its agents.

4.    Requires DenTek to recall from all distribution channels and all retail locations all products utilizing Medtech's patented technology, NIGHTGUARD™ mark, copyrighted material or any colorable variations thereof, and take affirmative steps to dispel such false impressions that heretofore have been created by its improper use of Medtech's patented technology, NIGHTGUARD™ mark, or colorable imitation thereof and Medtech's copyrighted material.

5.    Requires DenTek to deliver up for destruction all labels, signs, prints, packages, advertisements, products, and/or other matter infringing on Medtech's patent rights or bearing the unauthorized reproduction or imitation of Medtech's NIGHTGUARD™ mark, or Medtech's

copyrighted material, and all means for making such reproductions or imitations pursuant to 15 U.S.C. § 1118 and 17 U.S.C. § 503.

6. Requires DenTek to account for its profits arising from their patent infringement, trademark infringement, copyright infringement, unfair competition, use of Medtech's confidential and proprietary information, and other illegal and deceptive acts.

7. Requires DenTek, Duane and Kaplan to return all confidential and proprietary information back to Medtech.

8. Enjoins Duane and Kaplan from any further disclosures to DenTek of Medtech's confidential and proprietary information, and enjoins any further use of or profit from such confidential and proprietary information by Duane, CDS, Kaplan and DenTek.

9. Requires DenTek, Duane and Kaplan to identify every employee who possessed or had access to all information that was improperly taken and used from Medtech.

10. Enjoins Defendant DenTek from being in the dental protector business for the full two years provided in the Duane and CDS non-compete and further until such time as it is able to demonstrate that its development of a dental protector does not make use of any confidential and proprietary information and the trade secrets it stole from Medtech and affords Medtech the opportunity to recover from the damages inflicted on it to date;

11. Awards Medtech actual damages, in an amount to be determined at trial, to the fullest extent allowed under 15 U.S.C. § 1117, 17 U.S.C. § 504, and 35 U.S.C. § 284, or, in the alternative, statutory damages pursuant to the Lanham Act, the Copyright Act, 17 U.S.C. § 504, or New York for unfair competition in the maximum amount permitted by law.

12.     Awards Medtech actual damages for Duane's and Kaplan's breaches of contract, DenTek's and Duane's tortious interference with contract, and Duane's, Kaplan's CDS' and DenTek's civil conspiracy and trade secret misappropriation.

13.     Awards Medtech treble damages for DenTek's willful and deliberate actions to the fullest extent allowed under 15 U.S.C. § 1117, 35 U.S.C. § 284, and N.Y. Gen. Bus. Law § 349(h).

14.     Awards Medtech punitive damages pursuant to the State of New York for DenTek's, Duane's, CDS' and Kaplan's fraudulent, intentional, and malicious conduct.

15.     Awards Medtech costs and reasonable attorneys' fees to the fullest extent provided for by 15 U.S.C. § 1117, 17 U.S.C. § 505, 35 U.S.C. § 285 and the General Releases.

16.     Awards Medtech prejudgment and postjudgment interest at the highest rate prescribed by law.

17.     Taxes the costs of this case against DenTek, Duane, CDS and Kaplan.

18.     Awards such other and further relief as this Court deems equitable and just.

Dated: August 24, 2007.

Respectfully submitted,

ALSTON & BIRD LLP

By: _____
Karl Geercken (KG 5897)
Amy Manning (AM 0338)
90 Park Avenue
New York, New York 10016-1387
(212) 210-9471 (phone)
(212) 210-9444 (facsimile)
karl.geercken@alston.com
amy.manning@alston.com

W. Edward Ramage, TN BPR No. 16261
BAKER, DONELSON, BEARMAN,

CALDWELL & BERKOWITZ, P.C.1800
Commerce Center, Suite 1000
211 Commerce Street
Nashville, Tennessee  37201
(615) 726-5600
eramage@bakerdonelson.com
Admitted Pro Hac Vice

Carl M. Davis II, GA Bar Number 207710
BAKER, DONELSON, BEARMAN,
    CALDWELL & BERKOWITZ, P.C.1800
Six Concourse Parkway
Suite 3100
Atlanta, Georgia  30328
(678) 406-8700
cdavis@bakerdonelson.com
Admitted Pro Hac Vice

Micheline Kelly Johnson, TN BPR No. 13847
Clinton P. Sanko, TN BPR No. 23354
BAKER, DONELSON, BEARMAN,
    CALDWELL & BERKOWITZ, P.C.
1800 Republic Centre
633 Chestnut Street
Chattanooga, Tennessee  37450-1800
(423) 756-2010
mjohnson@bakerdonelson.com
csanko@bakerdonelson.com
Admitted Pro Hac Vice

Of Counsel:

Todd R. David , GA BPR No. 206526
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
todd.david@alston.com

Attorneys for Plaintiff Medtech Products Inc.