Exhibit D

Excerpts of *Markman* Hearing Transcript (September 5, 2007)

Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 07 CV 3302 (KMK)(LMS)

MEDTECH PRODUCTS, INC.,    )

    Plaintiff,    )

v,    )

DENTEK ORAL CARE, INC.,    )

    Defendant,    )

---------------------------)

MEDTECH PRODUCTS, INC.,    )

    Plaintiff,    )

v.    )

POWER PRODUCTS, INC.,    )

    Defendant.    )

AUDIO RECORDING TRANSCRIPTION OF the

HEARING before MAGISTRATE MARGARET SMITH,

September 5, 2007.

TRANSCRIBED BY:  ANNETTE M. MONTALVO, CSR, RMR,

    RMR CERTIFICATE NO. 833506.

ESQUIRE DEPOSITION SERVICES

Page 221

1  Q. How many times?
2  A. I have testified all together maybe
3  seven or eight times, and probably two or three
4  or four of those occasions had to do with
5  plastics and resins. Maybe 4 or 5.
6  MS. SPEED: Your Honor, we would move for
7  Mr. Stern to be admitted as an expert in resins
8  in this case.
9  MR. CHENG: Your Honor, a brief voir dire,
10 please.
11 THE COURT: Sure.
12 EXAMINATION
13 BY MR. CHENG:
14 Q. Good afternoon, Mr. Stern.
15 A. Same to you.
16 Q. I believe you testified you have a
17 bachelors degree in chemical engineering, is that
18 right?
19 A. Correct.
20 Q. And when did you receive that degree?
21 A. 1972.
22 Q. And what kind of courses did you take
23 to receive that degree?
24 A. Actually, I don't know if you are

ESQUIRE DEPOSITION SERVICES

Page 222

1  familiar with Cooper Union, but at the time that
2  I went there, Cooper Union was a rather unique
3  institution in that it crammed five years of
4  engineering training into a four-year program.
5  It did so rather successfully. I think at the
6  time I was there, Cooper Union was rated in the
7  top 3 engineering schools in the country. So the
8  kinds of courses I took were largely related to
9  chemistry and chemical engineering. There was a
10 requirement that every student take one course
11 per semester not related to chemical engineering
12 and chemistry, which were affectionally called
13 humanities courses. So I think this was a
14 program of, I don't know, 18 or 19 credits per
15 semester times 8 semesters, and I think we
16 graduated with 140 some odd credits with a very,
17 very specific focus on chemistry and chemical
18 engineering.
19     Q.   Mr. Stern, did you take any classes on
20 chemical testing or physical analysis of
21 materials while an undergraduate?
22     A.   Sure. Yes.
23     Q.   Have you taken any such courses after
24 you graduated?

Page 223

1   A.   No.
2   Q.   So since graduating in 1972, that's
3   over 30 years ago, you haven't taken a single
4   course in chemical testing or physical analysis?
5   A.   I did not.
6   Q.   And you didn't pursue any graduate work
7   in chemistry or chemical engineering, right?
8   A.   I did not.
9   Q.   And you haven't conducted any research
10  in the last 30 years since graduating from Cooper
11  Union, chemical testing of physical analysis of
12  materials?
13  A.   Actually, that's not correct. I was
14  managing partner of a consulting company called
15  Chem Systems with whom I was associated for about
16  20 years, and Chem Systems actually had an R&D
17  lab located in New Jersey. The focus of the R&D
18  that we did was largely a process related rather
19  than product related. But it included, elements
20  of both.
21  Q.   You didn't conduct the R&D yourself,
22  did you?
23  A.   I did not conduct the R&D myself, that
24  is correct.

