EXHIBIT A

## CONSULTING AGREEMENT

AGREEMENT, dated as of September 30, 1999 between Dental Concepts LLC, a Delaware limited liability company (the "Company"), and C.D.S. Associates, Inc., a New Jersey corporation (the "Consultant"), and Ray Duane ("Duane").

## WITNESSETH:

WHEREAS, the Company wishes to engage the Consultant and the Consultant wishes to be engaged by the Company in connection with the Company's sales activities; and

WHEREAS, the Consultant shall provide its services through Ray Duane ("Duane"), the President of the Consultant.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties hereby agree as follows:

1.      Engagement.  The Company hereby engages the Consultant, and the Consultant hereby accepts the engagement, to direct and supervise the sales of the Company's products, on the terms and conditions hereinafter set forth.

2.      Duties and Obligations.

(a)      The Consultant shall direct and supervise the sales of the Company's products, subject to and under supervision of the Company's President and its Board of Managers, such services shall include, but are not limited to: (i) attaining annual budgeted sales and profit levels; (ii) developing and implementing sales plans, (iii) supervising the day-to-day activities of third party brokers and the Company's sales support staff, and (iv) providing the Company, on a monthly basis, within ten days of the end of each month, a detailed written report of the activity and time devoted to the Company by Duane.

(b)      The Consultant shall provide its services to the Company solely through Duane.  The Consultant shall diligently and to the best of its and Duane's ability provide all services contemplated by this Agreement and/or requested by the Company's President or the Board of Managers of the Company, at the Company's headquarters, and shall engage in such travel as is necessary and appropriate in the reasonable judgment of the Company to perform such services.  The Consultant shall cause Duane to devote his entire business time, energy and skill to such activities on behalf of the Company and Duane shall be required to devote not less than 180 days per consecutive 365 day period to the Consultant's duties hereunder; provided, however

126984.8

that this Agreement shall not be interpreted to prohibit the Consultant or Duane from having passive personal investments or conducting personal business affairs if those activities do not contravene the provisions of Section 10 hereof and do not interfere in any manner with the duties required of the Consultant or Duane under this Agreement or the interests of the Company as reasonably determined by the Company.

(c)     The Consultant agrees to cause Duane to perform such other services as the Company shall reasonably request, and to act in such capacities (other than as an employee of the Company) for the Company and its Affiliates (as hereinafter defined), including serving as an officer of any thereof, as may be requested from time to time by the President or the Board of Managers of the Company, all without further compensation other than that for which provision is expressly made in this Agreement. For purposes of this Agreement, the term "Affiliate" shall refer to any entity which controls, is controlled by, or is under common control with, the Company.

3.     Term. The term of this Agreement shall commence as of the date hereof and shall terminate on December 31, 2002, unless sooner terminated as provided in this Agreement (the "Initial Term"). The then current term of this Agreement shall renew automatically for additional one-year periods commencing on the expiration of the Initial Term or on the immediately succeeding anniversary thereof, as the case may be, (each an "Additional Term", and, collectively with the Initial Term, the "Term"), unless sooner terminated (i) by either party by giving written notice to the other party not less than sixty (60) days prior to the end of the Initial Term or the then current Additional Term, as the case may be, or (ii) in accordance with Section 6 hereof.

4.     Independent Contractor.

(a)     Nothing in this Agreement shall be construed to create the relationship of employer and employee or master and servant between the Company and the Consultant or Duane or any employee of the Consultant. The Consultant and Duane shall be deemed at all times to be an independent contractor. The Consultant shall be solely responsible for the payment of any and all taxes which are payable in respect of any and all compensation from the Company and/or which are paid to or earned by Duane or any other officer or employee of the Consultant. Neither the Consultant nor Duane nor any of its other employees shall be eligible to participate in any fringe, pension, insurance, benefit or welfare plans or policies of the Company or any of its Affiliates.

(b)     Except as otherwise expressly provided herein, the Consultant shall pay all costs and expenses of whatsoever nature incurred by the Consultant in connection with this Agreement and/or the performance of any services for or on behalf of the Company or any of its Affiliates, including, without limitation, any commissions or other compensation paid to Duane or any other agents, consultants or employees engaged or employed by the Consultant, any expenses for travel, entertainment, offices or services and all taxes and other assessments.

