**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **MEDTECH PRODUCTS INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| **RANIR, LLC AND CVS PHARMACY, INC.,** | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| **MEDTECH PRODUCTS INC.,** | ) | **Civil Action No. 07 CV 3302 (KMK)(LMS)** |
| **Plaintiff,** | ) | |
| **v.** | ) | **ECF FILED** |
| **DENTEK ORAL CARE, INC.,** | ) | |
| **KELLY M. KAPLAN,** | ) | |
| **RAY DUANE, AND** | ) | |
| **C.D.S. ASSOCIATES, INC.** | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| **MEDTECH PRODUCTS INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| **POWER PRODUCTS, INC.,** | ) | |
| **d/b/a/ SPLINTEK,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**PLAINTIFF MEDTECH PRODUCTS INC.'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS RAY DUANE'S AND C.D.S. ASSOCIATES, INC.'S MOTION TO
DISMISS THE SECOND AMENDED COMPLAINT AND FOR OTHER RELIEF**

## TABLE OF CONTENTS                                Page No.

I.   PROCEDURAL BACKGROUND.................................................................................1

II.  INCORPORATION OF MEDTECH'S RESPONSE TO
     KAPLAN/DENTEK MOTION TO DISMISS .................................................3

III. THE RELEVANT MOTION TO DISMISS STANDARD..................................................3

IV.  ARGUMENT .................................................................................................4

     A.  THE CONSULTING AGREEMENT, BY ITS TERMS, WAS
         NOT TERMINATED UPON THE SALE OF DENTAL
         CONCEPTS TO MEDTECH. ...............................................................4

         1.  The Relevant Allegations Regarding the Non-Competition
             and Non-Solicitation Terms of the September 30, 1999
             Consulting Agreement. ................................................................4

         2.  The Covenant Not to Compete and Non-Solicitation
             Provisions Applied to C.D.S. and Ray Duane. ...........................6

     B.  THE GENERAL RELEASE DOES NOT SUPPLANT THE
         PRIOR CONTRACTS BECAUSE THE PROVISIONS WORK IN
         TANDEM. ......................................................................................10

         1.  Additional Background on the Confidentiality Obligations
             At Issue. ....................................................................................10

         2.  CDS was not a Party to the General Release and, Therefore,
             Its Confidentiality Obligations Are Governed by the
             Consulting Agreement and Proprietary Information
             Agreement...................................................................................14

         3.  As to Mr. Duane, the Confidentiality Obligations of the
             General Release Do Not Supersede the Confidentiality
             Provisions of the Consulting Agreement and the
             Proprietary Information and Inventions Agreements. ...............14

     C.  THE TRADE SECRET CLAIMS ARE PROPERLY PLEADED.......................17

<u>**TABLE OF AUTHORTIES**</u>                <u>**PAGE NO.**</u>

*American Express Bank Ltd. v. Uniroyal, Inc.,* 164 A.D.2d 275, 277,
    562 N.Y.S.2d 613, 614 (1st Dep't
    1990)……………………………………………………………...……....7,9

*CreditSights, Inc. v. Ciasullo*, No. 05 CV 9345 (DAB), 2007 WL 943352
    (S.D.N.Y. March 29,
    2007)………………………………………………………………….…….15

*Globe Food Services Corp. v. Consolidated Edison Co. of New York, Inc.*,
    184 A.D.2d 278 (1st Dep't
    1992)…………………………………………………..………….16

*PaineWebber Inc. v. Bybyk*  81 F.3d 1193, 1199 (2d Cir. 1996)…………………………….......7

*Tigue v. Commercial Life Ins. Co.,* 631 N.Y.S.2d 974, 975 (4th Dep't 1995)…………...........9

Plaintiff Medtech Products Inc. ("Medtech") respectfully submits this Memorandum in Opposition to Defendants Ray Duane's ("Mr. Duane") and C.D.S. Associates, Inc.'s ("C.D.S.") Motion to Dismiss the Second Amended Complaint and For Other Relief ("Motion to Dismiss") and Memorandum in Support of the Motion to Dismiss ("Duane/C.D.S. Memorandum").[1]   The Duane/C.D.S. Memorandum adds little to an already over-crowded docket.   With few exceptions, the arguments were already set forth by the other defendants in this case, and were extensively briefed by the parties.   For the reasons set forth in this pleading, the Motion to Dismiss should be **DENIED**.

## I.
## PROCEDURAL BACKGROUND

Currently, two other motions to dismiss are pending before this Court: [1] DenTek Oral Care, Inc.'s ("DenTek") Motion for (A) Partial Dismissal of the Second Amended Complaint and (B) Entry of a Protective Order and Order Compelling Disclosure of Alleged Trade Secrets, filed on November 21, 2007 ("DenTek's Motion to Dismiss") (Docket No. 109) and [2] Kelly M. Kaplan's ("Ms. Kaplan") Motion to Dismiss and For Other Relief, filed on November 21, 2007 ("Kaplan's Motion to Dismiss") (Docket No. 104).

