```
1          UNITED STATES DISTRICT COURT
1          SOUTHERN DISTRICT OF NEW YORK
2          ---------------------------------------x
     2     MEDTECH PRODUCTS, INC.,
3
     3                    Plaintiff,
4
     4          v.                                  07 Civ. 3302(KMK)(LMS)
5
     5
6          RANIR, LLC and CVS PHARMACY, INC.,
     6
7                         Defendants.
     7     ---------------------------------------x
8          MEDTECH PRODUCTS, INC.,
     8                    Plaintiff,
9                    v.
10         DENTEK ORAL CARE, INC.,
11                        Defendant.
     11    ---------------------------------------x
12         MEDTECH PRODUCTS, INC.,
     12                   Plaintiff,
13                   v.
14         POWER PRODUCTS, INC., d/b/a SPLINTEK,
15                        Defendant.
     15    ---------------------------------------x
16
17
18                                                  United States Courthouse
     18                                             White Plains, N.Y.
19                                                  October 30, 2007
     19
20
21
22         Before:
     22              THE HONORABLE LISA MARGARET SMITH,
23
     23                                             Magistrate Judge
24
25
```

1        And, finally, with regard to DenTek, what we are
2  proposing is to get production, once we now have a protective
3  order entered, within the week, a subset of documents as
4  described in our letter specifically relating to Ms. Kaplan,
5  Mr. Duane or relating to the DenTek dental protector that are
6  within the possession specifically of Mr. Jansheski and
7  Mr. Fox.  And we would like to take their depositions as well
8  by the end of November.  We are told that they're in Tennessee
9  and it would be efficient to do both of them in the same trip.
10       THE COURT:  Who wants to be heard first?
11       MR. SHALEK:  Jim Shalek of Proskauer Rose for the
12  defendant DenTek.
13       Your Honor, the time for a preliminary injunction
14  application for expedited discovery of any purported
15  misappropriation has long since past.  The plaintiff has known
16  about Duane's involvement with DenTek since January by their
17  own admission.  That was ten months ago, August 3rd.  They've
18  known of Kaplan's involvement with DenTek since at least as
19  early as May and, at the July hearing, raised many of the same
20  allegations they're raising now.  So the preliminary injunction
21  presents factual allegations that they have had in hand for
22  many, many months.
23       There's no showing of any change in market condition
24  or other circumstances that indicate any immediacy or
25  irreparable harm.  In fact, the preliminary injunction papers

1    are remarkably bare in that regard.  The only discussion of the
2    market is Wal-Mart, which is really what this case is largely
3    about.  And the Schrank deposition declaration, Exhibit F,
4    shows that the plaintiff lost market share at Wal-Mart about
5    six months ago, and that the situation has not changed, other
6    than that they seem to have regained a little of their market
7    share back last month.  So there's no immediacy.  There's no
8    irreparable harm.
9           Medtech moved for preliminary injunction in this case.
10   We had a very accelerated schedule that was quite costly, and
11   they simply didn't move forward on what they asked to move
12   forward on with great urgency, the patents and the trademarks.
13   And we believe they waived their right to move for preliminary
14   injunction on misappropriation last May.  They knew about
15   Kaplan.  They knew about Duane.  They moved for preliminary
16   injunction.  They didn't move on those subjects.
17          And, you know, this idea of expedited discovery, your
18   Honor, we served document requests in June, got a written
19   response in July, and we have yet to receive a single document
20   from them in response to our discovery.  So the notion that
21   they move for preliminary injunction, they accelerate
22   everything on a couple of issues that they don't go forward
23   with, and then, when that doesn't pan out, they move for a
24   preliminary injunction on something else that they knew about
25   for months and months, without producing any discovery

1      themselves, is really very inappropriate.

2               And, in short, on the need for emergency relief,

3      Medtech has cried wolf once, and it's once too often.  Relative

4      to the claim that there have been some trade secrets

5      misappropriated here, the threshold issue of any trade-secret

6      action is the existence of a trade secret.  And when they moved

7      to amend their complaint, we asked what the trade secrets were,

8      and Mr. Ramage couldn't identify them.  That was in -- back in

9      July.

10              And the Court permitted them to move forward with some

11     discovery, feeling that it was closely enough related to the

12     patents and trademarks to try and make their case.  And they

13     have taken some depositions.  They've moved forward over many

14     months.  And the net result is that they are unable to show any

15     trade secrets which have, in fact, been used by the defendants.

