# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEDTECH PRODUCTS, INC., <br><br> Plaintiff, <br><br> - *against* - <br><br> RANIR, LLC, and CVS PHARMACY, INC. <br><br> Defendant. | 07 CV 3302 (KMK)(LMS) <br><br> REPORT & RECOMMENDATION |

MEDTECH PRODUCTS, INC.,

Plaintiff,

- *against* -

DENTEK ORAL CARE, INC., KELLY M.
KAPLAN, RAY DUANE, and C.D.S.
ASSOCIATES, INC.,

Defendants.

MEDTECH PRODUCTS, INC.,

Plaintiff,

- *against* -

POWER PRODUCTS, INC.,

Defendant.

TO:    THE HONORABLE KENNETH M. KARAS,
       UNITED STATES DISTRICT JUDGE

Plaintiff Medtech Products, Inc. ("Medtech") brings this consolidated action pursuant to

35 U.S.C. § 271, 15 U.S.C. §§ 1116-1118, 1125(a), 17 U.S.C. § 101, et seq., New York General

1

Business Law §§ 349(h) and 360-O, and New York common law against DenTek Oral Care, Inc.

("DenTek"), Kelly M. Kaplan ("Kaplan"), Ray Duane ("Duane"), C.D.S. Associates, Inc.

("CDS") (collectively, "Defendants"), and Power Products, Inc ("Power Products").[1] In its

Amended Complaint ("Amended Complaint"),[2] Plaintiff claims that Defendants DenTek,

Kaplan, Duane, and CDS engaged in unfair competition, breach of contract, tortious interference

with contractual relations, civil conspiracy, trade secret misappropriation, tortious interference

with an advantageous business relationship, and patent, trademark, and copyright infringement.

This case was referred to me for all purposes on April 24, 2007. Docket entry 3. On

November 21, 2007, Kaplan and DenTek separately filed motions to dismiss the Amended

Complaint under Federal Rule of Civil Procedure ("FRCP") 12(b)(6). Docket entries 104-13.

DenTek also filed a motion, in the alternative, to compel Medtech to disclose with particularity

the alleged misappropriated trade secrets. Docket entry 109. Duane, acting pro se, attempted to

file a motion to dismiss on his own behalf and on behalf of CDS, Duane's consulting company,

on November 21, 2007. Subsequently, however, Duane and CDS obtained counsel and, on

March 6, 2008, submitted a new motion to dismiss, withdrawing the prior motion to dismiss.

Docket entries 137-39. In conjunction with their motions, Kaplan, Duane, and CDS seek

---

[1] On June 25, 2007, Medtech, Ranir, and CVS Pharmacy signed a voluntary stipulation of dismissal pursuant to Rule 41(a). See Docket entry 36. Medtech and Power Products signed a voluntary stipulation of dismissal pursuant to Rule 41(a) on November 15, 2007. Docket entry 101.

[2] Earlier in the case, Medtech made a motion to amend the Complaint and attached a "First Amended Complaint." Medtech's motion was stayed and the First Amended Complaint was never filed. Thus, although the parties refer to the Complaint at issue here as the "Second Amended Complaint," or "SAC," there is only one Amended Complaint, which has been docketed as docket number 66. Thus, I will refer to the Complaint at issue here as the Amended Complaint.

attorneys' fees. Medtech opposed the motions to dismiss and also moved the Court to strike

DenTek's memorandum of law in support of its motion to dismiss.[3]  Docket entries 116-18, 145.

The following Report and Recommendation addresses each of the motions.

## I.     BACKGROUND

### A.     <u>Summary of Relevant Facts</u>[4]

Medtech markets, distributes, and sells an over-the-counter ("OTC") dental device called

The Doctor's ® Nightguard ™ ("the Nightguard") throughout the United States.  Amended

Complaint at ¶ 1.  The device is designed to protect the teeth and jaw from the detrimental

affects of grinding, or bruxing, and clenching teeth.  <u>Id.</u> at ¶ 2.  Although Medtech's predecessor-

in-interest, Dental Concepts LLC ("Dental Concepts"), had been selling the Nightguard since

1997, Dental Concepts obtained U.S. Patent No. 6, 830, 051 ("the 051 Patent") entitled

"Interocclusal Appliance," in 2004 to cover a new version of the Nightguard and its improved

technology.  <u>Id.</u> at ¶¶ 47, 58-59.

Medtech alleges that in mid-March 2007, DenTek brought an OTC dental device to the

market, called the DenTek Nightguard, which infringes on its 051 Patent.  <u>Id.</u> at ¶¶ 6, 193.

According to Medtech, DenTek was able to manufacture the allegedly infringing product quickly

because it recruited Kaplan and Duane, Dental Concepts' Vice Presidents of Marketing and

---

[3] Medtech also moved the Court to strike CDS's motion to dismiss because CDS was not
represented by counsel.  Because CDS has now obtained counsel and resubmitted its motion to
dismiss, I conclude, and respectfully recommend that Your Honor should conclude, that
Medtech's motion to strike CDS's motion should be denied.

[4] The facts herein are taken from the Amended Complaint, the allegations of which are
taken as true for the purposes of ruling on Defendants' motions to dismiss pursuant to Rule
12(b)(6).  <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 191 (2d Cir. 2007).

Sales, respectively, and Kaplan and Duane divulged confidential and proprietary information and material to DenTek. Id. at ¶¶ 7, 129, 163.

Specifically, Medtech alleges that its predecessor-in-interest, Dental Concepts, hired Kaplan, Duane, and CDS, in September 1999; that prior to leaving Dental Concepts, Kaplan and Duane were involved in and financially interested in growing Dental Concepts so that it could eventually be sold; and that because of Kaplan and Duane's executive positions at Dental Concepts, Kaplan and Duane both had access to confidential and proprietary information and material relating to the Nightguard. Id. at ¶¶ 31-41. In particular, Medtech alleges that through their involvement in developing and marketing Dental Concepts' products, they learned confidential information and material about Medtech's marketing strategy, suppliers, designers, consultants, and product formulation and production sources. Id. at ¶ 41.

Medtech further alleges that when they were hired, Duane and CDS signed a Consulting Agreement with Dental Concepts ("Consulting Agreement") that included a twenty-four month non-compete provision and a non-solicitation provision. Id. at ¶¶ 31-34. In addition, Plaintiff alleges that Duane, on his own behalf and on behalf of CDS, and Kaplan, signed Proprietary Information and Inventions Agreements which required them to keep Medtech's proprietary information secret. Id. at ¶¶ 42-46. Furthermore, Medtech alleges that in November 2005, when Dental Concepts was eventually sold to a company called Prestige (which subsequently integrated Dental Concepts into Medtech), Duane and Kaplan each executed a General Release in which both agreed to keep secret any confidential and proprietary information learned while they were employed with Dental Concepts. Id. at ¶¶ 65-81.

Medtech alleges that Duane and Kaplan violated these agreements by divulging Dental

4

Concepts' trade secrets. Id. at ¶¶ 123-24, 128-30. Specifically, Medtech alleges that Duane, through CDS, began working with DenTek to develop a product that would compete with the Nightguard in August 2006, prior to the completion of the twenty-four month non-compete period; that Duane contacted Medtech employees seeking confidential information; that Duane recruited Kaplan and attempted to recruit other Medtech employees; that Duane and Kaplan contacted and developed relationships with Medtech's suppliers, consultants, and legal counsel; and that Duane and Kaplan disclosed Medtech's confidential information and material to help DenTek create a competing Nightguard. Id. at ¶¶ 120-162, Exhibit M.

## II.    DISCUSSION

### A.    Standard of Review for 12(b)(6) Motions to Dismiss

Under Rule 8(a)(2) of the FRCP, a plaintiff must only plead "a short and plain statement of the claim showing that [he or she] is entitled to relief" in order to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a)(2). In evaluating whether a plaintiff has met this standard pursuant to a motion to dismiss under 12(b)(6), the court must determine whether the plaintiff has pleaded "factual allegations [sufficient to] raise a right to relief above a speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007) (internal citations omitted). Furthermore, when considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, a district court must accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. McCarthy, 482 F.3d at 191.

**B.     Motion to Strike DenTek's Memorandum of Law**

In response to DenTek's motion to dismiss, Medtech filed a motion to strike DenTek's

motion and memorandum in support without leave to refile arguing that the documents attached

to DenTek's motion and referenced throughout its memorandum in support were beyond the

scope of a 12(b)(6) motion. See generally Medtech Memorandum in Support of Motion to

Strike. Indeed, in deciding a motion to dismiss under Rule 12(b)(6), the court's review is

"limited to the facts asserted within the four corners of the complaint, the documents attached to

the complaint as exhibits, and any documents incorporated in the complaint by reference."

