## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MEDTECH PRODUCTS INC.,**<br>　　　　**Plaintiff,**<br>　　**v.**<br>**RANIR, LLC AND CVS PHARMACY, INC.,**<br>　　　　**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>) |
| **MEDTECH PRODUCTS INC.,**<br>　　　　**Plaintiff,**<br>　　**v.**<br>**DENTEK ORAL CARE, INC.,**<br>**KELLY M. KAPLAN,**<br>**RAY DAUNE, AND**<br>**C.D.S. ASSOCIATES, INC.**<br>　　　　**Defendants.** | )　　**Civil Action No. 07 CV 3302 (KMK)(LMS)**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| **MEDTECH PRODUCTS INC.,**<br>　　　　**Plaintiff,**<br>　　**v.**<br>**POWER PRODUCTS, INC.,**<br>　　d/b/a/ **SPLINTEK,**<br>　　　　**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>) |

## MEDTECH PRODCUTS INC.'S RESPONSE TO DEFENDANTS DENTEK ORAL CARE, INC.'S, KELLY M. KAPLAN'S, RAY DUANE'S, AND C.D.S. ASSOCIATES, INC.'S MOTIONS TO DISMISS

Table of Contents

Page

I.    INTRODUCTION................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND........................................2

III.  ARGUMENT....................................................................................4

      A.   THE MOTION TO DISMISS STANDARD...........................................4

      B.   MEDTECH'S SECOND AMENDED COMPLAINT ALLEGES A
           PROPER CAUSE OF ACTION AGAINST DENTEK AND
           KAPLAN FOR MISAPPROPRIATION OF TRADE SECRETS
           (COUNT XIII)..................................................................4

           1.   Medtech is Not Required to Identify Each of Its Trade
                Secrets in the Second Amended Complaint. ................................4

           2.   Kaplan's and DenTek's Motions to Dismiss Contain
                Misleading Statements Regarding the Standard for
                Specificity in Trade Secret Misappropriation Complaints. ...............7

           3.   Medtech's Second Amended Complaint Specifically
                Identifies Numerous Categories of Trade Secret
                Information Misappropriated by Defendants. ...........................10

                a.   Duane and Kaplan had access to highly confidential
                     information while employed by Dental Concepts. ...............14

                b.   Medtech's Second Amended Complaint adequately
                     alleges the misappropriation of trade secrets by
                     Kaplan..........................................................16

                c.   Medtech's Second Amended Complaint properly
                     alleges that DenTek misappropriated confidential
                     information. ...................................................19

                d.   Kaplan and DenTek's arguments regarding the
                     public availability of certain information are
                     irrelevant to the Motions to Dismiss...........................21

      C.   MEDTECH ASSERTS A VALID CLAIM FOR BREACH OF
           CONTRACT AGAINST KAPLAN (COUNT VIII).............................22

i

Table of Contents
(continued)

Page

D.    MEDTECH'S SECOND AMENDED COMPLAINT ASSERTS A
VIABLE CAUSE OF ACTION FOR CIVIL CONSPIRACY
AGAINST KAPLAN AND DENTEK (COUNT XII)..........................................25

E.    MEDTECH'S CLAIM FOR TORTIOUS INTERFERENCE
WITH ADVANTAGEOUS BUSINESS
RELATIONSHIP/ECONOMIC ADVANTAGE AGAINST
DENTEK AND KAPLAN (COUNT XIV) IS PROPERLY PLED......................28

F.    MEDTECH ASSERTS A VALID CLAIM FOR TORTIOUS
INTERFERENCE WITH CONTRACTUAL RELATIONS
AGAINST DENTEK (COUNT X). .....................................................................30

G.    MEDTECH'S CLAIMS FOR UNFAIR COMPETITION AND
UNJUST ENRICHMENT AGAINST DENTEK ARE VALID
(COUNTS IV AND V)........................................................................................32

H.    THE MOTIONS TO DISMISS FILED BY RAY DUANE AND
C.D.S. ASSOCIATES, INC. SHOULD BE DENIED. ........................................34

IV.    *CONCLUSION* ....................................................................................................*35*

## TABLE OF AUTHORITIES

**Cases**

*A&G Healthplans, Inc. v. National Network Services, Inc.*, 2003 WL 1212933
(S.D.N.Y. 2003)...................................................................................................6

*Ace-Tex Corp., Sanitary Wiping Cloth Div. v. Rosenberg and Sanitary Wiping
Co.*, No. 88-CV-1300A, 1992 U.S. Dist. LEXIS 20584, *21-22 (W.D.N.Y. Oct.
6, 1992)...............................................................................................................7

*Alnwick v. European Micro Holdings, Inc.*, 281 F. Supp. 2d 629 (E.D.N.Y. 2003) ......................6

*American Bldg. Maintenance, Co. of New York, v. Acme Property Services, Inc.*,
No. 1:06-CV-1366 (LEK/RFT), 2007 WL 2492921 (N.D.N.Y. Aug. 29, 2007)....................12

*Barnum v. Millbrook Care Ltd. Partnership*, 850 F. Supp. 1227, 1236 (S.D.N.Y.
1994)...................................................................................................................22

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)................................................4

*Bernheim v. Litt.*, 79 F.3d 318, 321 (2d Cir. 1996) ........................................................4

*Bourdages v. Metals Ref., LTD*, No. 84 Civ. 743 (CSH), 1984 WL 665, at *6 ...........................14

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) ......................34

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 191 (2004) .......................................................29

*Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992).........................33

*Compuware Corp. v. International Business Machines*, 259 F. Supp. 2d 597, 605
(E.D. Mich. 2002)..................................................................................................7

*CreditSights, Inc. v Ciasullo*, No. 05 CV 9345, 2007 WL 943352, *6 (S.D.N.Y.
March 29, 2007) ...........................................................................................22, 24, 30

*Del Monte Fresh Produce Co. v. Dole Food Co. Inc.*, 148 F. Supp. 2d 1322,
1323-25 (S.D. Fla. 2001)..........................................................................................7

*DeRubeis v. Witten Tech. Inc.*, No. 1:06-CV-807-JTC, 2007 U.S. Dist. LEXIS
30047 (N.D. Ga. Apr. 23, 2007).................................................................................7

*DSMC v. Conerva Corp.*, 273 F. Supp. 2d 14, 23-24 (D.D.C. 2002)......................................7

Page

*Eberhard Investment Associates, Inc. v. Santino*, 2003 WL 22126846 (S.D.N.Y. 2003)..................................................................................................................6, 21

*Echomail, Inc. v. American Express Co.*, 445 F. Supp. 2d 87, 93 (D. Mass. 2006).......................6

*Estee Lauder Co., Inc. v. Batra*, 430 F. Supp. 2d 158, 175 (S.D.N.Y. 2006) .............11, 12, 13, 15

*Foxrun Workshop, Ltd. v. Klone Manu., Inc.*, 686 F. Supp. 86, 87 n. 3 (S.D.N.Y. 1988)...............................................................................................................................33

*Gaetano Associates LTD v. Artee Collections, Inc.*, 2006 WL 3026080, *1 (S.D.N.Y. Oct. 25, 2006) .....................................................................................5, 16, 20

*G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 555 (S.D.N.Y. 2002).......................28

*Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F. Supp. 2d 722, 729 (N.D. Ohio 1999).......................................................................................................................................7

*Globe Food Services Corp. v. Consolidated Edison Co. of New York, Inc.*, 184 A.D.2d 278 (1st Dep't 1992)....................................................................................24

*Hassan v. Deutche Bank A.G.*, 2007 WL 2827841 (S.D.N.Y. Sept. 27, 2007).......................28, 29

*Howard Berger Co. v. Ye*, 272 A.D.2d 445, 445 (N.Y. App. Div. 2000) ...............................12, 14

*Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir. 1993).......................14

*In re Houbigant Inc.*, 914 F. Supp 964, 990 (S.D.N.Y. 1995) .......................................................25

*Innovative Networks, Inc.*, 871 F. Supp. 709, 731 (S.D.N.Y. 1995) ............................................25

*Integrated Cash Mgmt. Serv., Inc. v. Digital Trans., Inc.*, 732 F. Supp. 370, 375-76 (S.D.N.Y. 1989)...........................................................................................................11, 12

*Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 492 ................................................................33

*Magellan International Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919 (N.D. Ill. 1999) .......................................................................................................8, 9, 10

*Martin Ice Cream Co. v. Chipwich Inc.*, 554 F. Supp. 933, 945 (S.D.N.Y.1983) ......................28

*Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1234 (W.D.N.Y. 1994) ..........................................13

*Nadel v. Play-by-Play Novelties Inc.*, 208 F.3d 368 (2d Cir. 2000)..............................................14

*Omni Food Sales v. Boan*, 2007 WL 2435163 (S.D.N.Y. 2007) ....................................................6

iv

Page

*Oswell v. Morgan Stanley Dean Witter & Co., Inc.*, 2007 WL 1756027, *7 (D.N.J. 2007) ................................................................................................................6, 17, 21

*Papa John's Intern., Inc. v. Rezko*, 446 F. Supp. 2d 801, 811 (N.D. Ill. 2006) ............................10

*Rahl v. Bande*, 328 B.R. 387, 422 (S.D.N.Y. 2005) ........................................................31

*Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1306 (Fed. Cir. 1999) ..................................34

*Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp.2d 369, 375 n.3 (S.D.N.Y. 2000) ........................33

*Sado v. Ellis*, 882 F. Supp. 1401, 1408 (S.D.N.Y.1995) ..............................................25

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ......................................................4

*SD Protection, Inc. v. Del Rio*, 498 F. Supp. 2d 576, 586 (E.D.N.Y. July 20, 2007) ...............5, 11

*Starr v. Time Warner, Inc.*, 2007 WL 4144627 (S.D.N.Y. Nov. 21, 2007) ........................4, 32, 35