ESQUIRE DEPOSITION SERVICES

Page 224

1    Q. And you are not an inventor of any
2  patents?
3    A. I am not.
4    Q. You said you -- I think you testified
5  earlier that you had 35 years experience in
6  chemical engineering and that you could not
7  testify that you had been practicing chemical
8  engineering for the last 35 years; is that
9  correct?
10   A. Well, it's a question of how you define
11  chemical engineering, and I think most people
12  define chemical engineering as people that design
13  chemical plants. I haven't designed chemical
14  plants in 30 years. But there's a lot more to
15  chemical engineering than designing chemical
16  plants, as I am sure you know, and assuming again
17  it gets back to chemical products, chemical
18  processes, and chemical production technology,
19  and those are areas that I am very conversant
20  with.
21   Q. Have you actually designed chemical
22  products?
23   A. Oh, sure.
24   Q. Have you designed a product called

ESQUIRE DEPOSITION SERVICES

Page 225

1  resins?
2  A.  No.
3  Q.  Have you designed any products
4  involving molding techniques?
5  A.  No.
6  Q.  Have you been affiliated with molding
7  techniques like injection molding?
8  A.  Generally, yes.
9  Q.  But you haven't studied that?
10 A.  Aside from studying it 35 years ago in
11 college, no.
12 Q.  You testified that you gave
13 presentations regarding resins, right?
14 A.  Yes.
15 Q.  And you gave them to the industry?
16 A.  Yes.
17 Q.  And what do you mean by "the industry"?
18 A.  The American Institute of Chemical
19 Engineers conducts annual meetings where --
20 teachers people that attend a whole variety of
21 things related to chemical products and resins.
22 There are lots of other kinds of industry groups
23 that are concerned about resins in general and
24 the resin business.  I have addressed groups like

0417755e-36b0-4448-bafd-90fe576754e4

1   that. I used to teach a course on the chemical
2   industry, part of which was associated with
3   resins.
4          But, again, let's be clear. When I
5   talk about resins, I am talking about not just
6   process technology for making resins, but the
7   economics of making resins, the commercial
8   elements of the business supply demands, the
9   pricing for products, strategic elements of being
10  in business, merger and acquisition deals and how
11  they affect the business.
12     Q.   These presentations, though, didn't
13  involve the design and manufacture of any product
14  called resins?
15     A.   No.
16     Q.   I believe you also said you testified
17  several times regarding the topic of resins, two
18  to four times; is that right?
19     A.   I think so right.
20     Q.   Was the scope of your testimony namely
21  related to the design or manufacture of any
22  products that involve resins?
23     A.   Certainly the manufacture of products,
24  but not the design and manufacture.

1  Q. And you testified actually to how a
2  product was being manufactured?
3  A. Partially, yes.
4  Q. In what way?
5  A. Well, the production technology of,
6  let's take some examples, polyethylene,
7  polystyrene, polypropylene, PVC, are not
8  universal. Different companies have different
9  methods, some of which they license, some of
10 which they don't. The ability to understand
11 those manufacturing processes and compare them is
12 a fairly significant item of contention in the
13 chemical industry. And so I am familiar with
14 those things and have talked about them in
15 litigation and other audiences.
16 Q. But your testimony has not been about
17 molding techniques?
18 A. No.
19 Q. You say you have been a consultant and
20 you're currently a managing director of LECG; is
21 that right?
22 A. Correct.
23 Q. And LECG is a consulting firm?
24 A. Yes.

Page 228

1   Q. And would you say the consulting work
2   has been about business initiatives and endeavors
3   in the chemical industry?
4   A. Well, part of it, yes.
5   Q. And would it by helping companies with
6   their strategic claim, for example?
7   A. Partially, yes.
8   Q. Business development opportunities?
9   A. Yes.
10  Q. It would not be about advising people
11  how to design their products?
12  A. I would say no.
13  Q. Okay. Or about how to manufacture
14  product involve resins?
15  A. Correct. I don't do that at LECG.
16  Q. Not about what molding techniques?
17  A. No.
18  Q. So you know a lot about the business
19  side of -- would it be fair to say you know a lot
20  about the business side of chemical industry as
21  you described it, but you haven't actually worked
22  with the materials themselves in the past 30
23  years?
24  A. I think that's -- with all due respect,