5.    Compensation and Benefits.

(a)    Commencing on the date hereof and during the Term, the Company shall pay the Consultant a consulting fee of $11,000 per month, to be paid on a monthly basis.

(b)    In addition to the compensation set forth in Section 5(a) and Section 5(c) hereof, during the Term the Consultant shall be paid the Incentive Fee, as and to the extent provided in Schedule A hereto, and subject to the terms and conditions set forth in Schedule A hereto.

(c)    In addition to the compensation set forth in Section 5(a) and Section 5(b) hereof, during the Term the Consultant shall be entitled to the Sale Fee, as described in Schedule B hereto, and pursuant to the terms and conditions as set forth in Schedule B hereto.

(d)    To the extent that the Consultant provides the Company with appropriate receipts the Company shall reimburse those amounts included in such receipts in respect of reasonable moving expenses to the New York metropolitan area incurred by Duane, up to an aggregate maximum amount of $20,000.

(e)    The Company shall provide the Consultant with office space and secretarial assistance at the Company's principal office.  It is contemplated that, in connection with its engagement hereunder, the Consultant may be required to incur reasonable and necessary entertainment and travel expenses in accordance with the Company's standards and policies.  The Company agrees to reimburse the Consultant for such reasonable and necessary entertainment and travel expenses incurred or expended by it incident to the performance of its duties hereunder upon submission by the Consultant to the Company of vouchers or expense statements satisfactorily evidencing such expenses.  The Consultant shall be required to obtain the prior written approval of the Company for any expenses in excess of $250 per individual expense, $750 per month, or such written budget as may be previously approved by the Company.

6.    Termination.

(a)    Notwithstanding anything to the contrary contained herein, the Company's engagement of the Consultant under this Agreement and the Consultant's right to any and all compensation to which the Consultant would otherwise be entitled, shall terminate upon the earliest to occur of the following events:

(i)    the death of Duane;

(ii)    at the Company's option, the permanent disability (as hereinafter defined) of Duane;

126984.8                                                -3-

Consultant;

(iii)    the bankruptcy or insolvency, dissolution or liquidation of the Consultant;

(iv)    the expiration of the Term;

(v)    upon written notice to the Consultant from the Company, for Just Cause (as hereinafter defined); or

(vi)    at the option of the Company, upon the sale of the Company or of substantially all its assets or business to a person or entity which is not immediately prior thereto an Affiliate of the Company.

(b)    "Just Cause" for purposes hereof shall mean:

(i)    the commission by the Consultant, Duane or any other employee, agent or affiliate of the Consultant of a felony, or of theft, embezzlement, obtaining funds or property under false pretenses or any similar act of material misconduct with respect to the property of the Company or any of its Affiliates or any of their respective employees or any of the Company's customers or suppliers, or should any representation made to the Company by the Consultant or Duane be false or inaccurate in any material respect;

(ii)    the commission by the Consultant, Duane or any other employee, agent or affiliate of the Consultant of a material act of malfeasance, dishonesty or breach of trust against the Company or any of its Affiliates or any of the Company's manufacturers, customers or suppliers, including a breach by the Consultant, Duane or any other employee, agent or affiliate of the Consultant of any of its covenants or obligations under Section 10 of this Agreement;

(iii)    the Consultant's or Duane's repeated failure to successfully fulfill its or his duties or obligations under this Agreement or its or his breach of any of the material obligations and covenants under this Agreement; or

(iv)    the termination or cessation of Duane's full-time employment with the Consultant, or the intentional failure of Duane to be available to perform the services contemplated by this Agreement, for any reason.

(c)    Duane shall be deemed to be permanently disabled for purposes hereof, at the option of the Company, in the event that Duane shall fail to render and perform any of the services contemplated by this Agreement for a continuous period of three (3) consecutive months, or for shorter periods aggregating one hundred and twenty (120) days or more during any period of twelve (12) successive months, because of physical or mental incapacity or disability.

(d)    In the event the engagement of the Consultant under this Agreement is terminated by the Company, other than pursuant to Section 6(a) hereof, prior to what would have

126984.8    -4-

been the end of the Term but for such termination, all payments to the Consultant due and payable under this Agreement shall remain due and payable.