Medtech responded on December 7, 2007 to DenTek's Motion to Dismiss and Kaplan's Motion to Dismiss ("Medtech's Response to Kaplan/DenTek Motion to Dismiss"), and both DenTek and Ms. Kaplan filed extensive reply briefs.

On November 19, 2007, Defendant Ray Duane, *pro se*, also filed a purported "motion to dismiss" with this Court entitled: "Defendants Ray Duane and C.D.S. Associates, Inc. Moves the Court to Dismiss and Sever Charges Brought by Plaintiff Medtech."  ("Duane First Motion to

---

[1]     Consistent with the Duane/C.D.S. Memorandum, Mr. Duane and C.D.S. are collectively referred to as the "Duane Defendants".

1

Dismiss and Sever"). As explained in Medtech's Response to Kaplan/DenTek Motions to Dismiss, Medtech demonstrated that Mr. Duane's *pro se* Motion to Dismiss and Sever raised "issues of fact not appropriate for determination by means of a motion to dismiss." (Medtech's Response to Kaplan/DenTek Motion to Dismiss at pp. 34-35.)

Mr. Duane also filed a separate motion on behalf of C.D.S. entitled: "C.D.S. Associates Moves the Court to Dismiss and Sever Charges Brought by Plaintiff Medtech" ("C.D.S. First Motion to Dismiss and Sever"). Medtech filed a Motion to Strike the C.D.S. First Motion to Dismiss and Sever because a corporation cannot proceed *pro se*—a fact expressly communicated to Mr. Duane. After appearing before this Court at the December 21, 2007 hearing, and after being informed again that he could not appear *pro se* on behalf of C.D.S., Mr. Duane and C.D.S. retained counsel.

After receiving leave at the February 14, 2008 hearing before this Court, Mr. Duane and C.D.S. filed the instant Duane/C.D.S. Motion to Dismiss. Almost off-handedly, at the end of the procedural section of the brief, the Duane/C.D.S. Memorandum announces that "[t]he previous motions filed by Duane *pro se* are withdrawn." (Duane/C.D.S. Mem. at p. 8.) Medtech does not object to procedurally considering those motions withdrawn. However, to the extent that Mr. Duane made factual statements in the Duane First Motion to Dismiss and Sever, those judicial admissions/statements cannot be withdrawn by a single sentence in the instant motion.[2]

---

[2]     For instance, Mr. Duane pleaded: "Duane had NO WAY OF KNOWING about Medtech's Maintaining it's [sic] so called '*three-size platform*' strategy. Duane was NEVER privy to Medtech's Marketing Strategy while working for Medtech. He NEVER attended a Marketing Meeting at Medtech; he NEVER attended a Sales Meeting at Medtech and indeed was NEVER even in the offices of Medtech during the transition period." (Duane Motion to Dismiss and Sever at p. 2) (emphasis in original).

## II.
## INCORPORATION OF MEDTECH'S RESPONSE
## TO KAPLAN/DENTEK MOTION TO DISMISS

Mr. Duane's arguments are a familiar refrain.  In the "Introduction," Mr. Duane and

C.D.S. argue:

> None of Medtech's claim [sic.] can survive this motion to dismiss,
> however, for any number of the following reasons described in
> detail below: (a) by its terms, the non-compete clause in the
> Consulting Agreement did not apply under the circumstances by
> which the agreement was terminated; (b) the Consulting
> Agreement, or at least its relevant provisions, was superseded by a
> later agreement; (c) Medtech has failed to identify any information
> that could reasonably qualify as a protectible trade secret.

(Duane/C.D.S. Memorandum at p. 1.)  Although the first part is unique to Mr. Duane and C.D.S.,

because they are the only defendants subject to a non-competition/non-solicitation covenant, all

other arguments have already been responded to in detail in Medtech's Response to

Kaplan/DenTek Motion to Dismiss at pages 4 through 35.  To the extent that Mr. Duane and

C.D.S. simply incorporate arguments made by Defendants DenTek and Ms. Kaplan, or otherwise

reiterate the same arguments, Medtech incorporates the corresponding response from Medtech's

Response to Kaplan/DenTek Motion to Dismiss and any applicable arguments from the Motion

to Strike.

## III.
## THE RELEVANT MOTION TO DISMISS STANDARD

The Duane Defendants reference the motion to dismiss standard of review in several

footnotes.  (*See* Duane/C.D.S. Mem. at p. 2, n. 1, and p. 4, n. 3.)  Medtech incorporates the

relevant standard as set forth in Medtech's Response to Kaplan/DenTek Motion to Dismiss at

page 4.