16     And if we take a look at their allegations of what trade

17     secrets there are, they don't really identify any.

18              For example, Mr. Duane, in his answer, was remarkably

19     direct, as only a pro se defendant can be, and he points out

20     that the heart of this dispute is that DenTek has taken a chunk

21     of Wal-Mart business from the plaintiff Medtech.  And what

22     Medtech claims is that Wal-Mart wanted the plaintiff to move

23     from multiple sizes to a one-size-fits-all to cut down

24     Wal-Mart's inventory and cost, and the plaintiff Medtech

25     refused, and that this decision, this bad business decision to

1    thumb one's nose at one's largest client, is somehow a
2    proprietary trade secret that Kaplan or Duane conveyed to the
3    defendant DenTek when the actual facts are that DenTek spoke to
4    Wal-Mart long before they ever talked to Kaplan or Duane.
5    Wal-Mart told DenTek that Medtech had refused to supply the
6    one-size-fits-all and asked DenTek if it could supply it.
7         So this purported trade secret that lies at the heart
8    of this, that was supposedly conveyed to us by Kaplan or Duane,
9    simply can't possibly be so.  It's not a trade secret because
10   Wal-Mart told it to DenTek, and it certainly wasn't conveyed by
11   any former employee.  This had happened long before DenTek ever
12   had anything to do with them.
13        And if we take a look at the remaining purported trade
14   secrets they identify on page six of their brief -- there's a
15   list of them here -- they identify a molder, Stelray Plastics,
16   who haven't been used by Medtech as an injection molder for
17   five years, when DenTek contacted them.  And they're well known
18   in the injection molding world.  We ran some searches on
19   Google.  I put in dental components or injection molding and
20   plastics.  Google tells you to go to something called
21   ThomasNet.  And then you stick in the same terms, and they show
22   up in the top 20.  So it's not exactly hard to find them.
23        They identify another consultant who supposedly is a
24   trade secret of some fashion, Frank Lesniak.  Now, he's
25   identified as one of the two inventors in the patent this Court

1    construed, which discloses how to fabricate the Nightguard, and
2    that patent issued in 2004, years before we got into the
3    business.  So it's impossible for his identity to be a trade
4    secret when it's right there on the face of their patent.
5    Furthermore, I'm not aware of my client having anything to do
6    with him.
7            They identify the three Tufts doctors who DenTek used
8    as a consultant.  Those doctors are world-renowned experts.
9    They pop up amongst -- at the very top of the list if you punch
10   in the Google, any of the terms that you would punch in in
11   association with this.
12           They identify a law firm, Natter & Natter, who my
13   client pointed to me they've never used.
14           They identify an outfit, AGI Klearfold, which supplies
15   packaging.  Now, the packaging -- DenTek is not even alleged to
16   use the same packaging company here that Medtech does for
17   Medtech Nightguard.  Apparently, Medtech uses AGI for something
18   else and we happen to use it for our product.  But this is a
19   part of Lesvaco.  And when I went and looked on the Internet,
20   this is the largest media packaging company in the world.  If
21   you simply go to their website, they say we are the world's
22   largest supplier of media packaging, the number one U.S.
23   supplier of hardening carts, holding carts.  It's the second
24   largest U.S. supplier of packaging of cosmetics.  And then they
25   go on to talk about how they've got 34 plants in nine

10

1    countries.  So this isn't a trade secret.  This is a well-known
2    supplier of packaging.  We found in their annual report that
3    they talk about some of their manufacturing suppliers.
4         So, in terms of trade secrets, your Honor, there is
5    simply nothing here.  And before they can take any discovery,
6    they need to show, as a threshold issue, that they have some
7    trade secrets.  And it's our intent, when we respond to the
8    complaint, to file a motion for a protective order to require
9    them to identify what trade secrets they actually have, can
10   establish to be trade secrets, and have some colorable basis
11   for alleging we used before they're entitled to take broad
12   discovery, raw discovery, or rummaging through our files.  They
13   were given leave to do that with Duane and a couple of others.
14   They had their chance.  And I think it's appropriate that, at
15   this point, we really see if there's anything there before we
16   launch off to expensive discovery and a preliminary injunction
17   hearing when there's no colorable trade secret and certainly no
18   immediacy or need for immediate relief.
19        I'll also note, your Honor, that Mr. Duane is a
20   defendant in this, and he's not represented here today.  I
21   don't know whether he was given notice, but he is apparently
22   defending himself pro se.
23        THE COURT:  In fact, let me just note this has been --
24   let me make sure I'm right.  This has been an electronic filing
25   case.  It will no longer be an electronic filing case with a