McCarthy, 482 F.3d at 191. The court may also look to matters of which judicial notice may be

taken, or to documents that the plaintiff has possession or knowledge of or that plaintiff relied

upon in drafting the complaint. See Global Network Commc'ns v. City of New York, 458 F.3d

150, 156-57 (2d Cir. 2006); Henschke v. New York Hosp.-Cornell Med. Ctr., 821 F. Supp. 166,

169 (S.D.N.Y. 1993). When matters outside the pleading are presented to the court on a Rule

12(b)(6) motion to dismiss, and do not fall into one of the categories mentioned above, the court

may either exclude such matters, or convert the motion to a motion for summary judgment under

Rule 56 of the FRCP. Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000). If the court

decides to convert the motion, the court must give all parties "reasonable opportunity to present

all material made pertinent to such a motion by Rule 56.' " Global Network, 458 F.3d at 154

(quoting FRCP 12(b)).

DenTek offers the Declaration of Brad Conley, a DenTek employee; portions of a

deposition of Duane and Noshir Mehta, one Medtech's alleged consultants ("the Tufts Doctors");

and printouts from various websites in support of its motion to dismiss. Medtech argues that the

Court may not consider these exhibits in determining the motions to dismiss and that because the exhibits are discussed in DenTek's memorandum in support, both the motion and the memorandum in support should be stricken without leave to refile.[5] Although I agree with Medtech that the exhibits offered in support of DenTek's motion should not properly be considered on a motion to dismiss under Rule 12(b)(6), I conclude, and respectfully recommend that Your Honor should conclude, that such drastic measures as those recommended by Medtech need not be taken. I will simply exclude DenTek's improper exhibits for the purposes of this motion. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Medtech's motion to strike DenTek's motion and Memorandum of Law should be denied. I also conclude, and respectfully recommend that Your Honor should conclude, that because discovery is still ongoing in this case, the motions should not be converted to motions for summary judgment.

## C.    Kaplan, DenTek, Duane, and CDS Motions to Dismiss

In the Amended Complaint, Medtech alleges the following causes of action against Kaplan: breach of contract, civil conspiracy, trade secret misappropriation, and tortious interference with advantageous business relationship/economic advantage. Amended Complaint

---

[5] In addition, it should be noted that Kaplan submits transcripts, briefing material, and panel materials from a dental products panel hearing conducted on October 12, 2005, before the Food and Drug Administration, which she argues the Court may take judicial notice of and consider for the purposes of her 12(b)(6) motion because they are public records. Kaplan Memorandum in Support at pages 5, 7. Medtech does not dispute the Court's consideration of Kaplan's additional materials. However, a court may take judicial notice of public records on a motion to dismiss "only to establish the existence of the [record], not for the truth of the facts asserted in [it]." Although she argues otherwise, Kaplan submits the additional submissions for the purposes of informing the Court of their contents and not simply to alert the Court of their existence. See Kaplan's Memorandum in Support at pages 8-11. Thus, I will not consider Kaplan's exhibits in determining her motion to dismiss under 12(b)(6).

at Counts VIII, IX, XII, XIII, and XIV. Medtech brings the following claims against Duane:
breach of contract, tortious interference with contractual relations, civil conspiracy, trade secret
misappropriation, and tortious interference with advantageous business relationship/economic
advantage. Amended Complaint at Counts VII, IX, XI, XII, XIII, and XIV. Medtech brings the
following claims against CDS: breach of contract, civil conspiracy, trade secret
misappropriation, and tortious interference with advantageous business relationship/economic
advantage. Amended Complaint at Counts VII, XII, XIII, and XIV. Kaplan, Duane, and CDS
move the Court to dismiss all of the claims against them, arguing that the Amended Complaint
fails to state a claim as to each cause of action against them.

Medtech alleges the following claims against DenTek: patent infringement, violation of
the Lanham Act, copyright infringement, unfair competition, unjust enrichment, violation of
section 349(H) of New York Act for Consumer Protection From Deceptive Acts and Practices,
tortious interference with contractual relations, civil conspiracy, trade secret misappropriation,
and tortious interference with advantageous business relationship/economic advantage.
Amended Complaint at Counts I, II, III, IV, V, VI, X, XI, XII. DenTek moves the Court to
dismiss Medtech's claims of unfair competition, unjust enrichment, tortious interference with
contractual relations, civil conspiracy, trade secret misappropriation, and tortious interference
with advantageous business relationship/economic advantage.

### 1.    *Medtech's Trade Secret Misappropriation Claims Against Kaplan, Duane, CDS, and DenTek*

In order to state a claim for trade secret misappropriation under New York law, a plaintiff
must establish the following elements: "(1) that it possessed a trade secret, and (2) that the
defendants used that trade secret in breach of an agreement, confidential relationship or duty, or

as a result of discovery by improper means." N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-

44 (2d Cir. 1999). "A trade secret may consist of any formula, pattern, device or compilation of

information which is used in one's business, and which gives [the owner] the opportunity to

obtain an advantage over competitors who do not know or use it." Restatement of Torts § 757,

comment b (1930) (adopted as the definition of a trade secret by the Second Circuit in Softel,

Inc. v. Dragon Med. & Scientific Communications, Inc., 118 F.3d 955, 968 (2d Cir. 1997)). The

following factors may be used to determine whether a particular piece of information is a trade

secret:

> (1) the extent to which the information is known outside of the business; (2) the
> extent to which it is known by employees and others involved in the business; (3)
> the extent of measures taken by the business to guard the secrecy of the
> information; (4) the value of the information to the business and its competitors;
> (5) the amount of effort or money expended by the business in developing the
> information; and (6) the ease or difficulty with which the information could be
> properly acquired or duplicated by others.

N. Atl. Instruments, 188 F.3d at 44 (internal citations omitted). Of course, the most important

consideration in determining whether a piece of information qualifies as a trade secret is whether

the information was actually a secret. Lehman v. Dow Jones & Co., 783 F.2d 285, 298 (2d Cir.

1986).

Although certain aspects of a product that would be easily ascertainable upon inspection

once the product is placed on the market, such as the design of a product, have been found to not

constitute trade secrets, see Linko, Inc. v. Fujisu, Ltd., 230 F.Supp.2d 492, 498-99 (S.D.N.Y.

2002), and marketing concepts, new product ideas, and business possibilities and goals have

likewise been found not to constitute trade secrets, id. at 499-500, lists of suppliers, Howard

Berger Co. v. Ye, 272 A.D.2d 445 (2d Dept. 2000); strategic information regarding price,

distribution, and marketing; brand strategies, Estee Lauder Co. v. Batra, 430 F. Supp. 2d 158,

175-76 (S.D.N.Y. 2006); and confidential business relationships, A& G Healthplans, Inc. v. Nat.

Network Servs., Inc., No. 99 CV 12153 (GBD), 2003 WL 1212933, *3 (S.D.N.Y. Mar. 14,

2003), have been found to constitute trade secrets. In addition, "[i]t is well-settled that 'a trade

secret can exist in a combination of characteristics and components, each of which, by itself, is

in the public domain, but the unified process and operation of which, in unique combination,

affords a competitive advantage and is a protectable secret.' " Integrated Cash Mgmt. Servs.,

Inc. v. Digital Transactions, Inc., 732 F. Supp. 370, 376 (S.D.N.Y. 1989) (quoting Imperial

Chem. Indus. Ltd. v. Nat. Distillers & Chem. Corp., 342 F.2d 737, 742 (2d Cir. 1965)), aff'd, 920

F.2d 171 (2d Cir. 1990).

    For example, in Head Ski Company, Inc. v. Kam Ski Company, Inc., 158 F. Supp. 919

(D.C. Md. 1958), which was cited by the Second Circuit in Imperial Chemical in support of the

proposition that it is well-settled that "a trade secret can exits in a combination of characteristics

and components[,]" 342 F.2d at 742, the plaintiff alleged that its former employees started their

own company and produced a competing metal ski using the knowledge they gained by working

for the plaintiff, the maker of the first metal ski. Head Ski, 158 F. Supp. at 920. The defendants

argued that all of the materials, processes, and methods they used were well known to aircraft

mechanics and engineers and therefore could not be the plaintiff's trade secrets. Id. at 923. In

finding that the materials, methods, and processes used by the plaintiff constituted trade secrets,

the court stated,

> '[t]he mere fact that the means by which a discovery is made are obvious, that
> experimentation which leads from known factors to an ascertainable but presently
> unknown result may be simple, we think cannot destroy the value of the discovery
> to one who makes it, or advantage the competitor who by unfair means, or as the

beneficiary of a broken faith, obtains the desired knowledge without himself
paying the price in labor, money, or machines expended by the discoverer.'