*Struthers Scientific & Intern. Corp. v. General Foods Corp.*, 51 F.R.D. 149, 151 (D. Del. 1970) ............................................................................................8

*Tracy v. Skate Key, Inc.*, 697 F. Supp. 748, 750 (S.D.N.Y. 1988) ................................34

*Univ. of Colorado Foundation, Inc. v. American Cyanamid Co.*, 342 F.3d 1298, 1307 (Fed. Cir. 2003) ........................................................................34

*White v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454 (2002) ................................8

*World Wrestling Federation Entertainment, Inc. v. Bozell*, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001) ..............................................................................25

*Xerox Corp. v. International Business Machines Corp.*, 64 F.R.D. 367 (S.D.N.Y. 1974) ........................................................................................8

## Rules

Federal Rule of Civil Procedure 12(b)(6) ................................................................4

Federal Rule of Civil Procedure 8(a) ..........................................................10, 16, 17, 20

Federal Rule of Civil Procedure 8(a)(2) ................................................................4

Federal Rule of Civil Procedure Sectio 8 ..............................................................7

## I.    **INTRODUCTION**

In their respective Motions to Dismiss, Defendants DenTek Oral Care ("DenTek") and Kelly Kaplan ("Kaplan") (collectively, the "Defendants") misrepresent the legal standard applicable to motions to dismiss by recasting the Second Amended Complaint in a light most favorable to them, rather than the Plaintiff.  Under the correct legal standard for determining motions to dismiss, however, this Court must accept the factual allegations of the Second Amended Complaint as true and draw all reasonable inferences in favor of the Plaintiff, not the Defendants.

In addition, the Defendants attempt to impose a new specificity requirement for pleading trade secret claims.  The Defendants assert that Medtech must, in its Second Amended Complaint, identity with specificity each and every trade secret that DenTek and Kaplan have stolen, how they used it, and when they disclosed it.  Essentially, the Defendants contend that **all** the facts and circumstances surrounding the alleged misappropriation must be pled before any meaningful discovery.  There is simply no support for the Defendants' position in the Federal Rules, or the law of this or any other circuit.

Under the appropriate legal standard, the Second Amended Complaint provides more than sufficient notice of the claims at issue in this case, namely the Defendants' misappropriation of Medtech's trade secrets pertaining to its dental protector device.

DenTek and Kaplan requested and received several extensions of time to respond to the Second Amended Complaint, so they both had several months to file the instant pleadings. Despite this delay, and despite the far-reaching representations made at the October 30 hearing, Defendants have failed to provide this Court with any legally-recognized theory under which the well-pled Second Amended Complaint should be dismissed.  Instead, the Defendants have

attempted to use inappropriate materials outside the Complaint,[1] based their arguments upon an improper and unrecognized pleading standard, and incorrectly characterized Medtech's claims. In short, DenTek and Kaplan have provided no basis supporting their Motions.

Due to the similar nature of the arguments made by Kaplan and DenTek, Medtech files this Response to both Motions to Dismiss. Also included is Medtech's Response to the Motions to Dismiss filed by Ray Duane and C.D.S. Associations, Inc. For the reasons discussed below, the Motions to Dismiss should be denied and the parties should proceed with discovery.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

After Medtech saw DenTek's product in the marketplace in late March 2007, this case was filed on April 29, 2007. (Docket No. 1.) The Complaint focused on intellectual property issues, containing causes of action for patent, trademark, and copyright infringement.

The scope of this case expanded after Medtech learned that Kaplan was working for DenTek. Medtech requested leave to file its First Amended Complaint almost immediately, adding to its intellectual property claims an allegation that DenTek had misappropriated Medtech's trade secrets. (Plaintiff's Motion for Leave to File Its Amended Complaint Against DenTek Oral Care, Inc., Docket No. 23.)

It was at this time that DenTek first requested more specificity regarding Medtech's trade secret claims. (See DenTek Oral Care Inc.'s Opposition to Plaintiff's Motion for Leave to File an Amended Complaint, Docket No. 33.) Medtech set out to provide more specificity and, after taking one limited deposition of Raymond Duane and the depositions of the Tufts Doctors, Medtech filed its motion seeking leave to file a Second Amended Complaint alleging, in great

---

[1] *See* Plaintiff Medtech Products Inc.'s Motion to Strike DenTek Oral Care Inc.'s Motion and Memorandum of Law in Support of its Motion for (A) Partial Dismissal of the Second Amended Complaint and (B) Entry of a Protective Order and Order Compelling Disclosure of Alleged Trade Secrets, filed Dec. 4, 2007 (Docket No. TBD.)

specificity, the facts then known about the misappropriation of its trade secrets. (*See* Plaintiff's Motion to Amend the Scheduling Order and Motion for Leave to File its Second Amended Complaint ("Second Motion to Amend" or "SAC"), Docket No. 53.) After the hearing on September 5, 2007, DenTek withdrew its opposition to Medtech's Second Motion to Amend. The Court granted Medtech's motion and Medtech filed the Second Amended Complaint on October 4, 2007. (*See* Second Amended Complaint for Injunctive Relief and Money Damages, Docket No. 66.) Several extensions were granted, and Kaplan's and DenTek's Motions to Dismiss were finally filed on November 21, 2007.

Medtech filed a Motion for Preliminary Injunction with supporting affidavits based on the misappropriation of its trade secrets. This Motion provided even more detail, both from a legal and factual standpoint, for the misappropriation of trade secret claims. (*See* Docket Nos. 72-82.) Despite requesting and receiving the specificity they sought, Kaplan and DenTek both complain that, incongruously, (1) it is still not enough; and (2) it is too long.

DenTek and Kaplan pay scant attention to the factual background of the dispute. Duane and Kaplan assisted in positioning Dental Concepts for sale to a strategic buyer; that buyer was Medtech, which paid approximately $30 million for the company. Dental Concepts was selling a product line, and the principle product of that line was THE DOCTOR'S® NIGHTGUARD™ brand dental protector.

Just a few months after they turned down positions at Medtech, Kaplan and Duane (who received, between them, over a million dollars for their parts in facilitating the acquisition) went to work for DenTek. Using Medtech's confidential and proprietary information, first Duane and then Kaplan systematically used this information to design a knock-off product, obtain

regulatory approval, engage manufacturers, consultants, and vendors, and bid to Wal-Mart, all in record time.

## III.    ARGUMENT

### A.    THE MOTION TO DISMISS STANDARD.

The law applicable to a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is well-known.  The starting point is Rule 8(a)(2), which requires that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The Supreme Court recently emphasized the minimal nature of this requirement, stating that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  All that must be shown by the pleader is that the claims asserted are plausible. *Id.* at 1969.  In construing a complaint in the context of a Rule 12(b)(6) motion, "the court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Starr v. Time Warner, Inc.*, 2007 WL 4144627 (S.D.N.Y. Nov. 21, 2007) (citing *Bernheim v. Litt.*, 79 F.3d 318, 321 (2d Cir. 1996)).

Kaplan's and DenTek's Motions to Dismiss advocate a higher pleading standard that is not supported by the case law.

### B.    MEDTECH'S SECOND AMENDED COMPLAINT ALLEGES A PROPER CAUSE OF ACTION AGAINST DENTEK AND KAPLAN FOR MISAPPROPRIATION OF TRADE SECRETS (COUNT XIII).

#### 1.    Medtech is Not Required to Identify Each of Its Trade Secrets in the Second Amended Complaint.

DenTek and Kaplan contest the sufficiency of the trade secret misappropriation claim contained in Medtech's Second Amended Complaint (Count XIII).  (Dentek Memorandum, pp.

7-21; Kaplan Memorandum, pp. 5-19.)  In support of their arguments, each of these Defendants argues a heightened pleading standard that is simply not supported by either the Federal Rules of Civil Procedure or federal case law.  As noted earlier, all that Rule 8(a) requires of Medtech's Second Amended Complaint is that it provide a short and plain statement of the claim showing that the pleader is entitled to relief.

A recent case from this Court illustrates that DenTek's claim for more specificity is just not the standard.  In *Gaetano Associates LTD v. Artee Collections, Inc.*, the defendant found in discovery that the plaintiff's computer system contained a list of several of the defendant's customers and the fabric those customers had ordered.  The defendant claimed the customer information originated from its former employee, who, not surprisingly, worked for the plaintiff and the defendant moved to amend its pleadings to assert a trade secret misappropriation claim against the plaintiff.  2006 WL 3026080, *1 (S.D.N.Y. Oct. 25, 2006).  In considering the merits of this proposed amendment, the court noted that all a trade secret claim must do at the complaint stage is provide fair notice to the opposing party; faulty claims are appropriately identified through discovery and summary judgment motions.  *Id.* at *2.  For this reason, the plaintiff's objections regarding a lack of specificity in the proposed complaint were found to be without merit:

> Plaintiff contends that the claim is defective because defendants have not explained "how the list of names or quantities of fabric sold constitutes a trade secret, what steps defendants took to preserve the secrecy of the information or how plaintiffs improperly obtained the alleged trade secret." **Under the notice pleading standard, however, defendants are not required to do so.**  The proposed answer and counterclaims describe the trade secrets at issue, the time period during which they were obtained, and the general method (conspiracy with a former [defendant's] employee) by which [the plaintiff] allegedly acquired them.

*Id.* (emphasis added); *see also SD Protection, Inc. v. Del Rio*, 498 F. Supp. 2d 576, 586 (E.D.N.Y. July 20, 2007) (refusing to require a plaintiff to identify trade secrets in its complaint:

"Naturally, [the plaintiff] has no obligation to reveal those [trade] secrets in the Complaint simply to prove that they exist.") (emphasis added).