1   I think that is a fairly narrow view of what I
2   have done over the past 35 years.
3      Q.   Have you ever actually worked with the
4   materials themselves?
5      A.   No.
6      MR. CHENG:  Your Honor, at this time, DenTek
7   would move, actually, with all due respect to
8   Mr. Stern, to exclude him testifying.  He is not
9   an expert skilled in the art of resins, in any
10  way that would help this Court understand the
11  claim construction issues that bear here.
12         So under Rule 702 of the evidence rules
13  as well as Daubert, we would move to exclude him.
14     THE COURT:  Ms. Speed?
15     MS. SPEED:  Your Honor, the expert in claim
16  construction is offered to explain the underlying
17  science.  In this case, your Honor, Mr. Stern is
18  offered to explain the underlying science, which
19  is very clear and with which he has a background
20  of education and experience in.  Your Honor, he
21  is not offered in order to teach the Court or to
22  offer expert opinions on abstract molding
23  concepts.  That's not what's at issue here, your
24  Honor.

ESQUIRE DEPOSITION SERVICES

Page 232

1  for these specific characteristics, hit "enter,"
2  and all the sudden you get a listing of the
3  materials that would satisfy that.
4       That's commensurate with what this
5  patent teaches, your Honor, and Mr. Stern has
6  been offered to guide the Court not in
7  understanding new and high science, but, instead,
8  he's been offered to instruct the Court on what
9  the state of the science was to one of ordinary
10 skill in the art when the patent application was
11 filed, which is something that under Phillips he
12 is permitted and he is experienced and he is
13 qualified to do.
14      MR. CHENG: Your Honor, if I may be heard for
15 a moment.
16      Claim 17 which is at issue here is a
17 method of fabrication. It is a manufacturing
18 claim. It's a process which Mr. Stern, with all
19 due respect, does not have experience in, and
20 with respect to, you know, the topics that
21 opposing counsel has mentioned, she mentioned
22 physical characteristics of resins and how they
23 interact, but Mr. Stern is not skilled in that
24 area. He hasn't consulted or provided --

Page 233

1   (WHEREUPON, there was a short
2   interruption in the audio
3   recording while the tape was
4   changed.)
5   MR. CHENG: -- years on the design and
6   fabrication of any products involved with resins
7   or plastics, and he is not in a position to
8   identify classes of resin taht would satisfy the
9   patent claim limitations. And, finally, with
10  respect to whether or not he's a person of
11  ordinary skill in the art, you know, our expert
12  report -- I mean, Dr. Rancourt's expert report
13  specifically says that the hypothetical person of
14  ordinary skill in the art would have an
15  undergraduate degree with five to ten years
16  industry experience and be versed in the
17  following: Mechanical design, which Mr. Stern
18  does not have, molding technique, which he
19  doesn't have, and chemical analysis of business,
20  which he also doesn't have.
21      So I think he really is not qualified
22  to be speaking in any way to help this Court
23  understand the claim limitations in the context
24  of the lawsuit.

Page 234

1  THE COURT: I understand the objection. I
2 think in the context of this hearing, where I if
3 I consider expert testimony at all, I consider it
4 with a great deal of hesitation. The objections
5 which have been interposed certainly go to the
6 weight, which would be afforded any testimony
7 from Mr. Stern. But for purposes of this
8 proceeding and this proceeding only, I will
9 overrule the objection an allow Mr. Stern to
10 testify as an expert.
11  MS. SPEED: Thank you, your Honor.
12   EXAMINATION (Resumed)
13 BY MS. SPEED:
14  Q. Mr. Stern, in your education and
15 experience, do you understand what the term
16 "resin" means to one that is actually engaged in
17 the business of resins?
18  A. I think so.
19  Q. And how do you know what the term resin
20 means to one of ordinary skill in the art such as
21 yourself or others?
22  A. Well, we will go back to basic
23 principles of what comprises resin. A resin can
24 be a natural or synthetic compound or substance,