(e)     Upon the termination of the Term, for any reason, or upon the termination of the Consultant's engagement as consultant hereunder, for any reason, the Consultant shall immediately discontinue the use of any and all trade names, trademarks, labels, copyrights, customer lists, manufacturer lists, supplier lists, advertising media and proprietary products or properties belonging to or supplied to the Consultant by the Company, and the Consultant shall, at the Consultant's expense, return to the Company all such materials.

7.     Proprietary Information; Confidentiality; Non-Competition.

(a)     The Consultant and Duane shall execute and deliver to and for the benefit of the Company an agreement substantially in the form of Exhibit A hereto, pertaining, among other matters, to Proprietary Information and Inventions (as such terms are defined in said Exhibit A) and confidentiality obligations, the provisions of which shall be deemed incorporated herein by reference as if set forth herein.

(b)     The Consultant and Duane agree that, commencing as of the date hereof and during the period of the Consultant's engagement by the Company (whether under this Agreement or otherwise) and for a period of twenty-four (24) months from and after the date of termination of such engagement, if such engagement is terminated by the Consultant or is terminated by the Company for Just Cause, neither the Consultant nor Duane shall, without the prior written approval of the Board of Managers of the Company, directly or indirectly, through any other person or entity, whether for itself or himself or as agent on behalf of any other person or entity, and whether as employee, consultant, principal, lender, partner, officer, director, stockholder or otherwise:

(i)     solicit, raid, entice or induce, or cause, any person who presently is, or any time during the Consultant's engagement by the Company shall be or shall have been, an employee of the Company or any of its Affiliates at any time during the twelve (12) months preceding such solicitation, raid, enticement, inducement or causation, to become employed or retained by any other person or entity; or

(ii)     initiate communications with, solicit, entice, or induce any client, customer or account who presently is, or at any time during the period of the Consultant's engagement by the Company shall be or shall have been, a client, customer, supplier or account of the Company or Dental Concepts, Inc. (the "Predecessor") at any time during the twenty-four (24) months preceding such communication, solicitation, enticement or inducement, to terminate or reduce any contractual, business or other relationship with the Company;

(iii)     sell any product or provide any service which is competitive with any of the businesses, products or services of the Predecessor and/or the Company engaged in or

126984.8                                        -5-

marketed during the period of the Consultant's engagement with the Company or during the 24-month period prior thereto (the "Activities"), or promote, market, sell, become or acquire an interest in, or associate in a business relationship with, or aid or assist, any other person or other entity whatsoever who is engaged in any line of business competitive with any of the Activities;

(iv) become an employee, consultant, agent, principal, lender, partner, officer, director, stockholder of, or otherwise provide services to or on behalf of, any other person or entity who is engaged in any line of business competitive with any of the Activities engaged in during the period of the Consultant's engagement with the Company or during the 24-month period prior thereto; or

(v) promote, market, assist or participate in the development, sale, marketing or licensing of any product or service competitive with any of those marketed by the Predecessor and/or the Company during the period of the Consultant's engagement with the Company or the 24-month period prior thereto;

(c) The provisions of this Section 7 and Exhibit A shall survive the termination or expiration of this Agreement and/or the Term, irrespective of the reason therefor, including without limitation under circumstances in which the Consultant or Duane continues thereafter to be engaged by the Company.

(d) Each of the Consultant and Duane acknowledges that the services to be rendered by it and him are of a special, unique and extraordinary character and, in connection with such services, it and he will have access to confidential information vital to the business of the Company and its Affiliates. By reason of the foregoing, the Consultant and Duane each consents and agrees that, if it or he violates or threatens to violate any of the provisions of this Section 7 or of Exhibit A, the Company and/or its Affiliates would sustain irreparable harm and, therefore, in addition to any other rights or remedies which the Company and/or its Affiliates may have under this Agreement or otherwise, the Company and its Affiliates shall be entitled (without the necessity of posting any bond or security) to an injunction from any court of competent jurisdiction restraining the Consultant and Duane from committing or continuing any such violation (or participating therein).