3

**IV.**

**ARGUMENT**

A.  **THE CONSULTING AGREEMENT, BY ITS TERMS, WAS NOT TERMINATED UPON THE SALE OF DENTAL CONCEPTS TO MEDTECH.**

   1.  The Relevant Allegations Regarding the Non-Competition and Non-Solicitation Terms of the September 30, 1999 Consulting Agreement.

Mr. Duane and C.D.S. accurately set forth some of the facts pertaining to the analysis of the Consulting Agreement as pleaded in Medtech's Second Amended Complaint.  ("SAC", Docket No. 66.)  However, the language of the Consulting Agreement that is critical to an analysis of the claims arising out of that contract is completely ignored by the Duane Defendants.

The entirety of the Consulting Agreement in both its structure and purpose revolved around Mr. Duane.  It was Mr. Duane, and *his personal* services as an independent contractor for Dental Concepts, that were the catalyst for the September 30, 1999 Consulting Agreement with the Duane Defendants.  (SAC at Ex. A (at p. 1, ¶¶ 1 & 2, and p. 2, ¶ 4.)  As set forth in the SAC:

> The Consulting Agreement provides that CDS's 'services' shall be provided through Duane, the President of [CDS].' (Ex. A [to the SAC] at p. 1.)  These 'services' were to 'direct and supervise the sales of [Dental Concepts'] products, subject to and under supervision of [Dental Concepts'] President and its Board of Managers.' (*Id*. at ¶ 2(a).)  Duane was required 'to devote his entire business time, energy and skill to such activities on behalf of [Dental Concepts].' (*Id*. at p. 1, ¶ 2(b).)

(SAC ¶ 32.)

The Duane Defendants clearly knew Dental Concepts' long-term intentions.  The Consulting Agreement clearly and expressly contemplated that Dental Concepts was being structured for sale to a strategic acquirer.  The terms of that contract provided the Duane Defendants with a "transaction incentive for a profitable sale that was tied to the selling price" of Dental Concepts.  (SAC ¶¶ 35 & 36.)  With that context, the Duane Defendants expressly agreed that the Consulting Agreement "shall be binding upon ***and inure to the benefit of*** the respective

4

heirs, personal representatives, **successors** and assign [sic.] of the parties hereto."[3]  (SAC at Ex. A (at p. 7, ¶ 8) (emphasis added).)  Medtech is the successor to Dental Concepts after acquiring Dental Concepts in November 2005.  (SAC ¶¶ 7, 71, & 80.)

The non-competition and non-solicitation provisions in paragraph 7 of the Consulting Agreement set forth in great detail the post-termination duties of the Duane Defendants.  (SAC at Ex. A (at pp. 5-6, ¶ 7).)  The express language of the Consulting Agreement provided for a twenty-four (24) month covenant not to compete and non-solicitation provision that was triggered "if such engagement **is terminated by the Consultant** or is terminated by the Company for Just Cause."  (SAC ¶ 34 (emphasis added) and Ex. A at ¶ 7.)  In this Motion to Dismiss, Mr. Duane and C.D.S. seize on the language of Paragraph 6 of the Consulting Agreement that provides that the Consulting Agreement "shall terminate" upon the occurrence of the following event:

> (vi) **at the option of the Company**, upon sale of the Company or of substantially all its assets or business to a person or entity which is not immediately prior thereto an Affiliate[4] of the Company.

(SAC at Ex. A (at pp. 3-5, ¶ 6(a)(vi) (emphasis added).

There are no allegations that the sale termination "option" was exercised by anyone.  In fact, the SAC includes the following relevant allegations:

> [1]     That "CDS and Duane **continued consulting for Medtech through and including February 2006**.  Duane stayed on board until Dental Concepts was completely transitioned into Medtech," (SAC ¶ 87 (emphasis added));
>
> [2]     That "**CDS and Duane declined continued employment** in a sales position that was offered by Prestige," (SAC ¶ 88 (emphasis added)); and

---

[3]     The only exception to this rule was that the Consulting Agreement was "personal to the Consultant [C.D.S.]."

[4]     The term "Affiliate," in the context of the Consulting Agreement, "shall refer to any entity which controls, is controlled by, or is under common control with, the Company."  (SAC at Ex. A (at p. 2, ¶ 2(c)).)

[3]  That the only relevant contract executed in that context relating to the Consulting Agreement was a General Release, in which Mr. Duane released any and all claims against Dental Concepts (but did not include a reciprocal release or any reference to any termination of the Consulting Agreement).  (SAC ¶¶ 72-74, 78.)