1               THE COURT:  What's the irreparable harm?

2               MR. RAMAGE:  The irreparable harm here, your Honor, is

3       the irreparable harm that is always inherent with the use of

4       trade secrets and continuing use of trade secrets.  We have

5       information to believe that DenTek is continuing to work on

6       some additional products and additional use of that additional

7       information with regard to some future plans of theirs that was

8       identified by the Tufts doctors.  Kelly Kaplan is identified as

9       being at several of those meetings.  They refused to disclose

10      what was actually discussed at those meetings.  And that would,

11      of course, lead to the irreparable harm with whatever they're

12      doing with regard to that.

13              In addition, Mr. Duane, who himself is in violation of

14      his covenant not to compete, which had a period of two years,

15      we are entitled -- certainly entitled to have that covenant not

16      to compete enforced for the duration of that time period.

17              THE COURT:  Mr. Ramage, I'm still not clear what

18      you're alleging the trade secrets are and what you're alleging

19      is the irreparable harm.  That maybe they've been talking about

20      something that maybe they'll be using again, that doesn't sound

21      like irreparable harm to me.

22              MR. RAMAGE:  Just a second, please.

23              THE COURT:  Sure.

24              (Pause)

25              MR. RAMAGE:  Your Honor, the key principal harm that

17

1    all due respect, they keep stumbling around month after month
2    trying to figure out a way to save the claim.
3           This case started as an intellectual property case.
4    This misappropriation stuff is a sideshow, and it's designed to
5    put pressure, I assume, on DenTek and also on my client.  But
6    there's nothing there.  And before everybody has to embark on
7    expensive disclosure and expensive motion practice, they really
8    ought to have to say what it is they mean in detail, subject to
9    examination and dismissal.
10          THE COURT:  Anything else, Mr. Ramage?
11          MR. RAMAGE:  I just want to point out that I was at
12   that initial hearing that Mr. Falco said that he read the
13   transcript.  I've read the transcript.  I remember.  In fact,
14   it is clear in the transcript that I mentioned the need to take
15   the deposition of Kelly Kaplan early on.  I trust that your
16   Honor does remember that or could review the transcript if you
17   need to refresh your recollection.  And in fact, taking the
18   deposition of Kelly Kaplan was one of the primary focuses of
19   this summer, attempting to do that.  She has been twisting and
20   wriggling to try to avoid having her deposition taken.  That
21   just makes me even more likely to conclude that there is some
22   information that she really doesn't want us to know about.
23          Thank you.
24          THE COURT:  I'm not sure that suspicion and surmise is
25   enough to allow you to go forward.  I'm also not sure that an

```
1    assertion that there are about to be or there may be or there
2    might be new products coming out from DenTek that maybe will
3    compete with some of Medtech's products is a basis for going
4    forward, either, where I'm hearing nothing terribly distinct.
5             Mr. Shalek, you were poised to say something.
6             MR. SHALEK:  Your Honor, I was simply going to make
7    the point that if, ultimately, Ms. Kaplan is deposed, there's a
8    difference between doing everything on an expedited basis.  And
9    to be blunt, we feel that, to some extent, this litigation is
10   being used as an anticompetitive tool.  We run around, we hurry
11   up on one count.  That doesn't work out.  I'll add another
12   count, another count with a lot of nebulous and vague
13   assertions, and hurry up and give us everything on 30 days.
14   It's very expensive.  And there's a reason that things are done
15   in an orderly process in litigation.  And I was simply going to
16   make the point that it does matter, and it matters a great deal
17   how discovery proceeds forward, even if it ultimately does go
18   forward.
19            THE COURT:  I think I want to take five minutes to
20   think about this before doing anything.  We'll reconvene in
21   just five minutes.
22            (Recess)
23            THE DEPUTY CLERK:  Your Honor, we're back on the
24   record.
25            THE COURT:  Well, I think I must agree with Mr. Shalek
```