Id. (quoting A.O. Smith Corp. v. Petroleum Iron Works Co., 73 F.2d 531, 538-39 (6th Cir.

1934)). The court noted that the defendants used the plaintiff's methods "from the beginning of

their operation, without the need for experimenting" and that "[a]lthough the materials used

[were] available for purchase by anyone, the choice of a particular material was dictated by years

of experimenting" that would be "most unlikely to result from an independant approach to the

problem by two separate groups." Id. at 922.

Medtech alleges that DenTek, like the defendant in Head Ski, was able to create a

competing nightguard on an expedited basis because of the knowledge it gained from Kaplan

and Duane, thereby cutting out the research and development phase of the process. Amended

Complaint at ¶¶ 129, 163. Specifically, Medtech alleges that Kaplan and Duane were involved

in "brand development and marketing" and "formulation of strategic sales and market goals and

initiatives," that they were "intimately familiar with Dental Concepts' consultants, brokers,

designers, suppliers, product formulation and production sources, and marketing strategies," that

they were privy to business plans for marketing the Nightguard, that Kaplan was included in

high-level discussions about the strategy for the Nightguard, and that Duane and Kaplan had

"access to . . . manufacturing cost details, drawings, test data, and other information about the

design and manufacturing process for [the] dental protectors." Id. at ¶¶ 9, 41, 89, 137-39, 277.

Additionally, Medtech alleges that Kaplan and Duane knew Medtech's strategic decision to

maintain its three-size platform. Id. at ¶ 123. Medtech alleges that because of Duane and

Kaplan's disclosure of such information to DenTek, DenTek was able to truncate its evaluation

and vetting process and that "[s]uch information was critical because of a limited window of

11

opportunity with the largest retailer . . . ." Id. at ¶ 129. I conclude, and respectfully recommend that Your Honor should conclude, that such allegations sufficiently allege that Medtech possessed trade secrets sufficient to satisfy the first prong of Medtech's trade secret misappropriation claim.

Defendants argue that all of the information Medtech alleges that Kaplan and Duane had access to, such as Medtech's relationship with the consultants and suppliers and Medtech's decision to maintain a three-size platform, was information easily obtained through public sources. DenTek Memorandum in Support at pages 9-18; Kaplan Memorandum in Support at pages 8-16; Duane and CDS Memorandum in Support at pages 8-9. However, the secrecy of particular information is an issue of fact and cannot be decided at the motion to dismiss stage. Kosower v. Gutowitz, No. 00 Civ. 9011 (JGK), 2001 WL 1488440, *8 (S.D.N.Y. Nov. 21, 2001) (citing Lehman v Dow Jones & Co., 783 F.2d 285, 297 (2d Cir. 1986)).[6]

With regard to the second element of Medtech's trade secret misappropriation claim, I conclude, and respectfully recommend that Your Honor should conclude, that Medtech has adequately alleged wrongful use of the alleged trade secrets by Kaplan, Duane, and DenTek. Specifically, Medtech alleges, *inter alia*, that "DenTek, Duane, and Kaplan systematically called upon and recruited various persons and companies known to Duane and Kaplan only because they had the confidential and proprietary information that they had from their time at Dental Concepts . . . ." Amended Complaint at ¶ 130. Medtech goes on to allege that Duane called

---

[6] It should also be noted that Defendants argue that the Amended Complaint fails to allege trade secrets with sufficient specificity. As pointed out by Medtech, however, a plaintiff need not reveal the alleged trade secrets in the Complaint. See Gaetano Assocs. Ltd. v. Artee Collections, Inc., No. 05 Civ. 3329 (DLC), 2006 WL 3026080, *2 (S.D.N.Y. Oct. 25, 2006). Defendants' concerns in this regard, however, are addressed in Part II.D infra.

Item, Stelray, and Proman Products, who were suppliers known to Duane only because of his association with Dental Concepts, and that Kaplan solicited the Tufts Doctors to do work for DenTek's Nightguard as consultants and advised DenTek of Medtech's strategic decision to maintain its three-size platform, despite the confidentiality agreements each entered into at the beginning of their employment with Dental Concepts and the General Releases they each entered into at the end of their employment with Dental Concepts. Amended Complaint at ¶¶ 128-162. Furthermore, as noted supra, Medtech alleges that DenTek used inside information gleaned from Duane and Kaplan to "eliminate the development time normally associated with entering into a new line of products." Id. at ¶ 128. Such allegations are sufficient to put Defendants on notice of the second element of Medtech's trade secret misappropriation claim. I therefore conclude, and respectfully recommend that Your Honor should conclude, that Defendants' motions to dismiss Medtech's trade secret misappropriation claims against them should be denied.

### 2.   *Medtech's Breach of Contract Claims Against Kaplan, Duane, and CDS*

In the Amended Complaint, Medtech asserts several breach of contract claims against Kaplan, Duane, and CDS. Specifically, in Count VII, Medtech asserts that Duane and CDS breached the non-compete and non-solicitation clause in their Consulting Agreement, executed on September 30, 1999, at the start of Duane and CDS's relationship with Dental Concepts, by working for DenTek within twenty-four months of their termination from Dental Concepts and by soliciting Medtech's suppliers, accounts, and employees. Amended Complaint at ¶¶ 229-238. Medtech also claims that Duane and CDS breached the confidentiality provision of the Proprietary Information and Inventions Agreement ("PIIA"), which was also executed on

13

September 30, 1999, by providing confidential and proprietary information to DenTek. Id. In

Count VIII of the Amended Complaint, Medtech alleges that Kaplan breached the confidentiality

provision in an almost identical PIIA that Kaplan and Dental Concepts executed on September

13, 1999, at the start of Kaplan's employment relationship with Dental Concepts. Id. at ¶¶ 239-

245. Finally, in Count IX of the Amended Complaint, Medtech claims that Duane and Kaplan

breached a General Release signed by Duane on November 10, 2005, and by Kaplan on

November 14, 2005, at the conclusion of their employment relationships with Dental Concepts.

Id. at ¶¶ 246-255.

   Duane and CDS argue that Counts VII and IX should be dismissed because the non-

compete and non-solicitation clause in the Consulting Agreement was not triggered by the way

in which the Consulting Agreement was terminated, because the Consulting Agreement

terminated automatically upon the sale of the Company, because the confidentiality provision in

the PIIA was superseded by the confidentiality provision in the General Release, and because

Medtech has not alleged that Duane disclosed trade secrets in breach of the confidentiality

provision in the General Release. Duane and CDS Memorandum in Support at pages 9-11.

Similarly, Kaplan argues that Counts VIII and IX should be dismissed because the PIIA was

superseded by the General Release and because Medtech did not sufficiently allege that Kaplan

disclosed trade secrets in breach of the confidentiality provision in the General Release. Kaplan

Memorandum in Support at pages 19-21.

   Medtech argues that, under the plain language of the contract, the Consulting Agreement

was not terminated automatically by the sale of the Company. Medtech's Memorandum in

Opposition to Duane and CDS Motion at pages 6-8. Rather, Medtech argues, the Consulting

Agreement was terminated by Duane and CDS opting to decline further employment after the sale of the Company, thereby triggering the non-compete and non-solicitation clause. Id. Additionally, Medtech argues that the General Releases did not supersede the PIIAs because the confidentiality provisions of the General Releases and PIIAs work in tandem. Id. at pages 10-14; Medtech's Memorandum in Opposition to DenTek and Kaplan Motions at pages 22-25. Furthermore, Medtech points out that CDS was not a party to Duane's General Release so its obligation under the PIIA continued under the PIIA regardless of the General Release. Medtech's Memorandum in Opposition to Duane and CDS Motion at page 14. Finally, Medtech argues that it has properly pleaded the disclosure of trade secrets by Duane and Kaplan in violation of the confidentiality provisions in the General Releases. Id. at page 17; Medtech's Memorandum in Opposition to DenTek and Kaplan Motions at pages 24-25.