Other decisions by this Court support the conclusion that a trade secret misappropriation claim need not be as specific as DenTek and Kaplan would have this Court believe. *See, e.g.,* *Omni Food Sales v. Boan*, 2007 WL 2435163 (S.D.N.Y. 2007) (rejecting argument that plaintiff's claim that "papers" were taken from it must fail because "papers" cannot constitute a trade secret: "Defendants are splitting hairs. **The level of specificity sought by Defendants is not required at this stage.**") (emphasis added); *Eberhard Investment Associates, Inc. v. Santino*, 2003 WL 22126846 (S.D.N.Y. 2003) ("[w]hile the allegations of the third claim are certainly not as specific as they should be as to what [the opposing parties] have done, the Court, again, cannot say that there is no claim suggested . . . .").[2]

The same holds true for other federal courts as well. *See, e.g., Oswell v. Morgan Stanley Dean Witter & Co., Inc.*, 2007 WL 1756027, *7 (D.N.J. 2007) (denying motion to dismiss because "[U]nless there are heightened pleading requirements as to a particular cause of action, **the Federal Rules of Civil Procedure do not require a plaintiff to plead all relevant facts in detail and generally do not require a plaintiff to provide specific information about trade secrets at this stage of the litigation.**") (int. cit. omit.) (emphasis added); *Echomail, Inc. v. American Express Co.*, 445 F. Supp. 2d 87, 93 (D. Mass. 2006) (finding sufficient specificity where "[the plaintiff] asserts that it has adequately alleged use of its trade secrets by [the

---

[2] *See also Alnwick v. European Micro Holdings, Inc.*, 281 F. Supp. 2d 629 (E.D.N.Y. 2003) (denying motion to dismiss complaint alleging trade secret misappropriation of, among other things, supplier contacts and methods of inventory acquisition, pricing, and business operation; noting that it is alleged "defendants used these trade secrets to compete against [the plaintiff]" and that "[t]hese allegations sufficiently plead a claim of misappropriation of trade secrets."); *A&G Healthplans, Inc. v. National Network Services, Inc.*, 2003 WL 1212933 (S.D.N.Y. 2003) (denying motion to dismiss because "[d]efendant alleges that plaintiffs wrongfully used defendant's confidential business relationships with medical providers to obtain discounts from these providers. These allegations are sufficiently plead to state a claim for misappropriation of trade secrets.").

defendant] even if it cannot determine, at this point in time, the extent of that use. [The plaintiff] contends, for example, that IBM has used plaintiff's information in its consulting work for AmEx").[3] In short, Medtech's Second Amended Complaint, analyzed under the proper standard, is sufficiently detailed to provide Kaplan and DenTek with proper notice.

> **2.    Kaplan's and DenTek's Motions to Dismiss Contain Misleading Statements Regarding the Standard for Specificity in Trade Secret Misappropriation Complaints.**

DenTek and Kaplan are less than candid in their reliance on several cases they allege support the proposition that Medtech's Second Amended Complaint should be dismissed because prior precedent requires that trade secrets be specifically identified.    (Kaplan Memorandum, p. 6, n.3; DenTek Memorandum, p.8, n.1.)  Each and every case the Defendants cite stands for the proposition that trade secrets must be specifically alleged either **(a) during discovery or (b) for purposes of motions for summary judgment or preliminary injunction**. No case cited by either DenTek or Kaplan stands for the proposition that a dismissal of a trade secret complaint can be based upon a lack of specificity in the complaint. *See, e.g., DeRubeis v. Witten Tech. Inc.*, No. 1:06-CV-807-JTC, 2007 U.S. Dist. LEXIS 30047 (N.D. Ga. Apr. 23, 2007) (discovery motions); *Del Monte Fresh Produce Co. v. Dole Food Co. Inc.*, 148 F. Supp. 2d 1322, 1323-25 (S.D. Fla. 2001) (motion to compel under California and Florida law); *Ace-Tex Corp., Sanitary Wiping Cloth Div. v. Rosenberg and Sanitary Wiping Co.*, No. 88-CV-1300A, 1992 U.S. Dist. LEXIS 20584, *21-22 (W.D.N.Y. Oct. 6, 1992) (discussing proof revealed at trial); *Xerox Corp. v. International Business Machines Corp.*, 64 F.R.D. 367 (S.D.N.Y. 1974)

---

[3] *See also DSMC v. Conerva Corp.*, 273 F. Supp. 2d 14, 23-24 (D.D.C. 2002) (holding that trade secret claims do not require a heightened pleading standard); *Compuware Corp. v. International Business Machines*, 259 F. Supp. 2d 597, 605 (E.D. Mich. 2002) ("While Compuware has not identified the trade secrets 'clearly, unambiguously, and with specificity,' such is not necessary at the pleading stage."); *Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F. Supp. 2d 722, 729 (N.D. Ohio 1999) ("[I]t would be improper under Fed.R.Civ.P. 8 for this Court to require Plaintiff to provide specificity in its pleadings or suffer dismissal.").

(discovery motions); *Struthers Scientific & Intern. Corp. v. General Foods Corp.*, 51 F.R.D. 149, 151 (D. Del. 1970) (discovery motions); *White v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454 (2002) (preliminary injunction).

For example, Kaplan cites *Xerox Corp. v. International Business Machines Corp.*, 64 F.R.D. 367 (S.D.N.Y. 1974), for the following principle: "[a]t the very least, defendant is entitled to know the bases for plaintiff's charges against it." (Kaplan Memorandum, p. 6, n.3.) However, Kaplan neglects to mention that *Xerox* involved a plaintiff's reluctance to specify trade secrets **during the discovery process** (and not an allegation of a lack of specificity within the complaint). Nor did Kaplan quote the very next sentence from the opinion: "[t]hus, *after nearly a year of pre-trial discovery*, Xerox should be able to identify in detail the trade secrets and confidential information alleged to have been misappropriated by IBM." *Xerox*, 64 F.R.D. at 371 (emphasis added). Accordingly, the request for more specificity in *Xerox* came after many months of discovery. That decision cannot serve as authority for requiring Medtech to specifically identify each of its trade secrets at the Complaint stage and before any discovery in the case.

DenTek's repeated use of *Magellan International Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919 (N.D. Ill. 1999), is another example. DenTek relies on *Magellan* to support its "specificity" rule. (DenTek Memorandum, pp. 8, 17.) In *Magellan*, the plaintiff, a steel distributor, entered into a contract with the defendant, a steel producer, under which the plaintiff would provide specifications for steel bars and the defendant would produce those bars for the plaintiff to sell to its customers. *Id.* at 920. When the relationship between the two parties soured, the defendant sought to sell the steel itself. *Id.* at 921. Together with claims for breach of contract and replevin, the plaintiff argued that the defendant was misappropriating a trade

secret by selling the finished steel bars.  Instead of providing the level of specificity in its complaint that Medtech has, the plaintiff in *Magellan* simply made references to information that was "sufficiently secret" and the "reasonable efforts" taken to maintain that secrecy without actually stating what was done to preserve that secrecy. *Id.* at 927.

Contrary to what DenTek misleadingly implies in its Memorandum, the court in *Magellan* **did not dismiss the plaintiff's complaint due to lack of specificity**. (DenTek Memorandum, p. 17.)  The court first noted that the plaintiff's complaint was vague as to what its trade secret was and then proceeded to examine other pleadings submitted by the parties to determine that the trade secrets alleged were actually the specifications for the steel bars being sold by the defendant. *Magellan International Corp.*, 76 F. Supp. 2d at 927.  Because the defendant was selling the steel bars themselves, *and not the specifications for those steel bars*, the court found no reason to afford those steel bars trade secret status since the plaintiff was in the business of selling the steel bars itself.[4]  *Id.*  As a result, the trade secret claims were dismissed not because the complaint lacked specificity as to what the trade secret was, but because the alleged trade secret was not endangered through the selling of the finished product (i.e., the steel bars).

The fact that the only case DenTek cites regarding the appropriateness of dismissing a trade secret misappropriation complaint is one containing such markedly different facts is indicative of the weak position it is urging on this Court.  This weakness is further illustrated not

---

[4] The court went on to note that classifying the specifications themselves as a trade secret would be questionable because those specifications were simply handed over by the plaintiff early in its relationship with the defendant. *Magellan International Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 927 (N.D. Ill. 1999).  Neither any restrictions on the use of those specifications nor any confidentiality agreements were even requested by the plaintiff, indicating that the plaintiff did not view the information as a trade secret. *Id.*  Again, this aspect of the court's decision has no bearing on the sufficiency of the plaintiff's complaint, nor is it relevant to this cause of action, as Medtech did preserve the secrecy of its trade secrets and did require confidentiality agreements. (*See, e.g.*, SAC, ¶ 276.)

only by the wealth of case law cited above regarding the proper, well-recognized standard regarding specificity for trade secret misappropriation complaints pending in federal court, but also by a later decision from the same district as *Magellan*. In *Papa John's Intern., Inc. v. Rezko*, the court addressed a motion to dismiss made against a second amended complaint that alleged misappropriation of trade secrets. In response to the defendant's argument that the plaintiff's allegations were insufficiently specific, the court held that "[w]hile it is true that plaintiffs have failed to plead any measures they took to prevent the use of their tradesecrets . . . . **[o]ur federal notice pleading standing is a much lower pleading bar [than in state court]**" and "**the details of tradesecrets need not be disclosed in pleading for the simple reason that such a requirement would result in public disclosure of the purported tradesecrets.**" 446 F. Supp. 2d 801, 811 (N.D. Ill. 2006) (int. cit. omit.) (emphasis added). In short, both Kaplan's and DenTek's Motions to Dismiss appear to be designed to do nothing more than further delay the resolution of this case. Medtech respectfully requests that this Court accordingly deny both Motions to Dismiss.

### 3. Medtech's Second Amended Complaint Specifically Identifies Numerous Categories of Trade Secret Information Misappropriated by Defendants.