Page 272

1  claim and silent to the material that should be
2  used.  What it is is also containing some of the
3  information from claim 1, which is the other
4  claim directed to the structure of the device,
5  the appearance of the device.
6          And so, your Honor, we submit that the
7  reasons for allowance has no bearing whatsoever
8  on this case and should be ignored in construing
9  the claim of -- the method claim of claim 17.
10         And I would like to point out that it
11  is pretty much on time.  Thank you, your Honor.
12     MR. SHALEK:  Your Honor, it is late, and by
13  way of rebuttal, I would really just like to
14  address one point relating to approximately
15  30 percent, if I may.
16     THE COURT:  Sure.
17     MR. SHALEK:  And I don't expect more than a
18  few minutes here.
19          What Mr. Stern testified in effect is
20  that if we take a look at the second limitation
21  in claim 17, which calls for an impression
22  preform comprising an ethylene vinyl acetate
23  copolymer having approximately 30 percent by
24  weight, that what we really should be doing is

0417755e-36b0-4448-bafd-90fe576754e4

Page 273

1  not looking to the words of the claim
2  "approximately 30 percent," but instead we should
3  be looking to any vinyl acetate compound that is
4  a Shore A hardness less than 80 and a Vicat
5  softening temperature less than 70. And at the
6  top of -- at the paragraph that bridges the two
7  pages of this report this is effectively what he
8  says: A person of ordinary skill in resins would
9  understand to make the device patent. The base
10 must be constructed of a resin that is harder and
11 can withstand higher temperatures than the
12 preform. So that would mean that the Shore A
13 hardness would have to be less than 80 and the
14 Vicat less than 70.
15         Now, if we go to what I think has been
16 marked as Exhibit 5, which is this typical
17 physical properties and Elvax, on the second
18 page, all the Elvax compounds that are 25 percent
19 EVA have Shore hardness which is 87 and 83. So
20 an Elvax compound that is 25 percent vinyl
21 acetate would be too hard to be included within
22 section B of the patent, even though Mr. Stern
23 testified that he would include them.
24         So there is a glaring inconsistency in

ESQUIRE DEPOSITION SERVICES

Page 274

1  his testimony there, particularly when the patent
2  says that the EVA content has to be at least 25.
3  So if the patent is saying you can use 25, and
4  the hardness that's specified here is 87 and 83,
5  Mr. Stern can't be right that the hardness must
6  be less than 80.
7       And more to the point, your Honor, the
8  inventor is allowed to claim his invention the
9  way he wants to claim it.  In talking about the
10 base, the inventor talked about Shore A hardness
11 and about Vicat softening temperature.  In
12 claiming the impression preform, the inventor
13 talked about the vinyl acetate content and
14 claimed approximately 30.
15      The inventor certainly knew how to say
16 that there should be some characteristic of the
17 impression preform relating to Shore A hardness
18 or Vicat softening if the inventor chose to make
19 those parameters, but the inventor chose not to.
20 And this is a classic case of a plaintiff trying
21 to rewrite clear claim language, perhaps not so
22 clear because of the ambiguity about
23 "approximately," but clear in the sense that it
24 talks only about vinyl acetate into what the

Page 275

1  plaintiff now wishes the claim had been written,
2  something having to do with Shore A hardness and
3  Vicat softening.
4        And we have cited in our reply brief
5  the Chef and the Lamblesta case (phonetic), the
6  black letter law that the plaintiff has to take
7  the claim as written and can't rewrite it after
8  the fact.
9        Thank you, your Honor. We thank the
10 court for its time and attention.
11    THE COURT: My pleasure.
12    MS. SPEED: Your Honor, may I address that
13 point? And I think I can do it in 2 minutes.
14        When we refer back to Mr. Stern's
15 report, which I believe is Exhibit 5 of the
16 plaintiff.
17    THE COURT: Yes.
18    MS. SPEED: If we look at the last page, what
19 it states, your Honor, in the last paragraph is
20 that a person of ordinary skill in resins would
21 know that the preform resin must contain vinyl
22 acetate as stated in claim 17, but a person of
23 ordinary skill in the art of resins would also
24 understand that the amount of vinyl acetate used