(e) Each of the Consultant and Duane agrees to keep the terms of this Agreement in strictest confidence, except as otherwise required by law or a court of competent jurisdiction, provided further that the Company shall be given reasonable opportunity prior to any such disclosure to contest such requirement.

(f) The Consultant shall not use any trademarks of or used by the Company, or any advertising, promotional or other materials or information for the purpose of advertising, promoting or otherwise publicizing the Company or any product or operations thereof without obtaining the prior written approval thereof by the Company, and then only in accordance with such policies and requirements by the Company shall establish from time to time.

8.      Assignment. This Agreement shall be personal to the Consultant and shall not be assigned by the Consultant, and the Consultant shall not provide any services pursuant hereto other than through the services of Duane, and no other employee of the Consultant shall perform services for the Company pursuant hereto or otherwise without the express prior written consent of the Company. Subject to the foregoing, the Agreement shall be binding upon and inure to the benefit of the respective heirs, personal representatives, successors and assign of the parties hereto.

9.      Law Governing. This Agreement shall be construed and governed in accordance with the laws of the State of New York without regard to such state's conflict of laws provisions.

10.      Entire Agreement. This Agreement contains the entire agreement between the parties. There are merged herein all prior and collateral representations, promises and conditions in connection with the subject matter hereof. Any representation, promise or condition not incorporated herein shall not be binding upon either party. This Agreement supersedes and is in lieu of all existing agreements or arrangements between the parties relating to the subject matter hereof. The representations, warranties, covenants and obligations of either the Consultant or Duane under this Agreement constitute the joint and several representations, warranties, covenants and obligations of each of the Consultant and Duane.

11.      Notices. Any notice required to be given under the terms of this Agreement will be considered to have been properly given when personally delivered or three days after mailing by registered first-class mail, return receipt requested, to the Company at its then principal executive office or if to the Consultant or Duane, at the address thereof in the Company's records.

12.      Severability. In the event that any provisions of this Agreement would be held to be invalid, prohibited or unenforceable in any jurisdiction for any reason, unless narrowed by construction, this Agreement shall, as to such jurisdiction only, be construed as if such invalid, prohibited or unenforceable provision has been more narrowly drawn so as not to be invalid, prohibited or unenforceable (or if such language can not be drawn narrowly enough, the court making any such determination shall have the power to modify in scope, duration or otherwise any such provision, but only to the extent necessary to make such provision or provisions enforceable in such jurisdiction, and such provision shall then be applicable in such modified form). If, notwithstanding the foregoing, any provision of this Agreement would be held to be invalid, prohibited or unenforceable in any jurisdiction, such provision shall be ineffective to the extent of such invalidity, prohibition or unenforceability, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

13.      Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement.

14.    Waiver. Any failure by any party to this Agreement to comply with any of its or his obligations hereunder may be waived by the Company in the case of a failure by the Consultant or Duane and by the Consultant in case of a failure by the Company. No waiver shall be effective unless in writing and signed by the party granting such waiver, and no such waiver shall be deemed a waiver of any subsequent failure of the same or similar nature.

15.    Drafting. No party shall be deemed to have drafted this Agreement or any of the agreements and instruments executed and delivered pursuant hereto but rather this Agreement and each of the agreements and instruments executed and delivered pursuant hereto are a collaborative effort of the undersigned parties and their attorneys.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

DENTAL CONCEPTS LLC

By: _____
Michael S. Lesser, President

C.D.S. ASSOCIATES, INC.

By: _____
Ray Duane, President

ACCEPTED AND AGREED:

_____
Ray Duane

126984.8                                    -8-

Schedule A

1.    If during the Term the business acquired by the Company from Dental Concepts, Inc., as the same may be expanded or developed from time to time and for which the Consultant shall then have sales supervisory responsibility under this Agreement (the "Business"), achieves Annual Net Invoice Sales in the calendar year 2000, in the following indicated amount, the Incentive Fee for such calendar year shall be as follows:

(a)    If such Annual Net Invoice Sales are at least $7,000,000 and not more than $7,249,999, the Incentive Fee will be $25,000; or

(b)    If such Annual Net Invoice Sales are between $7,250,000 and $7,499,999, the Incentive Fee will be $50,000; or

(c)    If such Annual Net Invoice Sales are $7,500,000 and $7,749,999, the Incentive Fee will be $75,000; or

(d)    If such Annual Net Invoice Sales are at least $7,750,000 or more, the Incentive Fee will be $100,000.