Finally, the continued employment of Mr. Duane after the acquisition of Dental Concepts by Medtech is clearly relevant to the Duane Defendants' arguments here.  The terms of the covenant not to compete and the non-solicitation provisions are found in paragraph 7 of the Consulting Agreement.  The Duane Defendants include a block quote in their brief of subparagraphs (a) and (b) of that section of the Consulting Agreement.  However, the Duane Defendants ignore the next provision, subparagraph (c), which is omitted from their quote. Paragraph 7(c) of the Consulting Agreement states that that the covenant not to compete and non-solicitation provisions "survive the termination or expiration of this [Consulting] Agreement and/or the Term, *irrespective of the reason therefor*, including without limitation, under circumstances in which the Consultant or Duane continues thereafter to be engaged by the Company."  (SAC ¶ 92 (citing Ex. A ¶ 7(c)) (emphasis added).)  Here, Duane did continue thereafter to be engaged by the Company; therefore, the non-compete covenant and non-solicitation provision survived.

2.    The Covenant Not to Compete and Non-Solicitation Provisions Applied to C.D.S. and Ray Duane.

The only argument offered by Mr. Duane and C.D.S. to avoid the non-competition and non-solicitation provisions of the Consulting Agreement is that "the Duane Defendants were terminated when their assignment was concluded pursuant to ¶ 6(a)(vi) of the Consulting Agreement, which provides for termination of the Consulting Agreement upon the sale of the company, as occurred when Dental Concepts was sold to Prestige."  (Duane/CDS Mem. at p. 10.)  In other words, the Duane Defendants argue that the Consulting Agreement automatically

terminated at the sale of Dental Concepts.  This argument is wrong.  That is neither what the Consulting Agreement provides, nor what happened.

> (a)     The Consulting Agreement Only Terminates Upon Sale "At the Option of the Company."

The Consulting Agreement provides that that it could be terminated "***at the option of the Company***, upon the sale of the Company . . . ."  (SAC at Ex. A (at ¶ 6(a)(vi)) (emphasis added).)  The plain meaning of the term "at the option" implies a right to choose whether or not to terminate the Consulting Agreement.  *See, e.g., Random House Webster's Unabridged Dictionary*, 2d ed. (2001) (defining "option" as "the power or right of choosing" or "something that may be or is chosen"); *see also PaineWebber Inc. v. Bybyk*  81 F.3d 1193, 1199 (2d Cir. 1996) ("In interpreting a contract, '[w]ords and phrases are given their plain meaning. Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement.'")  (quoting *American Express Bank Ltd. v. Uniroyal, Inc.,* 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990), *appeal denied,* 77 N.Y.2d 807, 569 N.Y.S.2d 611, 572 N.E.2d 52 (1991)).[5]  There is no automatic termination of the Consulting Agreement upon the sale of the company.  Even though both parties knew that Dental Concepts would be sold, they expressly did not provide for such an automatic termination, but, rather, gave the choice of termination to the Company.   Therefore, the Consulting Agreement did not automatically terminate on the sale of the Company as the "option" was not exercised.

> (b)     There is No Factual Support for the Duane Defendants' Claim that the Consulting Agreement was Terminated.

Although the parties agreed that the Consulting Agreement ***could be*** terminated upon the sale of Dental Concepts, nothing in the SAC states or implies that it was terminated by the

---

[5]     *See* SAC at Ex. A (at p. 7, ¶ 9 ("Law Governing.  This Agreement shall be construed and governed in accordance with the laws of the State of New York without regard to such state's conflict of laws provisions.").)

Company.  In fact, the only two paragraphs cited by the Duane Defendants in support of their argument are Paragraphs 71 and 87 of the SAC, both of which lead to the opposite conclusion. Those paragraphs provide in full:

> Paragraph 71: "Prestige ultimately acquired Dental Concepts in November 2005 for a transaction price of around $31 million. Certain post-closing purchase price adjustments (largely due to the issues with the balance sheet) were made to the escrowed funds for the transaction that negatively affected Duane's transaction incentive bonus in the amount of $250,000."

> Paragraph 87: "CDS and Duane continued consulting for Medtech through and including February 2006.  Duane stayed on board until Dental Concepts was completely transitioned into Medtech."

(SAC ¶¶ 71 & 87.)  There is nothing in these paragraphs that support Mr. Duane's factual conclusion that "the Duane Defendants were terminated when their assignment was concluded. . . ." (Duane/CDS Mem. at p. 10.)  In fact, the SAC plainly pleads both that Mr. Duane continued to consult for Medtech after the acquisition, (SAC ¶¶ 71 & 87), and that Mr. Duane rejected a job offer from Medtech.  (SAC ¶ 88.)

There is plainly a factual question raised by the SAC.  It was Mr. Duane who continued to work for Medtech after the acquisition and it was Mr. Duane who ended the relationship by refusing continued employment.  There is unquestionably an issue of fact regarding whether Mr. Duane terminated the Consulting Agreement and triggered the provisions of the non-compete and non-solicitation clauses.  The Duane Defendants have asked this Court to decide a key factual question in their favor.  They ask that this Court hold that it was Medtech (or Dental Concepts) that terminated the Consulting Agreement without any legal support, or valid citation to anything in the Complaint.  This is clearly improper in the context of a motion to dismiss.