Under New York law, a plaintiff making a claim for breach of contract must allege: (1) the existence of a contract; (2) that the plaintiff has performed his or her obligations under the contract; (3) that the defendant failed to perform his or her obligations under the contract, and (4) that the plaintiff suffered damages because of the breach. Creditsights, Inc. v. Ciasullo, No. 05 CV 9345 (DAB), 2007 WL 943352, *6 (S.D.N.Y. Mar. 29, 2007). Here, only the third element is in dispute. With regard to whether or not Duane, CDS, and Kaplan breached their contracts with Medtech, the arguments of the parties raise three issues: (1) whether the non-compete and non-solicitation clause applied to Duane and CDS under the alleged circumstances of their termination from employment from Dental Concepts as alleged in the Amended Complaint, (2) whether the confidentiality provisions of the PIIAs were superseded by the General Releases, and (3) whether the Amended Complaint adequately alleges that Duane, CDS, and Kaplan

disclosed confidential information in violation of their contracts with Medtech.

### a)      *Application of the Non-Compete and Non-Solicitation Clause*

The issue of whether the non-compete and non-solicitation clause applied to Duane and

CDS under the alleged circumstances of their termination from employment from Dental

Concepts is an issue of contract interpretation. Because contract interpretation "is generally a

question of law, it is suitable for disposition on a motion to dismiss." Reinhardt v. Wal-Mart

Stores, Inc., No. 07 Civ. 8233 (SAS), 2008 WL 1781232, *3 (S.D.N.Y. Apr. 18, 2008) (internal

quotations omitted). However, a court should only construe a contract as matter of law if the

contract is unambiguous on its face. See Metro Life Ins. Co. v. RJR Nabisco Inc., 906 F.2d 884,

889 (2d Cir. 1990). A contract is unambiguous on its face if it "has 'a definite and precise

meaning, unattended by danger of misconception in the purport of the [contract] itself, and

concerning which there is no reasonable basis for a difference of opinion.' " Sayers v. Rochester

Tel. Corp. Supplemental Mgmt. Plan, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting Breed v. Ins.

Co. of N. Am., 46 N.Y.2d 351, 355 (1978)). Contractual language is not ambiguous simply

because the parties "urge different interpretations in the litigation," Metro Life, 906 F.2d at 889,

rather, contractual language is ambiguous only if it is subject to more than one reasonable

interpretation. Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993).

I conclude, and respectfully recommend that Your Honor should conclude, that the

Consulting Agreement is unambiguous with regard to the applicability of the non-compete and

non-solicitation clause. Specifically, the Consulting Agreement states that

> for a period of twenty-four (24) months from and after the date of termination of
> such engagement, *if such engagement is terminated by the Consultant or is*
> *terminated by the Company for Just Cause*, neither [CDS] nor Duane shall, . . .
> solicit . . . any person who presently is, or any time during [CDS's] engagement
> by the Company shall be or shall have been, an employee of the Company or any

> of its Affiliates . . . .; or initiate communications with . . . any client, customer,
> supplier or account of the Company . . .; sell any product or provide any service
> which is competitive with any of the business . . . of . . . the Company . . .;
> become an employee . . . of . . . business competitive with any of the Activities
> engaged in during the period of [CDS's] engagement. . . .

Amended Complaint, Exhibit A at 7(b) (emphasis added). Thus, the non-compete and non-solicitation clause unequivocally states that it applies if the Consultant–CDS–terminates the relationship or if the Company–Dental Concepts–terminates the relationship for Just Cause. Id. Because the Amended Complaint alleges that Duane and CDS ended the employment relationship by declining further employment from Prestige, Amended Complaint at ¶ 88, I conclude, and respectfully recommend that Your Honor should conclude, that the non-compete and non-solicitation clause applied under the circumstances of Duane and CDS's termination from Dental Concepts.

Although Duane and CDS urge the Court to conclude that the entire Consulting Agreement, including the non-compete and non-solicitation clause, terminated automatically when Dental Concepts was sold to Prestige because CDS and Duane were specifically retained to grow the company so that it could be sold, see Duane and CDS Memorandum in Support at page 10 and Reply at pages 2-4, such an interpretation is not a reasonable one. First, nothing in the Consulting Agreement indicates that the Consulting Agreement was to automatically terminate upon the sale of Dental Concepts. See generally Amended Complaint, Exhibit A, Section 6. Indeed, the only relevant provision states that the Consulting Agreement "shall terminate . . . *at the option of the Company*, upon the sale of the Company . . . ." Id. at Section 6(a)(vi)(emphasis added). There is no allegation in the Amended Complaint that Dental Concepts exercised the option to terminate the Consulting Agreement at the time of the sale. See generally Amended Complaint at ¶¶ 82-93. Indeed, the Amended Complaint alleges that Duane

17

and CDS continued working for Prestige for several months after the sale. Id. at ¶ 87.

Additionally, the Consulting Agreement states that "[t]he Company hereby engages [CDS], and [CDS] hereby accepts the engagement, to direct and supervise the sales of the Company's products . . . ." indicating that Duane and CDS were not hired exclusively to grow the company so that it could be sold. Id. at Exhibit A at page 1. Furthermore, the Consulting Agreement states that it "shall be binding upon and inure to the benefit of the respective heirs, personal representatives, successors and assign [sic] of the parties hereto," id. at Exhibit A, Section 8, indicating that the Consulting Agreement was intended to continue after the sale of the Dental Concepts. Finally, the Consulting Agreement provides for the survival of the non-compete and non-solicitation clause after "the termination or expiration of [the Consulting Agreement] and/or the Term, irrespective of the reason therefor . . . ," id. at Exhibit A, Section 7(c), indicating that the non-compete and non-solicitation clause was to survive even if the Consulting Agreement terminated upon the sale of Dental Concepts to Prestige. Accordingly, I cannot conclude, and respectfully recommend that Your Honor should not conclude, that CDS and Duane's interpretation of the Consulting Agreement is reasonable.

### b)  *The Effect of the General Releases on the PIIAs*

As explained supra, Duane, CDS, and Kaplan argue that the confidentiality provisions in the PIIAs were superseded by the confidentiality requirements of the General Releases.[7] Duane

---

[7] As an initial matter, it is important to point out, as Medtech does, that, unlike the PIIA, Duane did not sign the General Release on behalf of himself and on behalf of CDS. Compare Amended Complaint, Exhibit B at page 5 with Amended Complaint, Exhibit G at page 5. Duane signed the General Release only on behalf of himself. Id. at Exhibit G at page 5. Additionally, unlike the Duane and CDS PIIA, the General Release does not contain language indicating that CDS was to be bound by the agreement. Compare Amended Complaint, Exhibit B (referring throughout to "the Consultant and Duane") with Amended Complaint, Exhibit G (referring throughout to "the Employee"). Although Duane and CDS state that Duane was the only

and CDS Memorandum in Support at pages 10-11; Kaplan Memorandum in Support at pages 19-

20. "New York law gives full effect to integration and merger clauses." Kreiss v. McCown De

Leeuw & Co., 37 F. Supp. 2d 294, 301 (S.D.N.Y. 1999) (citing Health-Chem Corp. v. Baker,

915 F.2d 805, 811 (2d Cir. 1990)). Thus, "[w]hen the parties to a contract enter into a new

agreement that expressly supersedes the previous agreement, the previous agreement is

extinguished, thereby reducing the remedy for breach to a suit on the new agreement." Health-

Chem, 915 F.2d at 811. Additionally, "under New York law, 'a subsequent contract regarding

the same subject matter supersedes the prior contract' " even where there is no integration and

merger clause in the subsequent contract. Creditsights, 2007 WL 943352, at *6. "However, a

subsequent contract not pertaining to 'precisely the same subject matter' will not supersede an

earlier contract unless the subsequent contract has definitive language indicating it revokes,

cancels or supersedes that specific prior contract." Id. (quoting Globe Food Servs. Corp. v.