When Medtech's Second Amended Complaint is examined in the light of the simple notice pleading standard required by Fed. R. Civ. P. 8(a), it is apparent that not only has Medtech met the low threshold of specificity required by that Rule, but Medtech's pleading goes further and identifies several trade secrets that it alleges were misappropriated by Defendants.

As DenTek and Kaplan acknowledge, New York courts have repeatedly and broadly defined trade secrets as "any formula, pattern, device or **compilation of information** which is used in one's business, and **which gives [the owner] the opportunity to obtain an advantage over competitors** who do not know or use it." *Estee Lauder Co., Inc. v. Batra*, 430 F. Supp. 2d

158, 175 (S.D.N.Y. 2006) (emphasis added); *Integrated Cash Mgmt. Serv., Inc. v. Digital Trans., Inc.*, 732 F. Supp. 370, 375-76 (S.D.N.Y. 1989).  Six factors have been developed to aid in the determination of when particular information constitutes a trade secret:

> (1) the extent to which that information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Estee Lauder Co., Inc.*, 430 F. Supp. at 175.  When examining these factors, though, courts have acknowledged that "the most important consideration is whether the information was secret." *Id.*[5]

Given the high number of cases directly on point with the issues presented here, as well as the fact that Medtech cited and discussed these cases in its Memorandum in Support of its Motion for Preliminary Injunction, it is disconcerting that instead of addressing these cases in their Motions to Dismiss, DenTek and Kaplan instead chose to misconstrue a small number of cases in an attempt to support their general proposition that the information identified by Medtech cannot be a trade secret.  Each of the categories of information identified by Medtech in its Complaint has been recognized in the case law as constituting a trade secret.  The wide scope of information that has been found to constitute a trade secret is obvious upon even the most cursory review of Second Circuit and New York precedent.  For example, each of the following types of information has qualified as a trade secret:

---

[5] Given the low bar set for specificity in a complaint, though, courts have recognized that discovery could be required to adequately address these six trade secret factors. *See, e.g., SD Protection, Inc. v. Del Rio*, 498 F. Supp. 2d 576, 586 (E.D.N.Y. July 20, 2007). ("Without discovery, I cannot possibly weigh the six factors . . . . Therefore, I will resolve this issue in favor of [the plaintiff], which alleges the existence of legitimate trade secrets, and I need not discuss the questions of whether [the plaintiff's] client lists are protectable or whether [the defendant's] services are unique (both of which will require discovery in any event).").

- Knowledge of brand strategies, confidential products in development, and product innovations scheduled for the next year, *Estee Lauder*, 430 F. Supp. at 175;

- Confidential information about the development stages of products in the pipeline, *id.* at 176;

- Strategic information/forward looking plans regarding business development, investment, geographic expansion, and new product development, *id.*;

- Financial outlook and marketing strategies, *id.*;

- "Price points" and the scope and pricing of various services, *American Bldg. Maintenance, Co. of New York, v. Acme Property Services, Inc.*, No. 1:06-CV-1366 (LEK/RFT), 2007 WL 2492921 (N.D.N.Y. Aug. 29, 2007);

- Trial and error, *Integrated Cash Management Services, Inc v. Digital Transactions, Inc.*, 732 F. Supp 370, 377 (S.D.N.Y. 1989), *aff'd*, 920 F.2d 171 (2d Cir. 1990);

- Specific experience and knowledge about product architecture and design gained through working on a particular product, *id.*; and

- Confidential customer, supplier and consultant lists. *Howard Berger Co. v. Ye*, 272 A.D.2d 445, 445 (N.Y. App. Div. 2000).

One of the most illustrative cases, and one that is very factually similar to the case presently before this Court, is *Estee Lauder Co., Inc. v. Batra*, 430 F. Supp. 2d 158, 175 (S.D.N.Y. 2006). In *Estee Lauder*, the defendant, Shashi Batra ("Batra") was the Global General Brand Manager and General Manager for North America. *Id.* at 160-61. The scope of Batra's responsibilities mirrored those of Kaplan and Duane because Batra participated in research and development, prepared and implemented brand strategies, participated in new product development meetings, and understood the "expenses and developments" and "the expected revenues" for Estee Lauder products. *Id.* As Medtech did with Kaplan and Duane, Estee Lauder gave Batra access to confidential information and allowed Batra to attend several meetings where confidential information was discussed. *Id.* at 163-64. The court in *Estee Lauder* also observed that Batra solicited other individuals from his employer and worked for his employer's competitor while still at Estee Lauder. *Id.* at 164-65.

Even though Batra argued that the information he learned while at Estee Lauder gave him no greater knowledge regarding Estee Lauder's products than that of anyone else who can read the products' ingredient labels, the court found that Batra did indeed possess trade secrets. This finding was based upon Batra's role in developing brand strategies, his knowledge of confidential products currently under development, and innovations scheduled for the next year, as well as the stage of development of each of these new products and innovations. *Id.* at 176. Weight was also afforded to the fact that Batra's new employer was a direct competitor to Estee Lauder: "it is concluded that, as in *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1234 (W.D.N.Y. 1994), 'even assuming the best of good faith, it is doubtful whether the defendant could completely divorce his knowledge of the trade secrets from any . . . work he might engage in.'" *Id.*

The set of facts currently before this Court is virtually identical, with one notable exception: the court in *Estee Lauder* granted a preliminary injunction based on its findings that the defendant possessed trade secrets. This Court is considering motions to dismiss and is therefore operating under a much lower standard. Given the very low bar that is set for specificity in a complaint alleging trade secret misappropriation, there is little doubt that Medtech's Second Amended Complaint does not merely meet the applicable requirements, but exceeds them. Not only does Medtech's Second Amended Complaint allege that Kaplan and Duane had access to each of the categories of confidential information listed above, that were found to qualify as trade secrets in *Estee Lauder*, but Medtech also alleges the inappropriate use of this confidential information.

**a.**    **Duane and Kaplan had access to highly confidential information while employed by Dental Concepts.**

In their capacities as Vice President of Sales and Vice President of Marketing at Dental Concepts, both Duane and Kaplan were privy to confidential and proprietary information. (SAC, ¶ 9.)  For example, Kaplan and Duane "were involved extensively in every aspect of the NIGHTGUARD™ dental protector business including brand development and marketing, and the formulation of strategic sales and market goals and initiatives, all of which can constitute a trade secret. (*Id.*, ¶ 41.)  Throughout their employment, they were also intimately familiar with Dental Concepts' consultants, brokers, designers, suppliers, product formulation and production sources, and marketing strategies." (*Id.*)  As noted above, the identity of such consultants, brokers, designers, and suppliers has been recognized as information that qualifies as a trade secret. *See, e.g., Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir. 1993) ("[c]ompilations of information, traditionally viewed and protected under trade secret law, are items like customer and supplier lists") (abrogated on other grounds by *Nadel v. Play-by-Play Novelties Inc.*, 208 F.3d 368 (2d Cir. 2000)); *Howard Berger Co.*, 272 A.D.2d at 445 (reversing summary judgment and noting existence of triable issue of fact as to whether supplier lists constituted trade secrets); *Bourdages v. Metals Ref., LTD*, No. 84 Civ. 743 (CSH), 1984 WL 665, at *6 (noting that identities of consultants "come within the commonly accepted definition of trade secrets").  While this allegation alone would be sufficiently specific for the purpose of defeating a Rule 12(b)(6) motion, Medtech's Second Amended Complaint goes further and specifically identifies some of the actual suppliers at issue: Item, Stelray, and AGI/Klearfold. (SAC, ¶¶ 137-39.)

The identities of vendors and suppliers were not the only confidential and proprietary information that Kaplan and Duane were exposed to, as both individuals were heavily involved

in strategy meetings related to Dental Concepts' products. Medtech's Second Amended Complaint is replete with allegations regarding the type of business strategy information provided by Medtech to Kaplan and Duane.

Below are examples that demonstrate the specificity with which Medtech has pled its claims:

- "Medtech made a shift to marketing the bruxism device previously sold professionally as BRUXGUARD®, which utilizes the technology of the 051 patent, as a new and improved NIGHTGUARD™ brand OTC bruxism device. This shift was accompanied by a packaging redesign and substantial marketing efforts, which included national television advertising. These business plans were confidential but were known to Kaplan and Duane in their transitional roles." (SAC, ¶ 83.)

- "[I]n December 2005, Kaplan was included in high-level discussions within Medtech regarding the future considerations and strategy of Medtech for THE DOCTOR'S® NIGHTGUARD™." (SAC, ¶ 89.)

- "Because of their employment and trusted management positions at Medtech, Duane and Kaplan had access to Medtech's trade secrets, including but not limited to manufacturing cost details, drawings, test data, and other information about the design and manufacturing process for its dental protectors." (SAC, ¶ 277.)

- "Medtech shared this information with Duane and Kaplan, as its exclusive consultant and employee, subject to the confidentiality agreements that both had signed, and in which both agreed not to divulge or appropriate to their own use or to the use of others any secret or confidential information or knowledge obtained by them or disclosed to them during their employment at Medtech." (SAC, ¶278.)

As these allegations make clear, Medtech's Second Amended Complaint identifies the business strategy information that Kaplan and Duane were exposed to while employed with Dental Concepts. Brand strategies, development of products, strategic information, forward looking plans regarding business development, and market strategies were the types of information shared with Kaplan and Duane, all of which have been recognized as constituting a trade secret. *Estee Lauder Co., Inc.*, 430 F. Supp. at 175-76. By not only identifying this business strategy category of information, but also specifically pointing to meetings in which this information was distributed (*e.g.*, SAC, ¶ 83) and the products to which the confidential and proprietary

information pertained (*e.g.*, SAC, ¶¶ 83, 277, 278), Medtech's identification of trade secret information has gone far beyond the "simple notice pleading" required by Federal Rule of Civil Procedure 8(a).[6]

**b.    Medtech's Second Amended Complaint adequately alleges the misappropriation of trade secrets by Kaplan.**

Given the wide array of trade secret information that Kaplan was exposed to while employed by Dental Concepts, there can be no credible argument that Medtech's Second Amended Complaint fails to adequately allege that Kaplan misappropriated that same information. For example, Medtech has alleged that:

- "Duane and/or Kaplan misappropriated Medtech's confidential and proprietary strategic information, namely its decision to maintain the three-size platform despite retailer pressure for a one-sku product (a one-size-fits-all device)." (SAC, ¶ 123.)