2.    If during the Term the Business achieves Annual Net Invoice Sales in the calendar year 2001, in the following indicated amount, the Incentive Fee for such calendar year shall be as follows:

(a)    If such Annual Net Invoice Sales are between $8,000,000 and $8,999,999, the Incentive Fee will be $50,000; or

(b)    If such Annual Net Invoice Sales are between $9,000,000 and $9,999,999, the Incentive Fee will be $75,000; or

(c)    If such Annual Net Invoice Sales are between $10,000,000 and $10,499,999, the Incentive Fee will be $100,000; or

(d)    If such Annual Net Invoice Sales are at least $10,5000,000 or more, the Incentive Fee will be $150,000.

3.    If during the Term the Business achieves Annual Net Invoice Sales in the calendar year 2002, in the following indicated amount, the Incentive Fee for such calendar year shall be as follows:

(a)    If such Annual Net Invoice Sales are between $11,000,000 and $11,999,999 Million, the Incentive Fee will be $60,000; or

126984.8

(b)    If such Annual Net Invoice Sales are between $12,000,000 and $12,999,999, the Incentive Fee will be $120,000; or

(c)    If such Annual Net Invoice Sales are at least $13,000,000 the Incentive Fee will be $180,000.

4.    For purposes of this Schedule A, Annual Net Invoice Sales for a particular year shall equal the amount of invoice sales by the Company to its customers during such year, less all off-and/or post-invoice allowances, returns, credits and adjustments and less all sales, value added and similar taxes and all customs, import and export duties and charges.

120984.8

Schedule B

Sale Fee.  Subject to the terms and conditions of this Schedule B:

A.    If, at any time during the Term or within twelve months from the end of the Term (unless the Term is terminated for Just Cause or is terminated by the Consultant), all or substantially all of the Business (as hereinafter defined) is sold (whether by sale of assets or sale of all or substantially all of the equity interests of the Company) to a person or entity which is not, at any time during the Term or immediately prior to such sale, an Affiliate of the Company, for an aggregate Purchase Price (as hereinafter defined) of at least $15,000,000 and not more than $24,999,999, the Consultant shall be entitled to a Sale Fee of $500,000; or

B.    If, at any time during the Term or within twelve months from the end of the Term (unless the Term is terminated for Just Cause or is terminated by the Consultant), all or substantially all of the Business (as hereinafter defined) is sold (whether by sale of assets or sale of all or substantially all of the equity interests of the Company) to a person or entity which is not, at any time during the Term or immediately prior to such sale, an Affiliate of the Company, for an aggregate Purchase Price (as hereinafter defined) of between $25,000,000 and $29,999,999, the Consultant shall receive a Sale Fee of $750,000; or

C.    If, at any time during the Term or within twelve months from the end of the Term (unless the Term is terminated for Just Cause or is terminated by the Consultant), all or substantially all of the Business (as hereinafter defined) is sold (whether by sale of assets or sale of all or substantially all of the equity interests of the Company) to a person or entity which is not, at any time during the Term or immediately prior to such sale, an Affiliate of the Company, for an aggregate Purchase Price (as hereinafter defined) of between $30,000,000 and $34,999,999, the Consultant shall receive a Sale Fee of $1,000,000; or

D.    If, at any time during the Term or within twelve months from the end of the Term (unless the Term is terminated for Just Cause or is terminated by the Consultant), all or substantially all of the Business (as hereinafter defined) is sold (whether by sale of assets or sale of all or substantially all of the equity interests of the Company) to a person or entity which is not, at any time during the Term or immediately prior to such sale, an Affiliate of the Company, for an aggregate Purchase Price (as hereinafter defined) of between $35,000,000 and $44,999,999, the Consultant shall receive a Sale Fee of $1,500,000; or

E.    If, at anytime during the Term or within twelve months from the end of the Term (unless the Term is terminated for Just Cause or is terminated by the Consultant), all or substantially all of the Business (as hereinafter defined) is sold to a person or entity which is not, at any time during the Term or immediately prior to such sale, an Affiliate of the Company, for a total aggregate Purchase Price (as hereinafter defined) of $45,000,000 or more, the Consultant shall receive a Sale Fee of $2,000,000, plus an additional $500,000 for each $10,000,000 of Purchase Price in excess of $45,000,000.