(c)    Mr. Duane's Continued Employment Triggers Paragraph 7(c).

There is no support for Mr. Duane's claims that he was "terminated" upon the sale of the Company.  Even assuming that he was, however, such termination would not provide him with a basis for dismissal from this cause.  Mr. Duane's continued employment from the November 2005 acquisition, when he claims he was "terminated" upon sale, through February 2006, would trigger the terms of paragraph 7(c) of the Consulting Agreement.  Under the provision, the non-competition and non-solicitation provisions "shall survive the termination or expiration of this [Consulting] Agreement and/or the Term, *irrespective of the reason therefor*, including without limitation, *under circumstances in which the Consultant or Duane continues thereafter to be engaged by the Company*."  (SAC ¶ 92 (citing Ex. A ¶ 7(c)) (emphasis added).)

The effect of this provision is clear.  If Mr. Duane continued to be employed after "the termination or expiration" of the Consulting Agreement, which he was, the terms of Paragraph 7 "shall survive . . . irrespective of the reason" for the termination.  That is what the contract says and, under New York law, "'[i]n interpreting a contract, the intent of the parties governs,' and therefore '[a] contract should be construed so as to give full meaning and effect to all of its provisions.'" *American Express Bank,* 164 A.D.2d at 277; *see also Tigue v. Commercial Life Ins. Co.,* 631 N.Y.S.2d 974, 975 (4th Dep't 1995) ("[T]he court must ascertain the intent of the parties from the plain meaning of the language employed.").  The terms of Paragraph 7(c) simply cannot be excised and ignored, as Mr. Duane would apparently have this Court do.  The clear effect of Paragraph 7(c) would cause the covenant not to compete and non-solicitation terms to continue *because Mr. Duane's employment continued* from November 2005 through February 2006.

(d)    The Language of the "Assignment" Provision Offers Furthers Support.

Finally, if the plain language and application of Paragraph 7 was not enough, the absurdity of Mr. Duane's position is revealed when it is considered in the light of the other provisions of the Consulting Agreement.  (*See* SAC at Ex. A (at p. 7, ¶ 8).)  The Duane Defendants agreed to an "Assignment" provision that stated that the Consulting Agreement would be "***binding upon*** and ***inure to the benefit of*** the . . . ***successors*** and assign [sic] of the parties." (*Id*. (emphasis added).)   In other words, the parties contemplated that when the inevitable sale of the company occurred, the Consulting Agreement would "inure to the benefit" of the successor company.  If the Duane Defendants' argument was correct, and the Consulting Agreement automatically terminated just because Dental Concepts was sold, the Assignment provision would be a nullity.  The Consulting Agreement would never inure to the benefit of a "successor" because a "successor" would necessarily have triggered the automatic termination of the Consulting Agreement.  Following the Duane Defendants' reasoning to its natural conclusion demonstrates that such a reading cannot be what the parties intended.

In short, the Duane Defendants cannot escape the applicability of the non-competition and non-solicitation clauses that they violated by working for DenTek and soliciting Kelly Kaplan and others.  The Motion to Dismiss should be denied on these grounds.

**B.    THE GENERAL RELEASE DOES NOT SUPPLANT THE PRIOR CONTRACTS BECAUSE THE PROVISIONS WORK IN TANDEM.**

1.    Additional Background on the Confidentiality Obligations At Issue.

(a)    The Consulting Agreement's Confidentiality Obligations.

Mr. Duane was the Vice President of Sales of Dental Concepts.  (SAC ¶ 7.)  As such, Mr. Duane had "substantial access to confidential and proprietary information regarding the NIGHTGUARD™ dental protector device, as well as the other products of Dental Concepts."

(SAC ¶ 40.)   Both the Consulting Agreement and an attachment thereto, imposed certain confidentiality obligations on the Duane Defendants.  First, the Consulting Agreement with the Duane Defendants provided:

> The Consultant and Duane shall execute and deliver to and for the benefit of the Company an agreement substantially in the form of Exhibit A [the Proprietary Information and Inventions Agreement] hereto, pertaining, among other matters, to Proprietary Information and Inventions (as such terms are defined in said Exhibit A) and confidentiality obligations, the provisions of which shall be deemed incorporated herein by reference as if set forth fully herein.
>
>          * * *
>
> Each of the Consultant and Duane acknowledges that the services to be rendered by it and him are of a special, unique and extraordinary character and, in connection with such services, it and he will have access to confidential information vital to the business of the Company and its Affiliates.

(SAC at Ex. A (at pp. 5-6, ¶¶ 7(a) and (d)).)