Consol. Edison Co. of New York, Inc., 184 A.D.2d 278 (1st Dept. 1992)). Additionally, "the

fact that a subsequent contract contains provisions which are of the same subject matter as those

in an earlier agreement is not sufficient to supersede the entire contract; rather, a subsequent

agreement supersedes only those terms of the earlier contract that are of the same subject

matter." Id. In order for the court to determine whether or not a particular provision is

superseded by a provision in a subsequent contract, the court should consider whether there is an

employee of CDS and therefore "Medtech achieved the same result as if both of the Duane
Defendants had signed the General Release," Duane and CDS Reply at pages 6-7, Duane and
CDS do not provide, and the undersigned cannot conclude from the four corners of the Amended
Complaint, any legal basis for finding that the General Release binds both Duane and CDS.
Accordingly, I conclude, and respectfully recommend that Your Honor should conclude that the
confidentiality provision of the PIIA survived the execution of the General Release with regard
to CDS.

integration and merger clause that explicitly indicates that the prior provision is superseded, whether the two provisions have the same general purpose or address the same general rights, and whether the two provisions can coexist or work in tandem. See Creditsights, 2007 WL 943352, at *7-9 (finding the initial agreement not superseded by a subsequent agreement because, although the subsequent agreement had an integration and merger clause, the merger clause did not indicate an intent to revoke the prior agreement, and the agreements addressed different rights and served dissimilar purposes); Indep. Energy Corp. v. Trigen Energy Corp., 944 F. Supp. 1184, 1196-97 (S.D.N.Y. 1996) (finding a prior oral agreement superseded by a subsequent written agreement when the terms of the agreement were inconsistent with each other and, although there was no merger clause, the language of the written agreement indicated an intention that the parties be bound only by the written agreement).

     I conclude, and respectfully recommend that Your Honor should conclude, that the confidentiality provisions in the PIIAs and the General Releases cover precisely the same subject matter. First, the confidentiality provisions of both the PIIAs and the General Releases cover the time period after the termination of Duane and Kaplan's employment. Compare Amended Complaint, Exhibit C, Section D.1 ("At all times, both during Consultant's engagement by the Company and after its termination, Obligors will keep in confidence . . . .") and Amended Complaint, Exhibit D, Section D.1 ("At all times, both during my employment by the Company and after its termination, I will keep in confidence . . . .") with Amended Complaint, Exhibits G and H, at page 1 ("Employee will receive the Consideration . . . as severance and contractual payout. . . . on the terms contained in this Release as fully set forth below."). Next, and most importantly, both the PIIAs and the General Releases prohibit Duane and Kaplan from disclosing trade secrets and confidential information "including, but not limited to" information regarding

manufacturing, marketing, sales, customers, methods, and processes. <u>Compare</u> Amended

Complaint, Exhibits C and D, Sections B-D <u>with</u> Amended Complaint, Exhibits G and H,

Section 7. Additionally, both the PIIAs and the General Releases require Duane and Kaplan to

surrender documents pertaining to the Company's business or work at the time of their

termination of employment. <u>Id.</u> Both the PIIAs and the General Releases further provide that if

Duane or Kaplan violate the confidentiality provision, the Company could request an injunction

and that Duane or Kaplan would concede that such a violation would cause irreparable harm. <u>Id.</u>

Finally, the General Releases include an integration and merger clause that states that "[t]he

parties hereto acknowledge that this Release constitutes a full, final, and complete settlement of

their differences and supersedes and replaces any and all other written or oral exchanges,

agreements, understandings, arrangements, or negotiations between or among them relating to

the subject matter hereof . . . ." Amended Complaint, Exhibits G and H at Section 10.

Accordingly, although the PIIAs were executed at the start of Duane and CDS's engagement and

Kaplan's employment with Dental Concepts and the General Releases were executed at the

termination of such engagement/employment, and therefore the context and purpose of the two

contracts are different, I conclude, and respectfully recommend that Your Honor should

conclude that because the confidentiality provisions of the PIIAs and the General Releases cover

the same rights of the parties and address precisely the same subject matter–confidentiality–and

in light of the integration and merger clause in the General Releases, the confidentiality

provisions of the PIIAs are superseded by the General Releases with respect to the Duane and

Kaplan. Thus, I conclude, and respectfully recommend that Your Honor should conclude, that

Medtech's claim against Duane and Kaplan for breach of the PIIAs should be dismissed.

### c) *Allegations of a Breach*

21

The Amended Complaint alleges that CDS entered into a consulting agreement with DenTek and Duane solicited Dental Concepts' employees, suppliers, and consultants in violation of the non-compete and non-solicitation claim. Amended Complaint at ¶¶ 120, 130-162, 231, Exhibit M. Accordingly, because I have concluded that the non-compete and non-solicitation clause applied under the alleged circumstances, I conclude, and respectfully recommend that Your Honor should conclude, that Medtech has sufficiently alleged a breach of contract claim against Duane and CDS on the basis of the non-compete and non-solicitation clause in the Consulting Agreement. Additionally, because I have already concluded <u>supra</u> that the Amended Complaint sufficiently alleges that Duane, CDS, and Kaplan disclosed trade secrets, I likewise conclude, and respectfully recommend that Your Honor should conclude, that the Amended Complaint also sufficiently alleges a breach under the breach of contract claims involving the confidentiality provisions of CDS's PIIA and Duane and Kaplan's General Releases. Thus, in sum, should Your Honor adopt my recommendation regarding the breach of contract claims, the remaining breach of contract claims would be Medtech's claim against Duane and CDS for breach of the non-compete and non-solicitation clause in the Consulting Agreement, Medtech's claim against Duane for breach of the confidentiality provision in the General Release, Medtech's claim against CDS for breach of the confidentiality provision of the PIIA, and Medtech's claim against Kaplan for breach of the confidentiality provision in the General Release.

### 3. *Medtech's Civil Conspiracy Claims Against Kaplan, Duane, CDS, and DenTek*

In Count XII of the Amended Complaint, Medtech asserts a claim of civil conspiracy against all Defendants. Amended Complaint at ¶¶ 269-273. Specifically, Medtech alleges that

Defendants conspired to use Medtech's trade secrets to bring DenTek's infringing nightguard to the market. Id. at ¶¶ 269-273. As Defendants point out, New York does not recognize an independant tort of civil conspiracy. Baker v. R.T. Vanderbilt Co., 688 N.Y.S.2d 726, 729 (3d Dept. 1999). Rather, a plaintiff may only make a claim of civil conspiracy if he or she adequately states a claim for an underlying tort. Id. Additionally, a plaintiff making a claim of civil conspiracy must also allege: "(1) an agreement between two or more parties, (2) an overt act in furtherance of the agreement, (3) the parties' intentional participation in the furtherance of the plan or purpose, and (4) resulting damage or injury." World Wrestling Fed'n Entm't, Inc. v. Bozell, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001). " '[T]o survive a motion to dismiss, a complaint must contain more than general allegations in support of the conspiracy. Rather, it must allege the specific times, facts, and circumstances of the alleged conspiracy.' " Brownstone Invest. Group, LLC v. Levey, 468 F. Supp. 2d 654, 661 (S.D.N.Y. 2007) (quoting Fitzgerald v. Field, No. 99-3406 (RWS), 1999 WL 1021568, *4 (S.D.N.Y. Nov. 9, 1999)). "Bare conclusory allegation[s] of conspiracy do[] not state a cause of action." Grove Press, Inc., v. Angleton, 649 F.2d 121, 123 (2d Cir. 1981) (citing Goldstein v. Siegel, 255 N.Y.S.2d 378 (1963)).

Here, although I have concluded supra that the Amended Complaint states a claim against each of the Defendants for the underlying tort of trade secret misappropriation, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff has not sufficiently alleged an agreement among the Defendants to engage in such tortious conduct to survive Defendants' motion to dismiss the civil conspiracy claim. In support of its argument that the Amended Complaint adequately states an agreement among the Defendants to misappropriate Medtech's trade secrets, Medtech only points to allegations in the Amended Complaint that state that Duane and Kaplan each engaged in employment discussions with

23

DenTek and signed employment agreements with DenTek following their employment with Dental Concepts. Medtech's Memorandum in Opposition to DenTek and Kaplan's Motion at page 27. However, merely hiring the employees of a competitor is not indicative of an agreement to misappropriate trade secrets. See, e.g., In re Dana Corp., No. 06-10354 (BRL), 2007 WL 3376882, *7 (Bankr. S.D.N.Y. Nov. 6, 2007) (finding that a company's employment of its competitor's former employees was not sufficient proof of a conspiracy or of trade secret misappropriation). Indeed, "conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 597 n.21 (1986). There are no allegations in the complaint that the Defendants specifically agreed to used the trade secrets that Duane and Kaplan gleaned from their employment with Medtech in order to produce DenTek's competing product. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Medtech's claim of civil conspiracy should be dismissed in favor of Defendants.