- "Kaplan continued to provide to DenTek certain of Medtech's confidential and proprietary information relating to THE DOCTOR'S® NIGHTGUARD™ product." (SAC, ¶ 158.)

- "Kaplan relied upon confidential legal advice provided by Medtech's intellectual property and regulatory counsel in making various recommendations and determinations regarding DenTek's dental protector and marketing that dental protector." (SAC, ¶ 160.)

- "Kaplan also relied on the confidential and proprietary strategies of Medtech to maintain its three-size platform and provide DenTek with an unfair competitive advantage." (SAC, ¶ 161.)

- "Duane and Kaplan used Medtech's trade secrets in the performance of their duties at DenTek for their own benefit and disclosed Medtech's trade secrets to DenTek and its employees and officers." (SAC, ¶ 280.)

Thus, after identifying the business strategy trade secret information possessed by Kaplan, Medtech's Second Amended Complaint not only alleges that the same information was

---

[6] The categories of information discussed within this Section are by no means intended to be a complete listing of the trade secrets possessed by Duane or Kaplan, nor is Medtech required to provide a full list of trade secrets in its SAC. *Gaetano Associates LTD v. Artee Collections, Inc.*, 2006 WL 3026080, *1 (S.D.N.Y. Oct. 25, 2006).

improperly provided by Kaplan to DenTek, but also provides some examples of that information (i.e., the decision to maintain a three-size platform).

Moreover, Medtech was not afforded the opportunity to take full discovery on these issues prior to drafting its Second Amended Complaint and cannot be expected to have a highly specific level of knowledge regarding Kaplan's transgressions. Fortunately, this situation is addressed by the notice pleading standards of Rule 8(a) and the multitude of courts that have commented on the lack of specificity required in a complaint alleging trade secret misappropriation. *See, e.g., Oswell v. Morgan Stanley Dean Witter & Co., Inc.*, 2007 WL 1756027, *7 (D.N.J. 2007) (denying motion to dismiss because "the Federal Rules of Civil Procedure do not require a plaintiff to plead all relevant facts in detail and generally do not require a plaintiff to provide specific information about trade secrets at this stage of the litigation.").

In addition, it should be noted that Kaplan's own actions, recited in the Second Amended Complaint, lend support to the allegations of misappropriation. Dental Concepts (through Kaplan, among others) had sought the assistance of several doctors from the Tufts Dental School, Dr. Noshir Mehta, Dr. Gerard Kugel, and Dr. Ayman Aboushala (collectively, the "Tufts Doctors"). (SAC, ¶ 55.) The Tufts Doctors were engaged by Dental Concepts to look at the prototypes, make design and fit suggestions, and generally collaborate with Dental Concepts as the "technical experts." (*Id.*) After leaving Dental Concepts, Kaplan began actively recruiting the Tufts Doctors, and the confidential information they held on the device she sought to "knock-off," on behalf of DenTek. As alleged in the Second Amended Complaint:

> After their engagement, and in accordance with their plan, DenTek, Duane, and
> Kaplan systematically called upon and recruited various persons and companies
> known to Duane and Kaplan only because they had the confidential and
> proprietary information that they had from their time at Dental Concepts, and

because of Duane's clandestine activities.  In this regard . . . In or around late-August or early-September, Kaplan and Duane personally called and solicited the Tufts Doctors to work for DenTek and provide information and feedback on the one-size-fits-all dental protector that DenTek was developing.

(SAC, ¶ 130.)  Again providing additional detail, the Second Amended Complaint refers to e-mail correspondence between Kaplan and Dr. Mehta:

- On September 5, 2006, Kaplan e-mailed Dr. Mehta and asked critical strategic questions regarding Medtech:
     Dear Nosh:
     How are you?  Hope you and your family are well.  It has been about 6 months and I wanted to check in, say hi and be sure that you and your family are well.
     I am doing fine.  All is well with my family and business.  I hope all is well at Tufts.  Are you doing anything really fun (like it was when we were working together)?  Are you doing any work with Prestige?  The Doctor's NightGuard or BruxGuard?  .
     . . .
     I would love you hear back from you when you have a moment.
     (SAC, ¶ 142, Ex. P.)

- On September 7, 2006, Dr. Mehta e-mailed "Yes we are in discussion with Prestige . . . for the Bruxguard."  Ms. Kaplan wrote in reply:
     Everything is well here.  I know Ray [Duane] is reaching out to you and I would listen to what he has to say.  I hope to get to Boston and will let you know when.
     Then, after an additional exchange, she states: "I hope you have the opportunity to meet with Ray and discuss his potential opportunity."
     (SAC, ¶ 143.)

Clearly, Kaplan engaged in a concentrated effort to glean protectable information from the Tufts Doctors, and did so on behalf of DenTek.[7]  Based upon these assertions, it cannot be said that Medtech has failed to allege that Kaplan misappropriated the trade secret information that was revealed to her during the time in which she was a high level employee of Dental Concepts.

---

[7] The attempts to obtain Medtech's trade secret information from third parties, such as the Tufts doctors, Hogan & Hartson, etc., are also included in Medtech's claim for trade secret misappropriation directed at Kaplan and DenTek. (SAC, ¶¶ 140-155.)

    **c.**      **Medtech's Second Amended Complaint properly alleges that DenTek misappropriated confidential information.**

If DenTek wanted to knock-off Medtech's THE DOCTOR'S® NIGHTGUARD™ brand dental protector and was not particular about the method it used, it was a natural to hire both Duane and Kaplan. After all, Duane and Kaplan were high-level employees and intimately involved in the formulation and creation of the very device that DenTek sought to copy. With the knowledge of Medtech's business strategies that Duane and Kaplan possessed, DenTek was looking for a way to speed up its creation of a dental product, capitalize on Medtech's decision not to make a one-size-fits-all product, and replace THE DOCTOR'S® NIGHTGUARD™ brand dental protector on store shelves. In its Second Amended Complaint, Medtech asserts that:

- "All of DenTek's efforts to develop and market the DenTek OTC bruxism device are attributable to Duane's and Kaplan's previous association with Dental Concepts. Moreover, DenTek's one-size-fits-all product's marketplace entry was made possible by Duane's and Kaplan's knowledge of Medtech's proprietary strategy to maintain its three-size platform. DenTek used Medtech's inside information to take advantage of a market opportunity." (SAC, ¶ 11.)

- "The confidential and proprietary information of Duane and Kaplan, learned as a result of their association with Dental Concepts, permitted the DenTek product to truncate the normal product development timeline. By utilizing Medtech's confidential and proprietary information, DenTek was able to establish itself with a major retailer to ensure a quick competitive entry into the marketplace that would pay handsome long-term dividends." (SAC, ¶ 12.)

- "All evaluation and vetting processes were truncated based on Duane and Kaplan's inside information about suppliers, designers, consultants, and legal advisors—all to the specific disadvantage of Medtech. Such information was critical, because of a limited window of opportunity with the largest retailer that made time of the essence." (SAC, ¶¶ 129.)

- "The fact that the Tufts Doctors were working with Dental Concepts and Medtech was confidential information. As a result of Duane and Kaplan's efforts, DenTek knew of this confidential relationship, including the terms of the relationship and the status of negotiations, and used this in competition with Medtech to compete for a consulting contract with the Tufts Doctors." (SAC, ¶ 140.)

- "Because of the assistance of Duane and Kaplan, DenTek has procured the same product designers and manufacturers, lawyers, and/or technical advisors as Medtech. Because of Duane's and Kaplan's position within Dental Concepts (now Medtech), both had confidential and proprietary knowledge about contacts among designers, manufacturers, technical experts, sales brokers, packaging firms and others." (SAC, ¶ 159.)

- "To Medtech's disadvantage, DenTek, Duane and Kaplan used Medtech's confidential and proprietary to virtually eliminate DenTek's development process and competitive entry into the dental protector market." (SAC, ¶ 163.)

Thus, based upon the allegations set forth above, Medtech has specifically alleged the actions taken by DenTek in regard to obtaining information that qualifies as trade secrets from Duane and Kaplan, has pled that this information permitted DenTek to gain an unfair advantage by greatly reducing the time which it would have taken otherwise to bring its dental protector product to the market, and has discussed the harm that has been caused to Medtech as a result of these activities. To require any greater level of specificity in the Second Amended Complaint would place an onerous burden on Medtech, essentially requiring it to detail information to which it has no access outside of discovery. It is for this reason that the pleading requirements set forth in Federal Rule of Civil Procedure 8(a) are low, and is also why courts routinely hold that the level of specificity urged by Kaplan and DenTek in their Motions to Dismiss is not required at this stage of litigation. *See, e.g., Gaetano Associates LTD v. Artee Collections, Inc.*, 2006 WL 3026080, *1 (S.D.N.Y. Oct. 25, 2006).