126984.8

F.    All references in this Schedule B to the "Business" shall refer only to the business acquired by the Company from Dental Concepts, Inc., as the same may be developed or expanded from time to time by the Company and for which the Consultant shall have sales supervisory responsibility under this Agreement, but excluding, unless the Company shall otherwise expressly agree in writing, any other business acquired by the Company after the date hereof (as such acquired business may be developed or expanded from time to time).

G.    For purposes of this Schedule B, the "Purchase Price" shall mean that portion of the aggregate purchase price for any sale covered by this Schedule B fairly allocable to the Business (as determined by the Company in good faith), reduced dollar-for-dollar by (i) the amount (if any) of all future equity contributed to the Company in connection with the Business and the amount of all future debt incurred by the Company in connection with the Business and outstanding immediately prior to such sale or discharged out of proceeds of such sale, and (ii) all finders' fees, commissions and other expenses incurred in respect of or in connection with such sale.

H.    Only one Sale Fee shall be payable to the Consultant notwithstanding the fact that there may be more than one sale, and such Sale Fee shall only be payable with respect to the first sale, to which this Schedule B could apply.

126984.8

## DENTAL CONCEPTS LLC

Proprietary Information and Inventions Agreement

The undersigned recognize that Dental Concepts LLC, a Delaware limited liability company (the "Company", which term includes, for purposes of this Proprietary Information and Inventions Agreement (the "Agreement") only, any entity directly or indirectly controlling, controlled by or under common control with the Company), is engaged in the design, development, marketing, licensing, distribution and sale of oral hygiene products.

The undersigned understand that:

A.    As part of the engagement by the Company of the consulting services, of C.D.S. Associates, Inc. ("Consultant") and its president Ray Dunne (collectively with Consultant, "Obligors"), Obligors are expected to make new contributions of value to the Company.

B.    Such engagement creates a relationship of confidence and trust between Obligors and the Company with respect to any information:

(1)    Applicable to the business of the Company and made known to any of Obligors by the Company or learned by any of Obligors; or

(2)    Applicable to the business of any client, distributor, supplier or customer or any person or entity in which the Company is engaged in a venture (a "strategic partner"), which may be made known to Obligors by the Company or by any client, customer or strategic partner of the Company, or learned by Obligors during the period of Obligors' engagement by the Company.

C.    The Company possesses and will continue to possess information that has been acquired, created, discovered or developed, or has otherwise become known to the Company (including, without limitation, information acquired, created, discovered, developed or made know by or to Obligors during the period of Obligors' engagement by the Company), and/or in which property or other rights have been assigned or otherwise conveyed to the Company, which information has commercial value in the business in which the Company is engaged and none of which is in the public domain except through the breach by Obligors or anyone else of a confidentiality duty to the Company. All of the aforementioned information is hereinafter called "Proprietary Information." By way of illustration, but not limitation, Proprietary Information includes "Developments" (as herein defined), data, know-how, techniques, marketing plans and opportunities, cost and pricing data, strategies, forecasts and customer lists. "Developments" includes inventions, product designs, developments, improvements, discoveries, trade secrets, technologies, processes, research, methods, formulae, uses of any of the foregoing, computer software and programs (including source code and related documentation), test and/or experimental data and results, specifications, laboratory notebooks, drawings and technical information and materials.

126984.8

D.    As used herein, the period of Obligors' engagement includes any time in which any of Obligors may be retained by the Company as a consultant or employee.