       (b)     The Proprietary Information and Inventions Agreement's Broad and Encompassing Confidentiality Obligations.

Moreover, the 5-page Proprietary Information and Inventions Agreement was signed on September 30, 1999 and attached to the Consulting Agreement.  That Proprietary Information and Inventions Agreement was executed by ***both*** Mr. Duane and C.D.S. and sets forth a number of provisions relating to the confidentiality obligations.  These include:

- An acknowledgement of the Duane Defendants that the "engagement creates a relationship of confidence and trust between [the Duane Defendants] and [Dental Concepts] with respect to information . . . [a]pplicable to the business of the Company . . . or [a]pplicable to the business of any client, distributor, supplier or customer . . .," (SAC at Ex. C (at p. 1, ¶ B));

- An acknowledgement of the Duane Defendants that Dental Concepts "possesses information that has been acquired, created, discovered or developed, or has otherwise become known to the Company . . . which information has commercial value in the business in which the Company is engaged . . . ." (SAC at Ex. C (at p. 1, ¶ C));

11

- A definition of "Proprietary Information" that "includes 'Developments' (as herein defined), data, know-how, techniques, marketing plans and opportunities, cost and pricing data, strategies, forecasts and customer lists. 'Developments' includes inventions, product designs, developments, improvements, discoveries, trade secrets, technologies, processes, research, methods, formulae, uses of any of the foregoing, computer software and programs (including source code and related documentation), test and/or experimental data and results, specifications, laboratory notebooks, drawings and technical information and materials," (SAC at Ex. C (at p. 1, ¶ C));

- An agreement that "All Proprietary Information shall be the sole property of the Company and its assigns, and the Company and its assigns shall be the sole owner of all patents, copyrights, trade secrets, trademarks, trade names and other rights in connection therewith. [CDS, Duane and Kaplan] hereby assign to the Company any and all rights which any of Obligors may have or acquire in any and all Proprietary Information,"  (SAC at Ex. C (at p. 2, ¶ 1));

- An agreement that "[a]t all times, both during Consultant's engagement by the Company and after its termination, [CDS, Duane and Kaplan] will keep in confidence and trust all Proprietary Information, and will not use or disclose any Proprietary Information without the written consent of the Company, except as may be necessary in the ordinary course of performing Consultant's duties as a consultant to the Company. SINCE IT IS SOMETIMES DIFFICULT TO SEPARATE PROPRIETARY INFORMATION FROM THAT WHICH IS NOT, OBLIGORS WILL REGARD ALL INFORMATION GAINED OR DEVELOPED AS A RESULT OF ANY ASSOCIATION WITH THE COMPANY AS PROPRIETARY INFORMATION," (SAC at Ex. C (at p. 2, ¶ 1) (emphasis in original));

- An agreement to disclose any improvements "made or conceived or reduced to practice or learned by [the Duane Defendants], either alone or jointly with others, during the period of Consultant's engagement by the Company which are related to or useful in the business of the Company, or result from use of premises, or property, equipment, facilities or funding [of Dental Concepts] (all said improvements, processes, techniques, know-how, data and other Developments shall be collectively called 'Inventions')," (SAC at Ex. C (at p. 2, ¶ 2));

- An agreement that all Inventions are the property of Dental Concepts, (SAC at Ex. C (at p. 2, ¶ 3)); and

- An agreement that in the event of the termination of the engagement, "for any reason, or any other time upon the Company's request, [the Duane Defendants] shall deliver to the Company all materials, samples, data, physical property, memoranda, notes, records, customer mailing or contact lists and other documents of any nature made or compiled by any of [the Duane Defendants] or made available to any of [the Duane Defendants] pertaining to any work with or to the business or affairs of the Company, all of which shall be deemed the property of

12

> the Company and [the Duane Defendants], upon such termination, shall not take with them any documents, data or property or any description or any reproduction of any of the foregoing containing or pertaining to any Proprietary Information and/or Inventions," (SAC at Ex. C (at p. 3, ¶ 5)).

In other words, the Proprietary Information and Inventions Agreement covered a broad range of subjects, from acknowledgments that there was information to protect, to defining that protectible information, to assigning ownership rights of existing and yet-to-be-created information, to an agreement that on termination the information would be returned to Dental Concepts. The Proprietary Information and Inventions Agreement ends with a provision that "[t]his Agreement shall be binding upon [the Duane Defendants] and their respective heirs, executors, successors, assigns and administrators, and shall inure to the benefit of the Company and its successors and assigns." (SAC at Ex. C (at p. 5, ¶ 9).)

(c)     The Narrow Provisions of the General Release.