### 4.    *Medtech's Tortious Interference Claims*

In Count X of the Amended Complaint, Medtech asserts a claim of tortious interference with contractual relations against DenTek, alleging that DenTek induced Duane, CDS, and Kaplan to breach the confidentiality provisions in the Consulting Agreement, PIIA, and General Releases. Amended Complaint at ¶¶ 256-262. In Count XI of the Amended Complaint, Medtech also asserts a claim of tortious interference with contractual relations against Duane, alleging that Duane induced Kaplan to breach the confidentiality provision of the General Release. Id. at ¶¶ 263-268. Additionally, in Count XIV of the Amended Complaint, Medtech asserts a claim of tortious interference with advantageous business relationship/economic

24

advantage against all Defendants, alleging that Kaplan, Duane, and DenTek knew of a relationship between Medtech and its consultants, the Tufts Doctors, and that Kaplan, Duane, and DenTek intentionally interfered with that relationship. Id. at ¶¶ 284-289.

### a)    *Tortious Interference with Contractual Relations*

Under New York law, in order to state a claim of tortious interference with contractual relations, a plaintiff must allege five elements: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." Kirch v. Liberty Media Corp., 449 F.3d 388, 401(2d Cir. 2006) (internal quotations omitted); see also Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94 (1993).

With regard to the second element, the plaintiff must "provide specific allegations" of the defendant's knowledge and cannot survive a motion to dismiss by making merely a "conclusory assertion" of knowledge. Wolff v. Rare Medium, Inc., 171 F. Supp. 2d 354, 359 (S.D.N.Y. 2001). "Although a defendant need not be aware of all the details of a contract to be liable for tortious interference, it must have actual knowledge of a specific contract." Int'l Minerals & Res., Inc. v. Pappas, No. 87 Civ. 3988 (PKL), 1992 WL 354504, *3 (S.D.N.Y. Nov. 17, 1992); see also Burns Jackson Miller Summit & Spitzer v. Lindner, 88 A.D.2d 50, 72 (2d Dept. 1982). Indeed, "to avoid dismissal of a tortious interference with contract claim a plaintiff must support his [or her] claim with more than mere speculation." Burrowes v. Combs, 25 A.D.3d 370, 373 (1st Dept. 2006).

"[T]he third element [of a tortious interference with contractual relations claim] involves a defendant's 'improper intentional interference with [] performance' of an existing contract."

25

Wolff, 171 F. Supp. 2d at 359 (quoting Imtrac Indus., Inc. v. Glassexport Co., No. 90 Civ. 6058,

1996 WL 39294, *7 (S.D.N.Y. Feb. 1, 1996)). In other words, a plaintiff alleging a tortious

interference with contractual relations claim must allege that the defendant used "wrongful

means" to procure the third party's breach. Id. The New York Court of Appeals has defined

"wrongful means" to include "physical violence, fraud, or misrepresentation, civil suits and

criminal prosecutions, and some degrees of economic pressure." Guard-Life Corp. v. S. Parker

Hardware Mfg. Corp., 50 N.Y.2d 183, 191 (1980). "Wrongful means" do not, however, include

persuasion alone, even if such persuasion is "knowingly directed at interference with the

contract." Id.

    DenTek argues that Medtech's claim of tortious interference with contractual relations

against it should be dismissed because the Amended Complaint contains no allegations that

DenTek had any knowledge of the confidentiality provisions of the Consulting Agreement,

PIIAs, or General Releases. DenTek's Memorandum in Support at page 23. In opposition to

DenTek's argument, Medtech points to paragraphs 258 and 259 of the Amended Complaint.

These paragraphs state:

> DenTek knew or should have known of the valid contracts between Duane
> and Dental Concepts/Medtech and Kaplan and Dental Concepts/Medtech.
>     DenTek is a sophisticated entity well aware of the industry practice of
> securing confidentiality agreements, as evidenced by its own conduct with Duane,
> Kaplan and the Tufts Doctors.

Amended Complaint at ¶¶ 258-259. I conclude, and respectfully recommend that Your Honor

should conclude that these paragraphs are insufficient to alleged actual knowledge of the

contracts on behalf of DenTek. There are no allegations in the Amended Complaint that Duane

or Kaplan told DenTek about the Consulting Agreement, PIIAs, or General Releases, that

DenTek saw copies of the contracts, or any other allegations stating that DenTek was otherwise

informed of the contracts. In fact, the Amended Complaint states that Duane told DenTek that he was not bound by any non-competition covenants and that Duane failed to inform DenTek that he could not work on DenTek's competing nightguard because of the non-compete agreement. Amended Complaint at ¶¶ 113, 116. Thus, the allegations that DenTek "knew or should have known" about the contracts because it is a "sophisticated entity" familiar with the concept of confidentiality agreements is mere speculation unsupported by the specific allegations of actual knowledge necessary to survive a motion to dismiss a claim of tortious interference with contractual relations.

Additionally, there are no allegations in the Amended Complaint stating that DenTek used wrongful means to induce Duane or Kaplan to breach their confidentiality agreements with DenTek. With regard to DenTek's interactions with Duane, the Amended Complaint merely states that "DenTek contacted Duane and asked if he would be interested in participating in a new project with DenTek," that DenTek told Duane that the project was "bringing an OTC bruxism device to the market that would compete with [Medtech's product]," and that "DenTek and Duane finalized the terms of their arrangement and signed an agreement pursuant to which Duane agreed to assist DenTek with the development of an OTC bruxism device to compete with [Medtech's product]." Amended Complaint at ¶¶ 111, 114, 120. With respect to DenTek's contact with Kaplan, the Amended Complaint merely alleges that Duane recruited Kaplan on DenTek's behalf and that "DenTek and Duane were successful in recruiting Kaplan." Id. at ¶¶ 133, 156. These allegations amount to nothing more than persuasion for the benefit of DenTek's business, not wrongful means intended to injure Medtech. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that DenTek's motion to dismiss Medtech's tortious interference with contractual relations claim against it should be granted.

Duane argues that Medtech's claim of tortious interference with contractual relations against him should be dismissed because the Amended Complaint does not allege that Duane intentionally induced Kaplan to breach the confidentiality provisions of the PIIA or General Release.[8]  Duane and CDS Memorandum in Support at pages 12-13.  I conclude, and respectfully recommend that Your Honor should conclude, that Duane is correct.  Just as there are no allegations in the Amended Complaint regarding DenTek's inducement of Duane and Kaplan's breach, there are no allegations in the Amended Complaint that Duane coerced, persuaded, or even asked Kaplan to breach her confidentiality agreement with Dental Concepts.  The Amended Complaint merely states that Duane recruited Kaplan to work for DenTek.  Amended Complaint at ¶ 133.  Indeed, there is no provision prohibiting Kaplan from working for a competitor in either her PIIA or her General Release, and thus, such an allegation cannot form the basis of "intentional inducement."  See generally Amended Complaint, Exhibits D and H.  Additionally, there is no allegation in the Amended Complaint that Duane used wrongful means to procure Kaplan's breach.  Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Duane's motion to dismiss Medtech's claim of tortious interference with contractual relations against him should be granted.

### b)    *Tortious Interference with Advantageous Business Relationship/Economic Advantage*

As explained supra, in Count XIV of the Amended Complaint, Medtech asserts a claim of tortious interference with advantageous business relationship/economic advantage against all

---

[8] In its opposition to Duane and CDS's motion, Medtech does not explicitly address Duane's argument with regard to the tortious interference with contractual relations claim.  See generally Medtech Opposition to Duane and CDS Motion to Dismiss.  However, Medtech incorporates its arguments made in response to DenTek's motion.  Id. at page 3.

of the Defendants, alleging that Kaplan, Duane, and DenTek knew of a relationship between

Medtech and the Tufts Doctors and that Kaplan, Duane, and DenTek intentionally interfered

with that relationship. Amended Complaint at ¶¶ 284-289. Under New York law, a plaintiff

asserting a claim of tortious interference with a business relationship must allege that " '(1) it had

a business relationship with a third party; (2) the defendant knew of that relationship and

intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest,

unfair, or improper means; and (4) the defendant's interference caused injury to the

relationship.'"  Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006) (quoting Carvel

Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003)).

      The New York Court of Appeals has explained that because "[g]reater protection is

accorded an interest in an existing contract . . . than to the less substantive, more speculative

interest in a prospective relationship . . . liability will be imposed only on proof of more culpable

conduct on the part of the interferer" under a tortious interference with business relationship

claim. Guard-Life Corp., 50 N.Y.2d at 191. Thus, a plaintiff must allege " 'more culpable

conduct on the part of the defendant' " for such a claim than for a claim for tortious interference

with contractual relations. Wolff, 171 F. Supp. 2d at 360 (quoting NBT Bancorp Inc. v.