Because the level of specificity sought by DenTek and Kaplan is not required under Rule 8(a) or the applicable case law precedent, Medtech's claim for misappropriation of trade secrets is valid as pled in the Second Amended Complaint. However, it is important to note that Medtech is not arguing that it will never fully identify the trade secrets at issue in this case, but rather that such identification is not required until the completion of the discovery phase of this case.

d.      **Kaplan and DenTek's arguments regarding the public availability of certain information are irrelevant to the Motions to Dismiss.**

Both Kaplan and DenTek go to great lengths in their Motions to Dismiss to try to prove that some of the trade secrets identified in Medtech's Second Amended Complaint are publicly available and therefore not worthy of trade secret status. In doing so, DenTek references a great deal of information that is entirely improper and wholly irrelevant for consideration in the context of a motion to dismiss. These improprieties are discussed in detail in Medtech's Motion to Strike and will not be repeated here. However, it bears noting that courts have repeatedly held that whether a trade secret is publicly available is a question of fact that should not be considered in a motion to dismiss. *See, e.g., Eberhard Investment Associates, Inc. v. Santino*, No. 01 Civ.3840 LMM, 2003 WL 22126846, *4 (S.D.N.Y. Sept. 12 2003) ("Whether Mr. Santino's 'trade secret,' i.e., principally the source code for the Portfolio Management System, is not a trade secret because of publication is a factual issue not resolvable on a Fed.R.Civ.P. 12(b)(6) motion."); *see also Oswell v. Morgan Stanley Dean Witter & Co., Inc.*, No. 06-5814 (JBS), 2007 WL 1756027, *7, n.6 (D.N.J. June 18, 2007) (denying motion to dismiss because "[a]t the summary judgment phase, [the defendant] will have the opportunity to argue that no genuine issue of material fact exists regarding whether the information was publicly known or readily available and therefore not protectible as a trade secret.").

Thus, even if the websites referenced by DenTek in its Motion to Dismiss were the type of documents of which judicial notice could be taken, and even if this Court were to ignore the fact that most were accessed and printed only a few weeks ago (at a point in time very distant from the time period relevant to this case), DenTek is still arguing an issue that must be dealt with at a later stage of the case. The same holds true for Kaplan's arguments because, although while she did not resort to the filing of improper documents like DenTek, the public nature of

information cannot be decided by a motion to dismiss. The issue of whether the information discussed by DenTek was within the public realm is ultimately irrelevant to this Motion to Dismiss.

**C.    MEDTECH ASSERTS A VALID CLAIM FOR BREACH OF CONTRACT AGAINST KAPLAN (COUNT VIII).**

Kaplan argues that Medtech's breach of contract claim, founded on Kaplan's breach of the Proprietary Information Agreement, must fail because the confidentiality provisions of that agreement could not have survived the execution of her General Release. (Kaplan Memorandum, pp. 19-21.) The Proprietary Information Agreement was executed on September 13, 1999, at the beginning of Kaplan's employment, while the General Release was executed on November 14, 2005, at the time of the Prestige acquisition. (*See* SAC, ¶¶ 42-72.) In New York, a subsequent contract regarding the same matter will supersede the prior contract. *Barnum v. Millbrook Care Ltd. Partnership*, 850 F. Supp. 1227, 1236 (S.D.N.Y. 1994).

However, under New York law, a subsequent contract "not pertaining to **precisely the same subject matter** will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels, or supersedes that specific contract." *CreditSights, Inc. v Ciasullo*, No. 05 CV 9345, 2007 WL 943352, *6 (S.D.N.Y. March 29, 2007) (holding that a subsequent contract with "broadly associated subject matter" in common with an earlier agreement and containing an integration clause did not supersede the earlier agreement) (emphasis added). When two agreements have "obviously dissimilar purposes" and the subsequent contract does not "revoke specifically" the first contract, the earlier contract is not superseded. *Id.* at *8.

The Proprietary Information Agreement and the General Release, which bookended the Kaplan (and Duane) relationship with Medtech, have "obviously dissimilar purposes." The

Proprietary Information Agreement provides that Dental Concepts will retain ownership of all

proprietary information and Kaplan's agreement not to disclose confidential information:

> **All Proprietary Information shall be the sole property of the Company** and its
> assigns, and the Company and its assigns shall be the sole owner of all patents,
> copyrights, trade secrets, trademarks, trade names and other rights in connection
> therewith. I hereby assign to the Company any and all rights which I may have or
> acquire in any and all Proprietary Information. **At all times, both during my
> employment by the Company and after its termination, I will keep in
> confidence and trust all Proprietary Information,** and will not use or disclose
> any Proprietary Information without the written consent of the Company, except
> as may be necessary in the ordinary course of performing my duties as an
> employee of the Company....

(SAC, Exhibit D, ¶ D(1)) (emphasis added). This agreement primarily determines ownership of

the confidential information that the parties contemplated would be created and/or acquired

during their association.

　　　In contrast, the purpose of the General Release was to secure Kaplan's agreement, upon

the date she left the company, to release all possible claims against Dental Concepts in exchange

for the $330,000 severance consideration that she was paid in connection with Prestige Brands'

purchase of Dental Concepts:

> In connection with the acquisition of the Company by Prestige Brands, Inc.,
> Employee will receive the Consideration (as defined below) as severance and
> contractual payout. In exchange for the Consideration, Employee intends to fully
> and unconditionally release any and all claims that he, his heirs, administrators,
> executors, personal representatives, beneficiaries, and assigns may have against
> the Company and each of their affiliates....

(SAC, Exhibit H.)

　　　An examination of the two contracts demonstrates that they each address different subject

matters and have obviously dissimilar purposes. The Proprietary Information Agreement focuses

on rights to proprietary information and disclosure issues while the General Release focuses on

the release of claims in exchange for financial consideration. Nor does the merger and

integration clause within the General Release specifically revoke the former agreement, as it

makes no mention of the Proprietary Information Agreement:

> <u>Entire Agreement</u>.  The parties hereto acknowledge that this Release constitutes a full, final, and complete settlement of their differences and supersedes and replaces any and all other written or oral exchanges, agreements, understandings, arrangements or negotiations between or among them relating to the subject matter hereof, and affirmatively states that there are no other prior or contemporaneous agreements, exchanges, representations, arrangement, or understandings, written or oral, between or among them relating to the subject matter hereof other than as set forth herein, **and that this release contains the sole and entire Release between them with respect to the subject matter thereof**.

(SAC Exhibit H, ¶ 10) (emphasis added); *see also CreditSights, Inc.*, 2007 WL 943352 at \*6

(requiring specific revocation of prior contract).  While this provision from the General Release

does purport to supersede and replace all other written agreements, New York courts have

previously found this type of broad language insufficiently definitive to supersede a particular

earlier contract.  *CreditSights, Inc.*, 2007 WL 943352, \*6 (citing *Globe Food Services Corp. v.

Consolidated Edison Co. of New York, Inc.*, 184 A.D.2d 278 (1st Dep't 1992)) (holding that a

later contract containing the phrase "this contract shall replace all prior agreements" not

sufficiently definitive to supersede a particular earlier contract).  Because the General Release

does not "revoke specifically" the Proprietary Information Agreement and because the two

contracts have "obviously dissimilar purposes," Kaplan's argument that the confidentiality

provision of the Proprietary Information Agreement was superseded must fail.

With regard to Kaplan's claim that Medtech has failed to sufficiently plead a breach of

the two contracts at issue, the arguments contained within Section III.B.3 of this Brief regarding

Kaplan's communication of trade secret information to DenTek are incorporated herein and

clearly establish that such information was misappropriated and the contracts thus breached.  It

should also be noted that Kaplan appears to argue that because she became employed by DenTek

in mid-October of 2006, at a time when DenTek had a "finished product," then she could not be said to have divulged confidential information. (Kaplan Memorandum, p. 21.) The erroneous nature of this argument is demonstrated by actual evidence, including her efforts to solicit the Tufts Doctors, that Kaplan was actively working with Duane and DenTek prior to the date she was officially hired by DenTek, as well as the reasonable inference that the evidence may show her relationship began much earlier. (SAC, ¶¶ 142-43.) Based on the foregoing, Medtech has adequately pled that Kaplan violated the terms of both her Proprietary Information Agreement and the General Release, and Kaplan's Motion to Dismiss should be denied.

D.   **MEDTECH'S SECOND AMENDED COMPLAINT ASSERTS A VIABLE CAUSE OF ACTION FOR CIVIL CONSPIRACY AGAINST KAPLAN AND DENTEK (COUNT XII).**

In their Motions to Dismiss, Kaplan and DenTek claim infirmities within Count XII of Medtech's Second Amended Complaint, which alleges civil conspiracy against both Defendants. (Kaplan Memorandum, pp. 21-22; DenTek Memorandum, pp. 26-27.) Although it is true that New York law does not recognize an independent tort of conspiracy, a claim for conspiracy can be brought if the allegations for an underlying actionable tort are pled. *In re Houbigant Inc.*, 914 F. Supp 964, 990 (S.D.N.Y. 1995) (citing *Innovative Networks, Inc.*, 871 F. Supp. 709, 731 (S.D.N.Y. 1995)); *Sado v. Ellis*, 882 F. Supp. 1401, 1408 (S.D.N.Y. 1995). In addition to alleging an underlying tort, the elements that must be pled to permit a claim for civil conspiracy to overcome a motion to dismiss made pursuant to Rule 12(b)(6) are (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. *World Wrestling Federation Entertainment, Inc. v. Bozell*, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001). Each of these elements, as well as the elements of the underlying torts providing a basis for civil conspiracy, are adequately pled in Medtech's Second Amended Complaint.

To the extent that Kaplan and DenTek argue that the civil conspiracy claim fails because no underlying tort was sufficiently pled, that argument fails for the reasons set forth in Section III.B of this Brief detailing the misappropriation of trade secrets by Duane, Kaplan, and DenTek. Further, as will be discussed in Section III.E, all three Defendants actively solicited the Tufts Doctors away from Medtech, an act that constitutes tortious interference with a business relationship. Because these underlying torts are viable causes of action, Kaplan and DenTek's argument that the civil conspiracy claim fails because "Medtech has not pled an independent intentional tort" is without merit.