In consideration of Consultant's engagement, and the compensation received or to be received by Consultant from the Company from time to time, Obligors hereby jointly and severally represent, warrant, covenant and agree to, with and for the benefit of the Company, as follows:

1.    All Proprietary Information shall be the sole property of the Company and its assigns, and the Company and its assigns shall be the sole owner of all patents, copyrights, trade secrets, trademarks, trade names and other rights in connection therewith. Obligors hereby assign to the Company any and all rights which any of Obligors may have or acquire in any and all Proprietary Information. At all times, both during Consultant's engagement by the Company and after its termination, Obligors will keep in confidence and trust all Proprietary Information, and will not use or disclose any Proprietary Information without the written consent of the Company, except as may be necessary in the ordinary course of performing Consultant's duties as a consultant to the Company. SINCE IT IS SOMETIMES DIFFICULT TO SEPARATE PROPRIETARY INFORMATION FROM THAT WHICH IS NOT, OBLIGORS WILL REGARD ALL INFORMATION GAINED OR DEVELOPED AS A RESULT OF ANY ASSOCIATION WITH THE COMPANY AS PROPRIETARY INFORMATION.

In the event that any of Obligors is compelled (by legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any of the Proprietary Information, Obligors shall provide the Company with prompt written notice of any such request or requirement so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by the Company, any of Obligors is nonetheless legally compelled to disclose Proprietary Information to any tribunal, any Obligor may disclose to such tribunal only that portion of the Proprietary Information which is legally required to be disclosed.

2.    Obligors will promptly disclose to the Company, or any persons designated by it, all inventions, designs, improvements, processes, techniques, know-how, data and other Developments made or conceived or reduced to practice or learned by any of Obligors, either alone or jointly with others, during the period of Consultant's engagement by the Company which are related to or useful in the business of the Company, or result from use of premises, or property, equipment, facilities or funding owned, leased, contracted for or provided by the Company (all said improvements, processes, techniques, know-how, data and other Developments, shall be collectively called "Inventions").

3.    Obligors agree that all Inventions shall be the sole property of the Company and its assigns, and the Company and its assigns shall be the sole owner of all patents, copyrights, trademarks and other rights in connection therewith. All Inventions shall be deemed for all purposes to be work for hire for the benefit of Company. Obligors hereby assign to the

126984.8

Company any rights which any Obligors may have or acquire in all Inventions. Obligors agree to execute any documents requested by the Company to effectuate the intent of this paragraph.

4.     The Company shall have the right (but shall not be obligated) to use, assert and/or apply for patent, copyright, trademark and other statutory or common law protection for any or all Inventions in any and all countries. Obligors agree to assist the Company in every reasonable way without additional compensation (but at the Company's expense), to apply for, prosecute and obtain, and from time to time enforce, defend and protect any and all patent, copyright, trademark and other statutory or common law protection for any of the Inventions in any and all countries. Obligors shall, whether during or following engagement by the Company, at the Company's request and expense, but without additional compensation to any of Obligors, execute any and all assignments, transfers, applications and other papers covering any Invention(s) which may be considered necessary or helpful by the Company in furtherance of the foregoing and/or to accomplish the assignment, transfer and/or license of any Inventions to persons designated by the Company.

In the event that the Company is unable for any reason whatsoever to secure any Obligor's signature to any document required to apply for or execute any application with respect to any of the foregoing (including renewals, extensions, continuations, divisions or continuations in part with respect to any of the foregoing), Obligors hereby irrevocably designate and appoint the Company and its duly authorized officers and agents, as their agents and attorneys-in-fact to act for and on their behalf and instead of them, such appointment being irrevocable and coupled with an interest, to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of any of the foregoing with the same legal force and effect as if executed by Obligors.

5.     In the event of the termination of engagement of any of Obligors or by the Company, for any reason, or any other time upon the Company's request, Obligors shall deliver to the Company all materials, samples, data, physical property, memoranda, notes, records, customer mailing or contact lists and other documents of any nature made or compiled by any of Obligors or made available to any of Obligors pertaining to any work with or to the business or affairs of the Company, all of which shall be deemed the property of the Company, and Obligors, upon any such termination, shall not take with them any documents, data or property or any description or any reproduction of any of the foregoing containing or pertaining to any Proprietary Information and/or Inventions.

6.     Obligors represent and warrant that their respective obligations under this Agreement and under the Consulting Agreement entered into with Dental Concepts LLC (the "Consulting Agreement") and their respective performance under this Agreement and the Consulting Agreement and otherwise as consultant to the Company, do not and will not breach any agreement or obligation in favor of any other person or entity whether to keep in confidence proprietary information acquired by any of them prior to engagement by the Company or any non-competition or similar agreement or otherwise. No Obligor has entered into, and Obligors agree no Obligor shall enter into, any agreement either written or oral in conflict herewith or with the Consulting Agreement.