After the sale to Medtech, Mr. Duane executed a "General Release" in which he released all claims against the Company and received his transaction incentive. (SAC at ¶¶ 72-74, 77, 80 & Ex. G.) The General Release covered any claim that Mr. Duane could have against Dental Concepts, both known and unknown, relating to his association with the company. (SAC at Ex. G. (at p. 1).) The General Release also contained the following clause:

> Confidential Information. Employee [Duane] agrees that it will not use, divulge, sell or deliver to or for any other person, firm or corporation other than the Company [Dental Concepts] and its respective subsidiaries, affiliates, successors and assigns any confidential information and material (statistical or otherwise) relating to the Company's business, including, but not limited to, confidential information and material concerning manufacturing, distribution, marketing, sales, advertising, customers, employees, suppliers, licensors, financial information, methods and processes incident to the business, and any other secret or confidential information. On or before the Effective Date, Employee will surrender to the Company all lists, books and records of or in connection with the Company's business and all other property belonging to the Company.

13

(SAC at Ex. G (at p. 3, ¶ 7).)  Accordingly, the only substance addressed in the General Release relating to confidential information was that (1) Mr. Duane agreed to not "use, divulge, sell or deliver to or for any person, firm or corporation other than" Dental Concepts any "confidential information and material;" and (2) that Mr. Duane would "surrender to the Company all" such information and property.  The General Release contains an integration clause that states it is the full agreement of the parties regarding "the subject matter hereof."

2.    CDS was not a Party to the General Release and, Therefore, Its Confidentiality Obligations Are Governed by the Consulting Agreement and Proprietary Information Agreement.

The Duane Defendants conclude that the confidentiality provisions in the Consulting Agreement and the Proprietary Information Agreement were superseded by the General Release, but they ignore an obvious fact: C.D.S. was not a party to the General Release.  (SAC ¶ 78.)  In fact, Count IX of the SAC, which alleges a breach of the General Release, excludes C.D.S. because it was never a party to that contract.  (SAC ¶¶ 246-255.)[6]  Therefore, in addressing the issue of the General Release, there can be no doubt that the terms of the Consulting Agreement and the Proprietary Information Agreement applied to the confidentiality obligations of C.D.S. and, as to C.D.S., there is no valid basis offered to dismiss Count VIII.

3.    As to Mr. Duane, the Confidentiality Obligations of the General Release Do Not Supersede the Confidentiality Provisions of the Consulting Agreement and the Proprietary Information and Inventions Agreements.

With broad and overreaching language, Mr. Duane claims that the General Release "is the only surviving agreement between the parties governing Duane's possession and use of confidential information."  (Duane/CDS Mem. at p. 10.)  First, Medtech has already briefed this issue and argument in the context of Kaplan's Motion to Dismiss.  (*See* Medtech's Resp. to

---

[6]    Alternatively, the Breach of the Consulting Agreement and Proprietary Information and Inventions Agreement, Count VII of the SAC, was pleaded against both of the Duane Defendants.  (SAC ¶¶ 229-238.)

14

Kaplan/DenTek Mot. to Dismiss at pp. 22-25.)  Medtech incorporates that same argument here as it is equally appropriate.  It is telling that while Mr. Duane broadly claims that the General Release had to supersede the other agreements, those agreements necessarily cover different things because they include ***different parties***.  As CDS is not a party to the Release, Mr. Duane overreaches in claiming that the Release supersedes the previous agreements.

One of the cases that Mr. Duane cites in support of his Motion to Dismiss actually supports the distinctions and arguments previously made by Medtech.  In *CreditSights, Inc. v. Ciasullo*, No. 05 CV 9345 (DAB), 2007 WL 943352 (S.D.N.Y. Mar. 29, 2007), the Court addressed a similar fact pattern in the context of a stock dispute.  In *CreditSights,* the defendant was one of three founders of CreditSights, and was an officer and director of the company.  *Id*. at *1.  As part of the transaction founding the company, the defendant signed a Restricted Grant Agreement that dictated the terms of his stock ownership and precluded the defendant from transferring or pledging the stock.  *Id*. at *2.  In spite of the agreement not to, the defendant subsequently pledged certain of his stock in the company.  *Id*. at *3.  After his stock pledge, the defendant submitted a resignation letter and entered into a Separation Agreement and Voting Agreement that transferred the voting rights in his shares.  *Id*. at *4.  The integration clause in the Separation Agreement states that:

> This agreement, together with the Voting Agreement and the provisions of the Employment Agreement that by their terms survive the termination thereof, constitute the entire agreement and understanding between you and the Company regarding the subject matter hereof, and supersedes all prior arrangements or discussions relating to your employment with the Company or the termination thereof.

*Id*.  In the subsequent motion practice, like Duane has done here, "Defendant's Motion to Dismiss Plaintiff's breach of contract claim challenge[d] the existence and enforceability of the Restricted Grant Agreement; Defendant argue[d] that the subsequent Separation Agreement,

15

Voting Agreement and Restricted Grant Agreement all supersede the Restricted Grant Agreement on which Plaintiff bases its action." *Id*. at *5.