Fleet/Norstar Fin. Group, Inc., 87 N.Y.2d 614, 621 (1996)). As a general rule, unless the

"defendant engaged in conduct for the sole purpose of inflicting intentional harm on plaintiffs,"

the defendant's conduct must amount to a crime or an independent tort. Carvel Corp. v. Noonan,

3 N.Y.3d 182, 190-91 (2004). "Conduct that is not criminal or tortious will generally be 'lawful'

and thus insufficiently 'culpable' to create liability for interference with prospective contracts or

other nonbinding economic relations." Id. Additionally, "mere suspicions are inadequate to

support a claim of tortious interference with business relations claim." Scutti Enterps. v. Park

Place Entm't Corp., 322 F.3d 211, 217 (2d Cir. 2003).

Defendants argue that the Amended Complaint fails to adequately allege the third element of Medtech's tortious interference with a business relationship claim because it does not allege that Defendants communicated with the Tufts Doctors solely out of malice or by using wrongful means. DenTek Memorandum in Support at page 25; Duane and CDS Memorandum in Support at pages 14-15; Kaplan Memorandum in Support at pages 24-26. I conclude, and respectfully recommend that Your Honor should conclude, that Defendants are correct. First, there are no allegations in the Amended Complaint stating that when Kaplan, Duane, and DenTek contacted the Tufts Doctors, they were acting solely out of malice. Rather, the allegations in the Amended Complaint establish that Defendants were motivated by their own economic and competitive interests when they contacted the Tufts Doctors to help DenTek develop its nightguard. See Amended Complaint at ¶¶ 130(d), 140-150. "A motive of 'normal economic self-interest' is inconsistent with a sole purpose of inflicting intentional harm." Hassan v. Deutsche Bank A.G., 515 F. Supp. 2d 426, 430 (S.D.N.Y. 2007).

Additionally, there are no allegations in the Amended Complaint stating that Defendants engaged in criminal or tortious activities in order to procure a relationship with the Tufts Doctors. In support of its argument in opposition to DenTek's motion to dismiss, Medtech points to paragraph 150 of the Amended Complaint which states that "DenTek never revealed to the Tufts Doctors the goals of DenTek's project. If the goals reflected in Exhibit N had been conveyed to the Tufts Doctors, DenTek would have been unsuccessful in procuring any consulting relationship with the Tufts Doctors." Medtech Memorandum in Opposition to DenTek's Motion to Dismiss at page 29; see Amended Complaint at ¶ 150. Exhibit N contains a list of four of DenTek's objectives, only one of which has to do with Medtech's device.

30

Amended Complaint, Exhibit N. It states, "newly designed NightGuard device to compete with

and maybe even replace The Doctor's Nightguard in retail stores." Id. I conclude, and

respectfully recommend that Your Honor should conclude, that these allegations do not amount

to fraud or misrepresentation; rather, they allege only that Defendants failed to tell the Tufts

Doctors that DenTek intended to create a device to compete with Medtech's device. Indeed,

other allegations in the Amended Complaint seem to imply the Tufts Doctors were aware of

DenTek's goal, regardless of DenTek's failure to disclose its precise goal to compete with

Medtech. See Amended Complaint at ¶¶ 130(d), 149 (Kaplan and Duane "personally called and

solicited the Tufts Doctors to work for DenTek and provide information and feedback on the

one-size-fits-all protector that DenTek was developing" and Dr. Mehta told Medtech that "he had

'discuss[ed] with [DenTek] that [the Tufts Doctors] would work with [DenTek] on an OTC

bruxism guard that verbally [the Tufts Doctors] had agreed to do . . . only with [DenTek].' ").

Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that

Defendants' motion to dismiss the tortious interference with business relations claim should be

granted.

### 5.    *Medtech's Unfair Competition and Unjust Enrichment Claims Against DenTek*

In Counts IV and V of the Amended Complaint, Medtech asserts claims of unfair

competition and unjust enrichment against DenTek. Amended Complaint at ¶¶ 212-21. DenTek

argues that these claims should be dismissed "[t]o the extent that these claims rest on the

enforcement of rights provided in the federal patent and copyright laws." DenTek's

Memorandum in Support at page 27.

In order to state a claim of unfair competition under New York law, a plaintiff must

allege that the defendant "misappropriated the plaintiffs' labors, skills, expenditures, or good will

and displayed some element of bad faith in doing so." Abe's Rooms, Inc. v. Space Hunters, Inc.,

38 A.D.3d 690, 692 (2d Dept. 2007). The elements of unjust enrichment under New York law

are: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience

militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch

Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004) (citing Clark v. Daby, 751

N.Y.S.2d 622, 623 (2002)). These state law claims are preempted, however, by federal

copyright and patent law when the rights to be protected by the state law claim "would infringe

one of the exclusive rights" provided by federal copyright or patent law. Computer Assocs. Int'l,

Inc. v. Altai, Inc., 982 F.2d 693, 716 (2d Cir. 1992). In order to determine if a state law claim is

preempted, the court must engage in a two-prong test. Briarpatch, 373 F.3d at 305. It must

determine: (1) if "the particular work to which the claim is being applied falls within the type of

works protected by the [federal copyright or patent law]," and (2) if "the claim seeks to vindicate

legal or equitable rights that are equivalent to one of the bundle of exclusive rights already

protected by [federal copyright or patent law]." Id. "The first prong of the test is called the

'subject matter requirement,' and the second prong is called the 'general scope requirement.' " Id.

Additionally, courts use the "extra element" test to determine if a claim is preempted. Computer

Assocs., 982 F.2d at 716. "A state law claim is not preempted if the 'extra element' [required by

the state law claim] changes the 'nature of the action so that it is *qualitatively* different from a

copyright [or patent] infringement claim." Id. (emphasis in original). "To determine whether a

claim meets this standard, we must determine 'what plaintiff seeks to protect, the theories in

which the matter is thought to be protected and the rights sought to be enforced.' " Id. (quoting 1

Roger M. Milgrim, Milgrim on Trade Secrets § 2.06A[3], at 2-150 (1992)).

In Briarpatch, for example, the Second Circuit concluded that the plaintiffs' unjust enrichment claim was preempted by the Copyright Act. Briarpatch, 373 F.3d at 305-307. Specifically, the Second Circuit noted that the plaintiffs were attempting to protect their interests under the theory that the defendant "was unjustly enriched by turning [a] novel and [a] screenplay into a motion picture without compensating [the plaintiff] or obtaining [the plaintiff's] permission." Id. at 306. The court identified this theory as one that was really an attempt to "enforce the right of adaptation–i.e., the right to prepare or authorize preparation of a derivative work based on a novel or screenplay," which, the Second Circuit concluded, was one of the bundle of rights protected by the Copyright Act. Id. at 306.

In Computer Associates, however, the Second Circuit found that the district court erred in finding that the plaintiff's unfair competition claim was preempted. The Second Circuit concluded that it was possible that the plaintiff's claim contained an "extra element" not included in the rights protected under the Copyright Act. Computer Assocs., 982 F.2d at 717-18. The Second Circuit noted that "[f]ollowing [the] extra element test, [it] has held that unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by [the Copyright Act]," while "unfair competition claims based upon breaches of confidential relationships, breaches of fiduciary duties and trade secrets" are not. Id. at 717. The Second Circuit pointed out that "[t]he defendant's breach of duty is the gravamen of such trade secret claims, and supplied the 'extra element' that qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely on copying." Id. Thus, the Second Circuit found that the plaintiff's claim alleging that a former employee stole a code and used it to design a program for the defendant, his new employer, in violation of an agreement with the plaintiff, could state a claim of unfair competition that was

33

not preempted by the Copyright Act. Id. at 717-18; see also Computer Assocs. Int'l, Inc. v. Atlai, Inc., 775 F. Supp. 544, 553-554 (E.D.N.Y. 1991). Accordingly, the Second Circuit remanded the case back to the district court to more fully consider the "factual and theoretical bases of [the plaintiff's] trade secret claims" to determine whether they were based on the same theory as the plaintiff's copyright infringement claim. Id. at 718.