Further, the references made by Kaplan and DenTek regarding a lack of specificity within the Second Amended Complaint as to the facts constituting the civil conspiracy claim have no basis. This is a case where the conspirators had obvious and admitted contact with one another. There is no dispute that Duane and Kaplan were employed by DenTek and assisted in the creation and marketing of the infringing product. Moreover, DenTek's actions in the recruitment and employment of both Duane and Kaplan are set forth in detail in the Second Amended Complaint. Only four months after Duane left Medtech, he was contacted by DenTek to work on a product that would be in direct competition with THE DOCTOR'S® NIGHTGUARD™ dental protector. (SAC, ¶ 111.) This initial contact was later followed by a personal meeting with David Fox, the President of DenTek, where Duane was again solicited to join DenTek and help bring "an OTC bruxism device to the market that would compete with THE DOCTOR'S® NIGHTGUARD™ dental protector." (*Id.*, ¶ 114.) This solicitation was ultimately successful, as on August 25, 2006, Duane and DenTek entered an agreement whereby Duane would assist DenTek in bringing the infringing product onto the market. (*Id.*, ¶ 120.) It did not take long for Duane to begin putting to use the confidential information he learned while at Medtech by

repeating the steps Medtech took and connecting with Medtech's contacts, such as Stelray, Proman Products, Natter & Natter, Hogan & Hartson, Item New Product. (*Id.*, ¶ 130.)

Shortly after Duane began working for DenTek, Duane and DenTek turned their attention to soliciting Kaplan, another former employee of Medtech. (SAC, ¶ 133.)  Kaplan officially joined DenTek and Duane in their efforts to create the infringing product, at the latest, in late-October or early-November of 2006. (*Id.*, ¶ 156.)  However, she assisted DenTek and Duane earlier than the date of her actual employment.  Kaplan began using her knowledge of Medtech's business strategies to provide an improper advantage to DenTek at least as early as September 5, 2006, when she contacted Dr. Mehta, one of the Tufts Doctors used by Medtech. (SAC, ¶ 141-43.)

Thus, all three Defendants had a clear agreement to create and market a product intended to compete with THE DOCTOR'S® NIGHTGUARD™ brand dental protector, meeting the first element requiring an agreement between the Defendants. (SAC, ¶¶ 120, 156.)  The second element, that of an overt act in furtherance of the agreement, is established through the numerous trade secret misappropriations that were pled throughout the Second Amended Complaint and the actions taken by the Defendants to solicit the Tufts Doctors.  That all three Defendants were in agreement as to their goal of producing an infringing product is apparent given the employer/employee relationship that existed and the fact that DenTek specifically hired Duane and Kaplan for the purposes of creating and marketing the infringing product. (*Id.*, ¶¶ 114, 156.)  Further, the damage suffered by Medtech based upon this civil conspiracy is adequately pled. (*Id.*, ¶¶ 180-88.)  These allegations, taken with others in the Second Amended Complaint detailing the relationship between Duane, Kaplan, and DenTek (and including the numerous specific facts regarding the steps taken by Defendants to misappropriate Medtech trade secrets),

as well as the fact that DenTek began utilizing the exact same subset of the numerous available suppliers and consultants as Medtech, provide more than enough specificity to overcome a motion to dismiss. (*Id.*, 137-39.)

**E.    MEDTECH'S CLAIM FOR TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP/ECONOMIC ADVANTAGE AGAINST DENTEK AND KAPLAN (COUNT XIV) IS PROPERLY PLED.**

In their Motions to Dismiss, both Kaplan and DenTek contest the viability of Medtech's claims for tortious interference with a business relationship/business advantage, which is pled in Count XIV of the Second Amended Complaint. (DenTek Memorandum, pp. 24-26; Kaplan Memorandum, pp. 23-26.) Specifically, Medtech alleges that both Defendants intentionally interfered with Medtech's relationship with the Tufts Doctors, who up until the actions taken by Defendants, had been engaged by Medtech to provide valuable consulting advice about bruxism and the efficacies of various protective devices. (SAC, ¶ 285.)

Under New York law, the elements of tortious interference with a business relationship are: (1) interference by the defendants with an existing contract or business relationship; (2) the interference was accomplished by dishonest, unfair, or improper means or was done intentionally; and (3) damages therefrom. *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 555 (S.D.N.Y. 2002) (citing *Martin Ice Cream Co. v. Chipwich Inc.*, 554 F. Supp. 933, 945 (S.D.N.Y.1983)). If there are allegations that the conduct of the defendants was either criminal, independently tortious, or wrongful, then there is no need to establish that the intent to interfere with the business relationship was the sole reason behind that interference. *Hassan v. Deutche Bank A.G.*, 2007 WL 2827841 (S.D.N.Y. Sept. 27, 2007). In essence, the objections of Kaplan and DenTek are based upon this element of the claim, and they both argue that there is no wrongful or independently tortious act that supports the interference with business relationship claim asserted by Medtech.

According to the court in *Hassan*, the type of "wrongful conduct" that would support a claim for tortious interference includes "physical violence, **fraud or misrepresentation**, civil suits and criminal prosecutions, and some degrees of economic pressure . . . ." *Hassan*, 2007 WL 2827841 at *4 (*quoting Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 191 (2004)) (emphasis added). In the present case, the very actions taken by DenTek and Kaplan in obtaining the services of the Tufts Doctors do rise to the level of "wrongful conduct" that is required to support a claim for tortious interference, **as the true nature of the work that was to be performed by the Tufts Doctors was kept hidden from them by Defendants until a conflict between those doctors and Medtech arose**.

In its Second Amended Complaint, Medtech alleges that:

- The Tufts Doctors and DenTek never agreed on the terms of a final written contract because DenTek insisted upon including an exclusivity provision in the contract. However, the Tufts Doctors were engaged and remunerated by DenTek for performing various consulting services for the development of DenTek's product. This had the intentional effect of creating a conflict so that the Tufts Doctors could no longer work for Medtech. (SAC, ¶ 148.)

- DenTek never revealed to the Tufts Doctors the goals of DenTek's project. If the goals reflected in Exhibit N had been conveyed to the Tufts Doctors, DenTek would have been unsuccessful in procuring any consulting relationship with the Tufts Doctors. (*Id.*, ¶ 150.)

It was only through misrepresenting and concealing the true nature of the product which DenTek sought to create that the Tufts Doctors were engaged by DenTek. By concealing this information, Kaplan, through her repeated e-mail solicitations of the Tufts Doctors (SAC, ¶¶ 130, 142-43.), and DenTek ensured that they would have full access to the Tufts Doctors, and the confidential information regarding Medtech that those doctors possessed, while at the same time creating a conflict of interest that would prohibit Medtech's further engagement of the Tufts

Doctors.[8]  Moreover, Medtech also states in the Second Amended Complaint that the solicitation and procurement of the services of the Tufts Doctors amounted to a misappropriation of Medtech's trade secrets by Kaplan and DenTek.[9]  This also provides a basis for the tortious interference claim, as the misappropriation of trade secrets satisfies the independent tort prerequisite for bringing this claim.

**F.     MEDTECH ASSERTS A VALID CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST DENTEK (COUNT X).**

Count X of Medtech's Second Amended Complaint alleges that DenTek tortiously interfered with several contractual agreements that Medtech had with Kaplan and Duane.  In its Motion to Dismiss, DenTek sets forth three grounds on which it claims this claim must fail, none of which have merit.  DenTek's first argument is that no such claim can exist as to any agreement except Kaplan and Duane's General Release, which DenTek alleges supersedes all former contracts.  (DenTek Memorandum, p. 22-23.)  As discussed previously in Section III.C of this Brief, a subsequent contract will not supersede a prior contract unless those contracts pertain to "precisely the same subject matter." *CreditSights, Inc. v Ciasullo*, No. 05 CV 9345, 2007 WL 943352, *6 (S.D.N.Y. March 29, 2007)  If the contracts at issue do not pertain to exactly the same subject matter, then the later contract must contain specific language stating that it revokes, cancels, or supersedes the earlier contract. *Id.*

---

[8] This act of creating a conflict of interest that forced the relationship between the Tufts Doctors and Medtech to be terminated was merely one example of the type of improper economic pressure exerted by DenTek.  In addition, given the degree of knowledge that Kaplan possessed regarding Medtech's retention of the Tufts Doctors, DenTek was in a position to improperly capitalize on that information and secure the services of those doctors.

[9] As noted previously, Kaplan's argument that Medtech cannot claim she did anything improper prior to her actual employment date with DenTek is without merit.  Kaplan's attempts to solicit the Tufts Doctors, as evidenced by her repeated e-mail correspondences with Dr. Mehta in September of 2006, are but one example of her activities undertaken to assist DenTek in misappropriating Medtech's trade secrets.  (SAC, ¶¶ 142-143.)

The arguments contained in Section III.C of this Brief clearly demonstrate that the purpose of the General Release was to allow Dental Concepts to obtain a release of all possible claims by Kaplan at the time when she left the company, but the Proprietary Information Agreement sought to insure the confidential and proprietary status of the information revealed to her during her employment with Dental Concepts. (SAC, Exhibits D, H.) Since the Proprietary Information Agreements and General Releases executed by Duane and Kaplan are substantially identical, Duane's General Release also does not operate to supersede his Proprietary Information Agreement. (*Id.*, Exhibits C, G.) Duane's separate Consulting Agreement is focused on detailing Ray Duane's duties, obligations, and compensation package, which differentiates it from the General Release. (*Id.*, Ex. A.) Further, since the Consulting Agreement was executed on September 30, 1999 – the same day that Duane executed the Proprietary Information Agreement – it cannot credibly be argued that those two contracts share precisely the same subject matter either. (*Id.*, Exhibits A, C.)