7.      In the event that any provision of this Agreement would be held to be invalid, prohibited or unenforceable in any jurisdiction for any reason (including, but not limited to, any provision which may be held unenforceable because of the scope, duration or area of its applicability), unless narrowed by construction, this Agreement shall, as to such jurisdiction only, be construed as if such invalid, prohibited or unenforceable provision had been more reasonably drawn so as not to be invalid, prohibited or unenforceable (or, if such language cannot be drawn narrowly enough, the court making any such determination as to any provision shall have the power to modify such scope, duration or area or all of them, but only to the extent necessary to make such provision enforceable in such jurisdiction, and such provision shall then be applicable in such modified form in such jurisdiction only). If, notwithstanding the foregoing, any provision of this Agreement would be held to be invalid, prohibited or unenforceable in any jurisdiction, such provision, as to such jurisdiction only, shall be ineffective to the extent of such invalidity, prohibition or unenforceability, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provisions in any other jurisdiction.

8.      By reason of the fact that irreparable harm would be sustained by the Company in the event that there is a breach by me of any of the terms, covenants and agreements set forth in this Agreement, in addition to any other rights that the Company may otherwise have, the Company shall be entitled to apply to and obtain specific performance and/or injunctive relief against Obligors from any court of competent jurisdiction, without making a showing that monetary damages would be inadequate and without the requirement of posting any bond or other security whatsoever, in order to enforce or prevent any breach or threatened breach of any of the terms, covenants and agreements set forth in this Agreement, and Obligors will not contest such application for specific performance and/or injunctive relief.

9.      This Agreement shall be binding upon Obligors and their respective heirs, executors, successors, assigns and administrators, and shall inure to the benefit of the Company and its successors and assigns.

Dated as of September 3c, 1999

                                        C.D.S. ASSOCIATES, INC.


                                        By: _____
                                        Name: R £ y D ᵤ ᵢ ₙ ᵤ
                                        Title: P ᵣ ₑ ₛ ᵢ d ₑ ₙ T


                                        _____
                                                  RAY DUANE


ACCEPTED:

DENTAL CONCEPTS LLC

By: _____
        Michael S. Lesser, President

126984.0                                    -5-

Dental Concepts    650 From Road    Ph 201 576 9700
Paramus    Fx 201 576 9780
New Jersey    www.dentalconcepts.com
07652

This is written as an ADDENDUM to the CONSULTING AGREEMENT dated as of September 30, 1999 between Dental Concepts LLC, a Delaware limited liability company (the "Company") and C.D.S. Associates, Inc., a New Jersey Corporation (the "Consultant") and Ray Duane ("Duane").

The term of this agreement is hereby extended to December 31, 2005.

Base pay will be raised to $150,000 annually and shall be paid monthly.

All the provisions of the Consulting Agreement will continue in full force and effect with the exceptions noted below:

<u>Termination:</u>  Paragraph 6 (a-i) & (a-ii).
In the event of Duane's death, his estate shall be paid all monies due him under Schedule A (Annual Bonus) and Schedule B (Sale of Business Bonus).  These payments will be calculated on a pro-rata basis (i.e. days of service divided by bonus period)



<u>Schedule A:</u>
*For 2003:*
- A year-end bonus of $50,000 will be paid if Annual Net Invoice Sales for that year equal the Business Plan Objective of $14,700,000 or more,
- A year-end bonus of $100,000 will be paid if Net Sales are $16,200,000 or more,
- A year-end bonus of $150,000 will be paid if Net Sales are $17,700,000 or more.

*For 2004 and 2005:*
A year-end bonus agreement based on that year's business plan and structured along similar guidelines will be agreed-upon at the start of 2004 and 2005.

This ADDENDUM shall be binding upon Obligors and their respective heirs, executors, successors, assigns and administrators and shall inure to the benefit of the Company and its successors and assigns.

Agreed upon this day of December *12*, 2002 by:

C.D.S. Associates, Inc.

By: _____
Ray Duane, President

_____
RAY DUANE

ACCEPTED:
Dental Concepts, LLC

By: _____
Michael S. Lesser, President