In denying the defendant's motion to dismiss, the Court noted that a "subsequent contract not pertaining to 'precisely the same subject matter' will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract." *Id*. at *6 (quoting *Globe Food Services Corp. v. Consolidated Edison Co. of New York, Inc.*, 184 A.D.2d 278 (1st Dep't 1992)). The Court found that the defendant had "overstate[d] his case by claiming that the 'subject matter' of the Restricted Grant Agreement was also the subject matter of the Separation Agreement, Voting Agreement and Amended Stockholders Agreement." *Id*. at *6. Rather, the Court found that even though the contracts all had "broadly associated subject matter in common," the former agreements were not superseded because certain rights and obligations were not covered in the later agreements. *Id*. at *6-7. Rather, considering that rights could co-exist and work in tandem, the Court held that Restricted Grant Agreement "survive[d]" the other contracts and denied the Motion to Dismiss. *Id*. at *7-9.

In the present case, the General Release only covers use after employment and surrender of what Mr. Duane has. It does not supersede in any way the vast majority of obligations covered by the Consulting Agreement and the Proprietary Information and Inventions Agreements, which include: (1) the acknowledgements in both contracts that Mr. Duane would "have access to confidential information vital to the business of the Company and its Affiliates" and that he had "relationship of trust" with respect to information; (2) the acknowledgement in the Proprietary Information and Inventions Agreement that Dental Concepts possesses information that "has commercial value in the business in which the Company is engaged;" (3)

16

the definition of "Proprietary Information" that defines what the parties meant by that term; (4) the provision detailing that "All Proprietary Information shall be the sole property of the Company and its assigns, and the Company and its assigns" and that Mr. Duane assigned all his rights to such information to the company; (5) Mr. Duane's agreement to disclose any improvements that are related or used or useful to Dental Concepts; (6) his agreement that all Inventions are the property of Dental Concepts; and (7) his agreement to not take with him "any documents, data or property or any description or any reproduction of any of the foregoing containing or pertaining to any Proprietary Information and/or Inventions."

**C.     THE TRADE SECRET CLAIMS ARE PROPERLY PLEADED.**

Finally, as an aside, Mr. Duane makes a short argument claiming that Medtech has failed to properly plead a protectible trade secret.  This issue has already been extensively briefed. Medtech adds this section only to respond to the purported list of trade secrets advanced by the Duane Defendants.  (Duane/C.D.S. Mem. at p. 9.)  The Duane Defendants' list ignores Medtech's February 8, 2008 list, contained in a letter to Judge Smith, which sets forth certain types of information that are currently known and are at issue in this case.  (2/8/2008 Ltr. from Helton to Judge Smith at p. 5.)  The Duane Defendants have eschewed Medtech's actual list of confidential information in favor of the contrived and incomplete list used by DenTek and Ms. Kaplan in their earlier motions.  By doing so, the Duane/CDS Memorandum shows that it is part of a concerted effort to set up a trade secret strawman that they can tear down.  In the context of a motion to dismiss, such efforts add nothing of substance.

17

## CONCLUSION

For all the foregoing reasons, this Court should deny the C.D.S./Duane Motion to Dismiss.

Dated: March 24, 2008

      New York, New York

                                     Respectfully submitted,

                                     ALSTON & BIRD LLP

                                     By: s/ Karl Geercken
                                     Karl Geercken (KG 5897)
                                     Amy Manning (AM 0338)
                                     90 Park Avenue
                                     New York, New York 10016-1387
                                     (212) 210-9471 (phone)
                                     (212) 210-9444 (facsimile)
                                     karl.geercken@alston.com
                                     amy.manning@alston.com

                                     Todd R. David, GA BPR No. 206526
                                     ALSTON & BIRD LLP
                                     One Atlantic Center
                                     1201 West Peachtree Street
                                     Atlanta, Georgia 30309-3424
                                     todd.david@alston.com

                                     W. Edward Ramage, TN BPR No. 16261
                                     BAKER, DONELSON, BEARMAN,
                                       CALDWELL & BERKOWITZ, P.C.
                                     Commerce Center, Suite 1000
                                     211 Commerce Street
                                     Nashville, Tennessee 37201
                                     (615) 726-5600
                                     eramage@bakerdonelson.com

Thomas O. Helton, TN BPR No. 01929
Micheline Kelly Johnson, TN BPR No. 13847
Clinton P. Sanko, TN BPR No. 23354
BAKER, DONELSON, BEARMAN,
   CALDWELL & BERKOWITZ, P.C.
1800 Republic Centre
633 Chestnut Street
Chattanooga, Tennessee  37450-1800
(423) 756-2010
mjohnson@bakerdonelson.com
csanko@bakerdonelson.com

Attorneys for Plaintiff
Medtech Products Inc.