In Count IV of the Amended Complaint, Medtech states that by "misappropriating the commercial advantage gained by Medtech in the Nightguard trademark, the Copyright Registration, and the 051 Patent, DenTek has competed unfairly in violation of the common law of New York, as preserved by N.Y. Gen. Bus. Law 360-O." Amended Complaint at ¶ 213. In Count V of the Amended Complaint, Medtech further states that "DenTek has received substantial benefits and profited from its unlawful use of Medtech's Nightguard trademark, its copyrighted material, and its patented invention, but has not compensated Medtech for the benefits DenTek received." Id. at ¶ 219. Although these allegations suggest that Medtech is trying to use the unfair competition and unjust enrichment claims to hold DenTek liable for violation of rights already protected by federal copyright and patent law, in its Memorandum of Law, Medtech argues that its theory or "underlying purpose" of the unjust enrichment and unfair competition claims "is that DenTek has engaged in unfair competition through the misappropriation and use of Medtech's intellectual property and proprietary information, whether trade secrets, confidential information, trademarks, patents, copyright, business relationships, or contacts." Medtech Memorandum in Opposition to DenTek and Kaplan Motions to Dismiss at page 33. Indeed, Counts IV and V incorporate the facts alleged earlier in the Amended Complaint, which include allegations that DenTek wrongfully obtained Medtech's methods, processes, suppliers, consultants, and product formulation and production strategies, through

34

Duane and Kaplan's improper disclosure and was therefore able to short-circuit the research and development phase of producing its competing nightguard.  Amended Complaint at ¶¶ 128-162, 212 and 222.  I conclude, and respectfully recommend that Your Honor should conclude, that these allegations sufficiently support Medtech's theory that its unjust enrichment and unfair competition claims are based on an "additional element" of breach of duty or trust and therefore are sufficient to survive DenTek's motion to dismiss on the basis of preemption.

**D.    DenTek's Motion for a Protective Order**

As an alternative to its motion to dismiss Medtech's trade secret misappropriation claim, DenTek submitted a motion for an order compelling Medtech to list with specificity the trade secrets it claims DenTek misappropriated.  DenTek's Memorandum in Support at pages 28-37. DenTek argues that it has not been put on fair notice of the particular trade secrets that Medtech claims DenTek misappropriated and states that requiring Medtech to disclose them will "assist both the parties and the Court in narrowing discovery, avoiding undue expense, and fairly and efficiently conducting discovery in this case."  DenTek's Memorandum in Support at page 29.

In response, Medtech asserts that it "is not resisting reasonable disclosure of its trade secrets" and that "[o]nce an adequate protective order ensuring that its proprietary information remains confidential is entered, Medtech anticipates providing DenTek additional detail concerning the relevant trade secrets." [9]  Medtech Response to DenTek's Motion for an Oder to Compel at page 3.  Medtech additionally states, however, that "[u]ntil Medtech has time to fully explore the issues in this case, it will not know what information was ultimately acquired and used by DenTek."  Id.

---

[9] A protective order was filed on January 31, 2008, establishing a procedure for handling discovery of confidential material.  Docket entry 133.

It should also be noted that Medtech filed a motion for a preliminary injunction in this case in large part based on its trade secret misappropriation claim. See Docket entries 82, 85. In the motion for a preliminary injunction, Medtech asks the Court to issue an order enjoining DenTek, Duane, and Kaplan "(i) from continuing to improperly use Medtech's trade secrets, (ii) from continuing to breach any contractual agreements with Medtech or its predecessor-in-interest, and (iii) from marketing and selling any dental protector products or other products in which Duane or Kaplan has had any involvement or provided any assistance to DenTek." Medtech's Memorandum in Support of Preliminary Injunction at page 1. After hearing brief oral argument on the motion, the undersigned stayed the motion pending further discovery.

Contrary to DenTek's assertion, I conclude, and respectfully recommend that Your Honor should conclude, that there is no "universal rule" that a plaintiff asserting a trade secret misappropriation claim must disclose the precise trade secrets it alleges were misappropriated before being allowed to proceed with the claim. See DenTek's Memorandum in Support at pages 29-30. Rather, in striking the balance between a plaintiff's right to conduct discovery with respect to information relevant to its claims and a defendant's right to be protected from the plaintiff discovering the defendant's trade secrets "under the guise of seeing whether [the plaintiff's] trade secrets have been misappropriated," Struthers Sci. & Int. Corp v. Gen. Foods Corp., 51 F.R.D. 149, 151 (D. Del. 1970), "courts have implemented various procedures, depending on the facts of a given case." Microwave Research Corp. v. Sanders Assocs., Inc., 110 F.R.D. 669, 672 (D. Mass. 1986) (noting that courts have delayed disclosure until trial, delayed disclosure until the plaintiff has done enough discovery to survive a summary judgment motion, required disclosure in detail during discovery, and appointed an independant expert to control discovery). There is some support, however, for DenTek's position that it is entitled to

know at some point during discovery in this case the precise trade secrets Medtech is asserting were misappropriated. Xerox Corp. v. Int'l Bus. Machs. Corp., 64 F.R.D. 367, 371 (S.D.N.Y. 1974). In Xerox, the court found that after almost a year of discovery the plaintiff was able to and should identify the precise trade secrets it alleged were misappropriated. Id. at 371-72. The court pointed out that "[a]t the very least, a defendant is entitled to know the bases for plaintiff's charges against it" and "[t]he burden is upon the plaintiff to specify those charges, not upon the defendant to guess at what they are." Id. at 371.

Here, discovery regarding Medtech's trade secret claim has been stayed pending the resolution of Defendants' motions to dismiss. Accordingly, I conclude that Medtech should be allowed limited discovery on the trade secret claim prior to being required to identify the precise trade secrets it is alleging were misappropriated. However, in order to defend against Medtech's preliminary injunction motion and for both sides to prepare for the evidentiary hearing to be held in conjunction with the motion,[10] I conclude that after Medtech's limited discovery on the trade secret claim, DenTek is entitled to receive a list of the specific trade secrets Medtech is alleging were misappropriated forthwith. As the parties have already sent letters to the undersigned regarding the discovery Medtech believes it will need in order to identify the trade secrets and Defendants' objections to such discovery, the parties are directed to attend the conference scheduled before the undersigned on June 23, 2008, prepared to discuss and resolve the limited trade secret discovery issues. The undersigned will supervise such discovery and set a briefing

---

[10] "It is an established principle that where issues of fact are in conflict, a preliminary injunction should not be issued without an evidentiary hearing." 1Melvin F. Jager, Trade Secrets Law § 7:4 (2007). As noted supra, there are issues of fact regarding whether the trade secrets that Medtech alleges were misappropriated actually qualify as trade secrets. Accordingly, I find that an evidentiary hearing is appropriate in this case.

Case 7:07-cv-03302-KMK-LMS     Document 160-2     Filed 06/19/2008     Page 39 of 40
Case 7:07-cv-03302-KMK-LMS     Document 155     Filed 06/03/2008     Page 38 of 39

schedule and hearing date for the preliminary injunction motion at an appropriate time thereafter.

## III.  CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that Medtech's motion to strike should be denied, that Kaplan and Duane's motions for attorneys' fees should be denied without prejudice to refile at an appropriate time, and that Defendants' motions to dismiss as to the following claims should be granted: civil conspiracy against all Defendants, tortious interference claims against all Defendants, breach of the PIIA against Duane, and breach of the PIIA against Kaplan.  Thus, I conclude, and respectfully recommend that Your Honor should conclude, that Medtech's claims for trade secret misappropriation against all Defendants, unjust enrichment and unfair competition against DenTek, breach of the General Release against Kaplan and Duane, breach of the Consulting Agreement against Duane and CDS, and breach of the PIIA against CDS, should survive Defendants' motions to dismiss.

## IV.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have ten (10) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(e), or a total of thirteen (13) working days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation.  Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Kenneth M. Karas at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

38

respectfully recommend that Your Honor should conclude, that Medtech's claims for trade secret misappropriation against all Defendants, unjust enrichment and unfair competition against DenTek, breach of the General Release against Kaplan and Duane, breach of the Consulting Agreement against Duane and CDS, and breach of the PIIA against CDS, should survive Defendants' motions to dismiss.

**IV.    NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have ten (10) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(e), or a total of thirteen (13) working days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Kenneth M. Karas at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Karas.

Dated: June 2, 2008
White Plains, New York

Respectfully Submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

A copy of the foregoing Report and Recommendation has been sent to the following:

The Honorable Kenneth M. Karas, U.S.D.J.