Next, DenTek makes the unsupported contention that it "had no knowledge of the contracts upon which Medtech purports to base it tortious interference claim" – which is yet another example of DenTek's attempt to rely upon improper information in its Motion to Dismiss. (DenTek Memorandum, p. 23.) This statement is not supported by any affidavit or declaration (nor can such supporting documents be filed to support a motion to dismiss) and DenTek seems to be hoping this Court will simply accept its conclusory factual statement as the truth. This is clearly improper under the well-recognized standard for motions to dismiss.

In any event, the knowledge that DenTek had regarding Kaplan's and Duane's Proprietary Information Agreement and General Release is a question of fact that cannot be resolved in a motion to dismiss. *See, e.g., Rahl v. Bande*, 328 B.R. 387, 422 (S.D.N.Y. 2005)

(noting that an allegation that defendant knew or should have known qualifies as a factual issue inappropriate for determination in a motion to dismiss).  Further, Medtech's Second Amended Complaint makes the following two allegations with regard to this issue:

> DenTek knew or should have known of the valid contracts between Duane and Dental Concepts/Medtech and Kaplan and Dental Concepts/Medtech.  (SAC, ¶ 258.)
>
> DenTek is a sophisticated entity well aware of the industry practice of securing confidentiality agreements, as evidenced by its own conduct with Duane, Kaplan and the Tufts Doctors.  (*Id.*, ¶ 259.)

As Medtech has specifically pled that DenTek had, or should have had, knowledge of these two contracts, and because "the court must accept the factual allegations of the complaint as true," then for the purposes of this Motion, DenTek's argument regarding a purported lack of knowledge must fail.  *Starr v. Time Warner, Inc.*, No. 07 Civ. 5871(DC), 2007 WL 4144627 (S.D.N.Y. Nov. 21, 2007).

Finally, DenTek relies on its earlier arguments that the Second Amended Complaint contains no allegations that confidential or proprietary information was disclosed to DenTek by Duane or Kaplan.  (DenTek Memorandum, p. 23-24.)  Again, this issue was extensively discussed in Section III.B of this Brief (which is incorporated herein by reference), and the information alleged to have been improperly given by Duane and Kaplan to DenTek goes far beyond the realm of "industry knowledge and experiences."  As a result, DenTek's Motion to Dismiss Count X of Medtech's Second Amended Complaint must be denied.

**G.    MEDTECH'S CLAIMS FOR UNFAIR COMPETITION AND UNJUST ENRICHMENT AGAINST DENTEK ARE VALID (COUNTS IV AND V).**

In its Memorandum, DenTek requests that the Court dismiss Medtech's unfair competition (Count IV) and unjust enrichment (Count V) claims "to the extent that these claims rest on the enforcement of rights provided for under the federal patent and copyright laws."

(DenTek Memorandum, p. 27.)    DenTek, however, fails to articulate the manner in which it contends Medtech's state law claims meet the requirements of preemption.  Notwithstanding, Medtech agrees that to the extent that either of these claims would cover the same subject matter and the same scope as does copyright law and patent law, with no additional elements for the state law claims, those portions of the state law claims directed to copyright and patent (but not trademark) may be preempted.

However, even if DenTek were to articulate a theory under which preemption would apply, both Counts (and their respective claims) cannot and should not be dismissed in their entirety for two reasons.  First, both Counts include allegations based on trademark law.  Trademark law is not an area of law over which the federal courts have exclusive jurisdiction.  *See Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp.2d 369, 375 n.3 (S.D.N.Y. 2000); *Foxrun Workshop, Ltd. v. Klone Manu., Inc.*, 686 F. Supp. 86, 87 n. 3 (S.D.N.Y. 1988).  DenTek has not argued that Medtech's trademark claim should be dismissed on the basis of preemption.

Second, the underlying purpose of the claims contained in Counts IV and V, as specifically stated in paragraphs 212 and 218 of the Second Amended Complaint that incorporates the facts and allegations throughout the Second Amended Complaint, is that DenTek has engaged in unfair competition through the misappropriation and use of Medtech's intellectual property and proprietary information, whether trade secrets, confidential information, trademarks, patents, copyright, business relationships, or contacts.  An unfair competition claim based upon breaches of confidential relationships, breaches of fiduciary duties, trade secrets, and trademark law is not preempted by the Copyright Act or federal patent law.  *Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 492 (federal patent law does not preempt state trade secret law that does not

offer "patent-like protection"); *Tracy v. Skate Key, Inc.*, 697 F. Supp. 748, 750 (S.D.N.Y. 1988) (Copyright Act does not preempt Lanham Act claim); *cf. Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1306 (Fed. Cir. 1999). Likewise, an unjust enrichment claim that has an element beyond the scope of copyright law or patent law is not preempted. *See Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004); *Univ. of Colorado Foundation, Inc. v. American Cyanamid Co.*, 342 F.3d 1298, 1307 (Fed. Cir. 2003).

Accordingly, to the extent that either of these Counts would cover the same subject matter and the same scope as does copyright law and patent law, with no additional elements for the state law claims, then those portions of the state law claims directed to copyright and patent (but not trademark) may be preempted. In addition, in order to clarify the relief that it seeks under Counts IV and V, Medtech intends to file a motion to amend the Second Amended Complaint to specifically address the facts and allegations that are more narrowly tailored to its non-copyright and non-patent infringement allegations in this context.

**H.     THE MOTIONS TO DISMISS FILED BY RAY DUANE AND C.D.S. ASSOCIATES, INC. SHOULD BE DENIED.**

Finally, since as Ray Duane's Motion to Dismiss raises arguments beyond the ones identified in Kaplan's and DenTek's Motions to Dismiss, those arguments raise issues of fact not appropriate for determination by means of a motion to dismiss. For example, Duane states that he "had NO WAY OF KNOWING about Medtech's Maintaining it's so called '*three-size platform*' strategy" and that he "NEVER attended a Marketing Meeting at Medtech; he NEVER attended a Sales Meeting at Medtech and indeed was NEVER even in the offices of Medtech during the "transition period." (Duane Motion to Dismiss, p. 2) (emphasis in original). It appears through these statements, and others contained in his Motion, that Duane is claiming that he was not privy to any of Medtech's trade secret information. These unsupported claims are

- 34 -

directly contradictory to the allegations contained in Medtech's Complaint, as discussed in Section III.B.3.a, *supra*.¶¶    Given that the "the court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of" Medtech, Duane's Motion to Dismiss must be denied.  *Starr v. Time Warner, Inc.*, 2007 WL 4144627 (S.D.N.Y. Nov. 21, 2007).

With regard to C.D.S. Associates, Inc.'s ("C.D.S. Associates") Motion to Dismiss, which was improperly filed by Ray Duane,[10] the argument that C.D.S. Associates, given its corporate status, is not liable for the allegations contained in Medtech's Second Amended Complaint is without merit.  Accordingly, the Motion to Dismiss filed by C.D.S. Associates should be denied.

## IV.    CONCLUSION

For all the foregoing reasons, Medtech requests that the Motions to Dismiss filed by Kelly Kaplan, DenTek Oral Care, Inc., Ray Duane, and C.D.S. Associates, Inc. be denied.

Dated: December 7, 2007.

New York, New York

Respectfully submitted,

ALSTON & BIRD LLP

By: _____
Karl Geercken (KG 5897)
Amy Manning (AM 0338)
90 Park Avenue
New York, New York 10016-1387
(212) 210-9471 (phone)
(212) 210-9444 (facsimile)

---

[10] Medtech is concurrently filing a Motion to Strike C.D.S. Associates, Inc.'s Motion to Dismiss on this ground.

karl.geercken@alston.com
amy.manning@alston.com

Todd R. David, GA BPR No. 206526
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
todd.david@alston.com

W. Edward Ramage, TN BPR No. 16261
BAKER, DONELSON, BEARMAN,
    CALDWELL & BERKOWITZ, P.C.
Commerce Center, Suite 1000
211 Commerce Street
Nashville, Tennessee  37201
(615) 726-5600
eramage@bakerdonelson.com

Micheline Kelly Johnson, TN BPR No. 13847
Clinton P. Sanko, TN BPR No. 23354
BAKER, DONELSON, BEARMAN,
    CALDWELL & BERKOWITZ, P.C.
1800 Republic Centre
633 Chestnut Street
Chattanooga, Tennessee  37450-1800
(423) 756-2010
mjohnson@bakerdonelson.com
csanko@bakerdonelson.com

*Attorneys for Plaintiff*
*Medtech Products Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing  MEDTECH PRODCUTS INC.'S RESPONSE TO DEFENDANTS DENTEK ORAL CARE, INC.'S, KELLY M. KAPLAN'S, RAY DUANE'S, AND C.D.S. ASSOCIATES, INC.'S MOTIONS TO DISMISS was served this 7th day of December by emailing and mailing a copy of the same in a postage-paid first-class envelope addressed as follows:


James Holman Shalek
Alan Federbush
Theodore Kevin Cheng
Proskauer Rose LLP
1585 Broadway
New York, NY 10036
jshalek@proskauer.com
afederbush@proskauer.com
tcheng@proskauer.com


Gregory James Sieczkiewicz
Proskauer Rose LLP
One International Place
Boston, MA 02110
gsieczkiewicz@proskauer.com


*Attorneys for Consolidated and Counter Claimant DenTek Oral Care, Inc.*


John Paul Fulco
Salon Marrow Dyckman Newman & Broudy LLP
292 Madison Avenue, 6th Floor
New York, New York 10017
jfulco@salonmarrow.com


*Attorneys for Consolidated Defendant Kelly M. Kaplan*

Raymond H. Duane
7741 Broadwing Drive
N. Las Vegas, NV 89084
cdsfix@aol.com

C.D.S. Associates, Inc.
7741 Broadwing Drive
N. Las Vegas, NV 89084
cdsfix@aol.com

*Consolidated Defendants*

Victoria Ford
_____
Victoria Ford